**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| STALLION OILFIELD SERVICES LTD., *et al.*,[1] | ) | Case No. 09-_____(___) |
|  | ) |  |
| Debtors. | ) | Joint Administration Requested |
|  | ) |  |

**DECLARATION OF JOHN R. CASTELLANO, CHIEF RESTRUCTURING**
**OFFICER OF STALLION OILFIELD SERVICES LTD., *ET AL.*, IN**
**SUPPORT OF STALLION'S CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, John R. Castellano, hereby declare under penalty of perjury:

1.     I am the Chief Restructuring Officer of Stallion Oilfield Services Ltd., a limited partnership organized under the laws of the State of Texas and one of the above-captioned debtors and debtors in possession (collectively, "<u>Stallion</u>").  In this capacity, I am familiar with Stallion's day-to-day operations, businesses, financial affairs, and books and records.

2.     On the date hereof (the "<u>Petition Date</u>"), Stallion Oilfield Services Ltd. and 17 of its affiliates each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  The Stallion entities continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently herewith, Stallion filed a motion seeking joint

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, include:  Stallion Oilfield Services Ltd. (2101); Central Industries, Inc. (3594); Salty's Disposal Wells, LP (0682); Salty's Manufacturing, Ltd. (0679); Stallion Acquisition, LLC (2495); Stallion Heavy Haulers, LP (3203); Stallion Interests, LLC (4416); Stallion Offshore Quarters, Inc. (7410); Stallion Oilfield Construction, LLC (1600); Stallion Oilfield Finance Corp. (7114); Stallion Oilfield Holdings GP, LLC (7889); Stallion Oilfield Holdings, Ltd. (7890); Stallion Oilfield Services, Inc. (8455); Stallion Production Services, LP (2038); Stallion Production, LLC (2040); Stallion Rockies Ltd. (9473); Stallion Solids Control, Inc. (4425); and Stallion Stables, LLC (7522).  The location of Stallion's corporate headquarters and the service address for its affiliates is:  950 Corbindale Road, Suite 300, Houston, Texas 77024.

administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.      I submit this declaration (this "First Day Declaration") to provide an overview of Stallion and these chapter 11 cases and to support Stallion's chapter 11 petitions and "first day" motions (each, a "First Day Motion," and collectively, the "First Day Motions").  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of Stallion's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of Stallion's management and Stallion's advisors, or my opinion based on my experience, knowledge, and information concerning Stallion's operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of Stallion, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

<u>**Preliminary Statement**</u>

4.      As discussed in further detail below, due to the state of the capital markets and the oil and natural gas industry, it became necessary for Stallion to effectuate a balance-sheet restructuring.  As such, Stallion engaged in extensive good faith, arm's-length negotiations with its major creditor constituents and, ultimately, reached a deal with its key economic stakeholders on the terms of a prearranged chapter 11 restructuring.  Stallion filed these chapter 11 cases to effectuate that deal.

5.      Stallion is a leading provider of oilfield services in the United States.  Since its inception in December 2002, Stallion has been, and continues to be, committed to strategic growth.  In connection therewith, in January 2007, Stallion issued $300 million in senior notes in a private offering to certain qualified institutional investors to fund certain acquisitions and internal organic growth.  In addition, in August 2007, Stallion obtained an unsecured bridge loan

2

to fund certain additional acquisitions. From 2007 until the summer of 2008, Stallion and its advisors worked on a registration statement on Form S-1 and several amendments thereto relating to Stallion's proposed initial public offering of equity. Stallion planned to use the proceeds from the initial public offering to pay off the bridge loan previously discussed. By August 2008, Stallion believed that it would be in a position to launch its initial public offering during the fourth quarter of 2008, subject to formal approval of the registration statement by the Securities and Exchange Commission. As now is well-documented, however, the capital markets collapsed in September 2008, and Stallion was forced to abandon its initial public offering.

6. In addition, over the last year the U.S. oil and natural gas services industry has experienced its worst downturn in more than 15 years. The number of land-based drilling rigs—a key indicator of the health of Stallion's industry—has dropped precipitously from approximately 1,950 in September 2008 to less than 850 by June 2009. Moreover, technological advancements in the industry have resulted in increased drilling efficiencies, causing natural gas supply levels to increase despite the reduced rig count. The reduction in drilling rigs, paired with the increased natural gas supply, has resulted in a significant decrease in the demand for oilfield services.

7. In light of industry conditions and lack of access to the capital markets, Stallion shifted its focus to streamlining its operations. Over the last several months, Stallion successfully completed various operational restructurings throughout its organization, including a reduction in Stallion's workforce of approximately 40%. Nonetheless, in light of current and expected market conditions—especially in light of the additional debt Stallion incurred in connection with the consummation of certain significant acquisitions and the subsequent collapse

of the capital markets—Stallion must de-lever its balance sheet. In connection therewith, Stallion has engaged in discussions with its key stakeholders, which have resulted in a negotiated consensual balance sheet restructuring. The agreement reached amongst the parties contemplates a significant deleveraging of Stallion's balance sheet and a full recovery for holders of Allowed General Unsecured Claims (as defined in the Plan). Stallion agreed to implement this balance sheet restructuring through a prearranged chapter 11 plan of reorganization (the "Plan").

8. Accordingly, Stallion commenced these chapter 11 cases to effectuate the consensual debt restructuring proposed under the prearranged Plan—the final step in Stallion's overall restructuring efforts—to enhance liquidity, reduce leverage, and improve long-term growth prospects and operating performance. Contemporaneously herewith, Stallion has filed the Plan and accompanying disclosure statement (the "Disclosure Statement"). Importantly, because Stallion already has a deal negotiated with its primary stakeholders, Stallion expects these chapter 11 cases to move swiftly, which will reduce, to the extent practicable, any adverse effects of the bankruptcy filing on its businesses. Moreover, by deleveraging its capital structure through a prearranged bankruptcy, Stallion intends to emerge from chapter 11 better situated to weather the current economic storm and well-positioned to take advantage of the recovery in the oil and natural gas industry, which experts expect could begin later this year and could last throughout 2010.

9. To familiarize the Court with Stallion and the relief it will seek on the first day of these chapter 11 cases, this First Day Declaration is organized as follows: Part I describes Stallion's corporate history, business operations, and prepetition organizational and capital structure. Part II describes the events leading to the commencement of these chapter 11 cases. Finally, part III sets forth the relevant facts in support of each First Day Motion.

K&E 15763060.1

I. **Stallion's Corporate History, Business Operations, and Organizational and Prepetition Capital Structure.**

A. **Corporate History.**

10.     Stallion Oilfield Services Ltd. is a privately held partnership formed in December 2002. Since its formation, Stallion has focused on strategic growth, completing more than 37 acquisitions. Founded by Mr. Craig M. Johnson, Stallion quickly has become a leading provider of comprehensive wellsite support services and production and logistics services to exploration and production companies and drilling companies throughout the United States. Stallion's ***Everything but the Rig***™ service offerings are designed to improve living and working conditions at the wellsite, wellsite safety, and its customers' drilling and production operations.

11.     In April 2007, Stallion filed documents with the Securities and Exchange Commission in preparation for a proposed initial public offering of Stallion's equity. Stallion planned to use the proceeds from the initial public offering to repay the Bridge Loan Obligations (as defined herein). As noted below, however, Stallion withdrew the proposed initial public offering in January 2009.

B. **Stallion's Business Operations.**

12.     Stallion's principal executive offices are located in Houston, Texas. Stallion employs approximately 1,700 people throughout its 65 field offices in the United States. Stallion provides a broad and comprehensive range of critical services to support wellsite operations, including onshore and offshore workforce accommodations, water and sewer systems, communications services, IT networks, surface equipment rental, solids control, fluid transportation, disposal and storage, production services, wellsite construction, heavy equipment hauling to and from the wellsite, and wellsite relocation services. Stallion's business operations

5

are comprised of two business segments: the Wellsite Support Services segment and the Production & Logistics Services segment. Stallion's Wellsite Support Services segment provides integral wellsite support operations services to oil and natural gas companies, drilling contractors, and other wellsite service providers. Stallion's Production & Logistics Services segment provides services critical to establish, maintain, and decommission a wellsite location and position key equipment prior to, during, and after drilling operations.

13.     Stallion currently focuses on oil and natural gas regions within North America that it believes provide attractive long-term potential for growth, including: South Texas; the Gulf Coast; ArkLaTex; the Fort Worth Basin; the Permian Basin; the Mid-Continent; the Marcellus Shale in the Appalachian Basin; the Rocky Mountain regions; and Prudhoe Bay, Alaska. Stallion also supplies offshore workforce accommodations and related equipment for use in the Gulf of Mexico and, to a lesser extent, other international offshore regions. Stallion maintains long-standing customer relations with leading players in the oil and natural gas industry. Indeed, Stallion provides services to a diversified group of more than 3,300 customers.

14.     Stallion's services span the entire life-cycle of the land-based wellsite—wellsite preparation, rig deployment, drilling activities, production activities, and decommissioning of the wellsite. Stallion assists in the initial preparation of the wellsite and often hauls the rig and related heavy equipment onto the wellsite using its fleet of tractor trucks, trailers, pole trucks, and cranes. Throughout the drilling and completion phases of the land-based well, Stallion provides rental equipment and required support services to the wellsite, including workforce accommodations and integrated wireless communications services through Stallion's StaRComm satellite system. In some cases, Stallion also provides continuing support services during the production phase of the well, including the construction of production facilities and well

6

connections to existing pipeline infrastructure, water hauling logistics, and saltwater disposal. Finally, Stallion performs production facility disassembly and wellsite restoration, which are the last phases of the wellsite decommissioning process. As part of this process, Stallion is often contracted to transport the drilling rig and other heavy equipment to a new wellsite following the decommission of the old wellsite. In addition, Stallion's offshore workforce accommodations business serves its offshore customers during many phases of the offshore drilling and production life-cycle.

### C. Stallion's Prepetition Organizational Structure.

15. The following chart generally depicts Stallion's prepetition organizational structure:



**D. Stallion's Prepetition Capital Structure.**

16. As of the Petition Date, Stallion had total consolidated funded debt of approximately $755.1 million, including $240.1 million in secured bank debt, $250 million in unsecured bridge loan debt, and $265 million in principal amount of 9.750% unsecured notes. These amounts exclude accrued interest and fees outstanding through the Petition Date as well as open but undrawn letters of credit and hedging obligations.

**1. Senior Credit Agreement.**

17. Stallion Oilfield Services Ltd., as borrower, and certain of its affiliates, as guarantors, UBS AG, Stamford Branch, as administrative agent (the "Senior Secured Agent"), and the lenders party thereto (together with the Senior Secured Agent, the "Senior Lenders") are parties to that certain Third Amended and Restated Credit Agreement, as further amended (the "Senior Secured Credit Agreement"), dated as of June 12, 2007. The Senior Secured Credit Agreement provides for a $175 million revolving credit facility (the "Senior Revolving Facility"), of which $166.8 million remains outstanding (excluding $5.2 million of unfunded letters of credit obligations) and a $75 million term loan (the "Senior Term Loan"), of which $73.3 million remains outstanding (collectively, the "Senior Secured Credit Agreement Obligations"). The Senior Revolving Facility and the Senior Term Loan mature on March 1, 2011, and June 12, 2013, respectively. Apart from Stallion Oilfield Services Ltd. (which serves as borrower), Stallion Oilfield Holdings GP, LLC, Stallion Oilfield Services, Inc., and Stallion Oilfield Finance Corp., each of the domestic Stallion entities guarantees the Senior Secured Credit Agreement Obligations.

18. Stallion Oilfield Services Ltd., as borrower, certain of its affiliates, as guarantors, and UBS AG, Stamford Branch, as collateral agent for the Senior Lenders (the "Security Agreement Collateral Agent") are parties to that certain Security Agreement, as amended (the

K&E 15763060.1

"Security Agreement"), dated as of March 1, 2006. Under the Security Agreement, Stallion provided the Security Agreement Collateral Agent with a security interest in substantially all of its assets. Stallion utilizes the Secured Term Loan to finance its day-to-day operations and for other general corporate purposes.

### 2. Unsecured Bridge Loan.

19. Stallion Oilfield Services Ltd., as borrower, and certain of its affiliates, as guarantors, Wilmington Trust FSB, as administrative agent (the "Bridge Agent"), and the lenders party thereto (together with the Bridge Agent, the "Bridge Lenders") are parties to that certain Credit Agreement (the "Bridge Loan Agreement"), dated as of August 1, 2007, entered into in connection with the acquisition of certain businesses. The Bridge Loan Agreement provides for a $250 million bridge loan, all of which remains outstanding as of the Petition Date (the "Bridge Loan Obligations"). The Bridge Loan Obligations mature on August 1, 2012. Stallion intended to repay the Bridge Loan Obligations using the proceeds of the initial public offering. Apart from Stallion Oilfield Services Ltd. (which serves as borrower), Stallion Oilfield Holdings GP, LLC, Stallion Oilfield Services, Inc., Stallion Oilfield Finance Corp., and Stallion Stables, LLC, each of the domestic Stallion entities guarantee the Bridge Loan Obligations.

### 3. 9.750% Unsecured Notes Due 2015.

20. Stallion Oilfield Services Ltd. and Stallion Oilfield Finance Corp., as issuers, certain of their affiliates, as guarantors, and The Bank of New York Trust Company, N.A., as indenture trustee, are parties to that certain Indenture, as supplemented by a Supplemental Indenture (the "Notes Indenture" and, together with the Senior Secured Credit Agreement and the Bridge Loan Agreement, the "Debt Instruments"), dated as of January 24, 2007. Under the Notes Indenture, Stallion Oilfield Services Ltd. and Stallion Oilfield Finance Corp. issued a total of approximately $300 million in 9.750% Unsecured Notes due 2015 (the "Notes," and, together

with the Bridge Loan Obligations, the "<u>Unsecured Funded Debt</u>") to holders (the "<u>Noteholders</u>," together with the Bridge Lenders, the "<u>Unsecured Funded Debt Lenders</u>," and, collectively, with the Senior Lenders, the "<u>Lenders</u>"). In October 2008, Stallion repurchased in the open market and retired $35 million in Notes. As of the Petition Date, $265 million in Notes remain outstanding. Apart from Stallion Oilfield Services Ltd. and Stallion Oilfield Finance Corp. (who serve as issuers), Stallion Oilfield Holdings GP, LLC, Stallion Oilfield Holdings, Ltd., Stallion Interests, LLC, Stallion Stables, LLC, and Stallion Oilfield Services, Inc., each of the domestic Stallion entities guarantees the Notes.

### 4. Hedging Agreements.

21. Stallion Oilfield Services Ltd. entered into certain hedging agreements with Credit Suisse International in connection with certain of the Debt Instruments. Specifically, Stallion hedged $250 million of the Bridge Loan Obligations pursuant to a confirmation dated March 4, 2008, which is scheduled to terminate on August 7, 2010 (the "<u>Bridge Swap</u>"). In addition, Stallion hedged $70 million of Senior Term Loan obligations pursuant to a confirmation dated October 31, 2008, which is scheduled to terminate on August 7, 2010 (the "<u>Senior Term Swap</u>"). Finally, Stallion hedged $100 million of Senior Revolving Facility obligations pursuant to a confirmation dated December 4, 2008, which is scheduled to terminate on December 31, 2009 (the "<u>Senior Revolver Swap</u>," and, together with the Bridge Swap and the Senior Term Swap, the "<u>Swap Agreements</u>"). On December 4, 2008, the Swap Parties entered into that certain Master Agreement, which governs the Swap Agreements. Obligations under the Swap Agreements are secured pursuant to the Senior Secured Credit Agreement.

### 5. Interests in Stallion.

22. As shown in the corporate organizational chart above, Stallion Oilfield Holdings GP, LLC and Stallion Oilfield Holdings, Ltd. are Stallion's top-level entities. As of the Petition

K&E 15763060.1

Date, the holders of the existing membership interests of Stallion Oilfield Holdings GP, LLC include C/R Stallion GP, LLC (50%) and Cardigan Holdings, Inc. (50%) (together, the "Holdings GP, LLC Equity Interests").  As of the Petition Date, the holders of the existing partnership interests of Stallion Oilfield Holdings, Ltd. include C/R Stallion GP, LLC (62.53%), C/R Energy Coinvestment II, L.P. (5.84%), Laminar Direct Capital, L.P. (1.64%), Cardigan Holdings, Inc. (15.44%), C/R Laminar Coinvestment L.P. (1.57%), Stallion Value, LP (6.83%), and PPHB, LP (0.44%) (collectively, the "Holdings, Ltd. Equity Interests," and, together with the Holdings GP, LLC Equity Interests, the "Stallion Equity Interests").[2]

## II.     Events Leading to these Chapter 11 Cases.

23.     As discussed above, Stallion has approximately $755.1 million of indebtedness. A series of unforeseen events placed significant strain on Stallion's ability to comply with certain of its financial covenants contained in the Senior Secured Credit Agreement and the Bridge Loan Agreement and ultimately led to Stallion's filing of these chapter 11 cases.  Those events include (A) the unprecedented downturn in the United States oil and natural gas industry, (B) the collapse of the capital markets, (C) the resulting deterioration in Stallion's financial performance, (D) Stallion's unsuccessful out-of-court restructuring efforts, (E) defaults under the Debt Instruments, and (F) Stallion's successful negotiations with the Lenders in connection with the prearranged Plan.

### A.     The Downturn in the United States Oil and Natural Gas Industries.

24.     Since June 2008, the United States oil and natural gas industry experienced an unprecedented decline.  Natural gas prices have plummeted nearly 75% during the period from

---

[2]     In addition, certain individuals hold *de minimus* partnership interests in Stallion Oilfield Holdings, Ltd. that aggregate to approximately 5.70%.

K&E 15763060.1

June 2008, when natural gas was over $13/MMBTU, to just over $3/MMBTU in August 2009. With almost 70% of domestic drilling rigs aimed at natural gas reserves, the impact was substantial. Indeed, total average domestic rig count decreased over 55% during the period from nearly 1,950 in September 2008 to less than 850 in June 2009.



25.     Moreover, as noted above, despite the reduced rig count, technological advances in natural gas drilling practices caused domestic natural gas supplies to increase, further reducing natural gas prices and compounding the problem.

**B.     The Collapse of the U.S. Credit Markets.**

26.     The substantial deterioration in the oil and gas markets was followed by the rapid softening of the economy and tightening of the U.S. financial markets in the second half of 2008, which resulted in the effective collapse of the U.S. credit markets. In the face of such market conditions, Stallion withdrew its application for an initial public offering in January 2009. As has been widely reported, the U.S. financial markets did not show much sign of improvement through the first three quarters of 2009.

### C. The Deterioration of Stallion's Financial Performance.

27.     The adverse market conditions have taken a toll on Stallion's financial position over the last year.  With fewer rigs to service, market competition in the oilfield services industry has intensified as Stallion and its competitors seek to provide services to the remaining drill sites. This increased competition has led to competitive price reductions and further erosion in profit margins.

28.     In 2008, Stallion's service revenue totaled $607.4 million.  Through June 30, 2009, Stallion has amassed service revenue of only $181.1 million, down from $288.3 million during the same six month period in 2008—a drop of 37.2%.  Moreover, Stallion's adjusted EBITDA for the six months ending June 30, 2009, was only $37.3 million, down from $74.0 million during the same six month period in 2008—a drop of 49.5%.

### D. Stallion's Out-of-Court Restructuring Initiatives.

29.     In response to the downturn in the oil and natural gas industry and Stallion's depressed financials, Stallion embarked on a comprehensive operational restructuring to right-size its service portfolio and workforce.  These efforts included a bottom-up analysis of Stallion's entire enterprise and, ultimately, resulted in the implementation of a number of operational and strategic initiatives aimed at maximizing supply chain and production efficiencies and eliminating unused capacities to increase cash flow and reduce costs.

30.     Stallion also has effectuated significant changes to its workforce over the last year to deal with the depressed industry environment.  Since October 2008, Stallion has initiated workforce reductions on all levels.  As a result, Stallion's current workforce is approximately 40% smaller than its fourth quarter 2008 levels.  Stallion also has taken additional employee-related measures, including reducing its discretionary spending allowance to curtail its capital, operational, and SG&A expenditures, scaling back certain workforce benefits previously

provided, such as suspension of its 401(k) matching program, and reducing certain workers compensation and property/casualty insurance costs by nearly 40% within the last year.

31.    Experts predict a recovery could begin to occur as soon as the fourth quarter of 2009 and could last through 2010.  Early in 2009, analysts were estimating a significant further decline in rig counts through the third quarter of 2009.  However, actual rig counts have been increasing slightly since June 2009, indicating the market has somewhat stabilized in the short term.



32.     U.S. drilling permit data, which traditionally has served as an accurate two-month leading indicator of rig count fluctuations, supports this current trend where rig count levels should remain stable, albeit at significantly reduced levels from the fourth quarter of 2008. Though permits have substantially declined, the level of permit use appears to have stabilized similar to rig count.



33.     Initially, Stallion believed that an operational restructuring alone could suffice to capitalize on the predicted industry recovery.    Despite Stallion's successful operational restructuring efforts over the past year, Stallion since has realized that a corresponding balance sheet restructuring also is necessary

34.     Over the course of the last six months, Stallion has been engaged in extensive discussions with the Lenders regarding the terms of a consensual out-of-court restructuring. Notwithstanding its best efforts, however, Stallion was unable to obtain sufficient Lender support to effectuate an out-of-court restructuring.    As a result, Stallion shifted its efforts towards accomplishing a reorganization through a consensual chapter 11 plan.

15

### E. Stallion Defaults Under the Debt Instruments.

35.     As Stallion continued to engage in discussions with the Lenders, the depressed state of the oil and natural gas industry caused Stallion's financial performance to continue to deteriorate.  Stallion's deteriorating financial performance impaired its ability to comply with certain financial covenants in the Senior Secured Credit Agreement and the Bridge Loan Agreement and, ultimately, Stallion defaulted under certain covenants in the Debt Instruments.

#### 1. Stallion Obtains a Waiver Under the Bridge Loan Agreement.

36.     The Bridge Loan Agreement required Stallion to meet certain financial covenants, including a maximum total leverage ratio covenant.  Specifically, the Bridge Loan Agreement requires that Stallion maintain a total debt to EBITDA ratio, as of June 30, 2009, that does not exceed 4.25x.  As June 30, 2009, approached, however, Stallion determined that it likely would exceed this allowed leverage ratio.  As such, Stallion engaged the Bridge Administrative Agent in discussions for a waiver of compliance with the financial covenant.  Ultimately, Stallion obtained such a waiver to be effective June 29, 2009 with respect to the compliance period ending June 30, 2009.

#### 2. Stallion Defaults Under the Unsecured Funded Debt.

37.     Recognizing the need for maximum liquidity while Stallion continued to negotiate a prearranged restructuring with the Lenders, Stallion elected not to make two interest payments due under the Unsecured Funded Debt—an interest payment due August 1, 2009 and payable August 3, 2009 under the Notes Indenture and an interest payment due and payable August 7, 2009 under the Bridge Loan Agreement (together, the "Interest Payment Defaults").  Both the Notes Indenture and the Bridge Loan Agreement provided for a 30-day grace period before Stallion's failure to make the payments constituted an actionable event of default.  During that time, Stallion negotiated with counsel to an informal committee of Unsecured Funded Debt

16

Lenders (the "Informal Funded Debt Committee"), which represented the requisite amount of Noteholders and Bridge Lenders needed to obtain a forbearance under the Unsecured Funded Debt.

38.     On September 2, 2009, Stallion entered into two forbearance agreements—one with the requisite amount of Noteholders and the second with the requisite amount of Bridge Lenders—pursuant to which certain Unsecured Funded Debt Lenders agreed to forbear from exercising remedies on account of, among other things, the Interest Payment Defaults (collectively, the "Unsecured Funded Debt Defaults"), through September 30, 2009.

### 3.     Stallion Defaults Under the Senior Credit Agreement.

39.     The Unsecured Funded Debt Defaults triggered a cross-default under the Senior Credit Agreement (the "Senior Credit Agreement Defaults"), entitling the Senior Lenders to exercise remedies under the Senior Credit Agreement.

40.     Stallion engaged in discussions with the Senior Secured Agent to obtain a similar forbearance period as that reached with certain of the Noteholders and Bridge Lenders. Ultimately, Stallion was able to secure a forbearance with the Senior Lenders through September 30, 2009.  Stallion also engaged in discussions with and received a forbearance through September 30, 2009, from Credit Suisse International in connection with the Swap Agreements.

### F.     Stallion Negotiates a Prearranged Chapter 11 Plan.

41.     After good-faith, arm's-length negotiations, Stallion reached an agreement with the Lenders with respect to a consensual restructuring on the terms set forth in the Restructuring

K&E 15763060.1

Term Sheet (the "Term Sheet"), and formalized by the Restructuring and Lock-Up Agreement (the "Restructuring and Lock-Up Agreement"), dated October 17, 2009.[3]

42.     Stallion received an executed Restructuring and Lock-Up Agreement from holders of more than (i) 90% of the Senior Secured Credit Agreement Obligations, (ii) 74% of the Bridge Loan Obligations, (iii) 88% of the outstanding Notes, and (iv) 68% of the Stallion Equity Interests.

### G.     Stallion Commences These Chapter 11 Cases.

43.     Stallion filed these chapter 11 cases to effectuate the terms of the Restructuring and Lock-Up Agreement.  Based on the Restructuring and Lock-Up Agreement, Stallion is prepared to seek confirmation of the Plan shortly after the filing of these chapter 11 cases. Indeed, because the Plan is based on a consensual deal with Stallion's key stakeholders and contemplates a significant de-leveraging of Stallion's balance sheet and a full recovery for holders of General Unsecured Claims (as defined in the Plan), confirmation of the Plan is expected to occur over a relatively short timeframe.  Specifically, Stallion and the Lenders have agreed that the Disclosure Statement must be filed within 10 days of the Petition Date, the Disclosure Statement and accompanying solicitation materials must be approved and a hearing to confirm the Plan must be scheduled, within 40 days after the filing of the Plan, the Plan must be confirmed within 60 days of the date on which the Disclosure Statement is approved (subject to a 15-day extension under certain circumstances), and the Plan must become effective within 25 days of the confirmation date (subject to a 15-day extension under certain circumstances).

---

[3]     A copy of the Restructuring and Lock-Up Agreement is attached hereto as **Exhibit A** (including the Term Sheet, which is attached as **Exhibit 1** thereto) and incorporated by reference as though fully set forth herein. Due to confidentiality concerns, Stallion has redacted the signature pages of the Bridge Lenders, Noteholders, Senior Lenders, and holders of Existing Equity Interests.

### III. Evidentiary Support for First Day Motions.

44.     As discussed above, Stallion has entered into the chapter 11 process with the goal of implementing a simple balance sheet restructuring with minimal disruption to its operations. To that end, concurrently with the filing of its chapter 11 petitions, Stallion has filed a number of First Day Motions seeking relief that Stallion believes is necessary to enable it to operate with minimal disruption and loss of productivity. Stallion requests that the relief requested in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating Stallion's operations during the pendency of these chapter 11 cases. I have reviewed each of the First Day Motions discussed below and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.[4]

### A. Motion of Stallion Oilfield Services Ltd., *et al.*, for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases (the "<u>Joint Administration Motion</u>").

45.     Stallion requests entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b). Specifically, Stallion requests that the Court maintain one file and one docket for all of these chapter 11 cases under the case of Stallion Oilfield Services Ltd. and also requests that an entry be made on the docket of each of Stallion's chapter 11 cases, other than Stallion Oilfield Services Ltd., to reflect the joint administration of these chapter 11 cases.

46.     Given the integrated nature of Stallion's operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the

---

[4] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the relevant First Day Motion.

substantive rights of any party in interest. Many of the motions, hearings, and orders that will arise in these chapter 11 cases will jointly affect Stallion Oilfield Services Ltd. and each of its affiliates that also have filed chapter 11 cases. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

47.     I believe that the relief requested in the Joint Administration Motion is in the best interests of Stallion's estates, its creditors, and all other parties in interest, and will enable Stallion to continue to operate its businesses in chapter 11 without disruption. Accordingly, on behalf of Stallion, I respectfully submit that the Joint Administration Motion should be approved.

**B.      Motion of Stallion Oilfield Services Ltd., _et al._, for Entry of an Order Authorizing Stallion to (a) Continue Using Its Existing Cash Management System, Bank Accounts, and Business Forms; (b) Maintain Existing Investment Practices; and (c) Continue Performing Ordinary Course Intercompany Transactions (the "Cash Management Motion").**

48.     Stallion requests the authority to:  (a) continue to use, with the same account numbers, all of the Bank Accounts in its Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of Stallion as debtors in possession; (c) open new debtor in possession accounts, if needed; (d) use, in their present form, all correspondence and business forms (including, without limitation, letterhead, purchase orders, and invoices) and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to their status as debtors in possession; (e) maintain its existing Investment Practices; and (vi) continue performing Intercompany Transactions in the ordinary course of business.

49.     In addition, Stallion further requests that the Court authorize the Banks to: (a) continue to maintain, service, and administer the Bank Accounts and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks drawn on the Bank

Accounts that are presented for payment at the Banks or exchanged for cashier's checks prior to the Petition Date; (ii) checks or other items deposited in the Bank Accounts prior to the Petition Date that have been dishonored or returned unpaid for any reason (including associated fees and costs), to the same extent Stallion was responsible for such items prior to the Petition Date; and (iii) undisputed, outstanding service charges owed to the Banks as of the Petition Date on account of the maintenance of Stallion's Cash Management System, if any.

50.     In the ordinary course of business, Stallion utilizes an integrated cash management system to collect, transfer, and disburse funds generated by its operations and maintains current and accurate accounting records of all daily cash transactions. If Stallion was required to comply with the U.S. Trustee Guidelines, the burden of opening new accounts, revising cash management procedures, instructing customers to redirect payments, and the immediate ordering of new checks with a "Debtor in Possession" legend, would disrupt Stallion's business at this critical time. Stallion respectfully submits that parties in interest will not be harmed by its maintenance of the existing Cash Management System, including its Bank Accounts, because Stallion has implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

51.     Stallion also adheres to certain Investment Practices, which Stallion believes will provide the protection contemplated by section 345(b) of the Bankruptcy Code, while providing additional interest income. Therefore, Stallion seeks a waiver of strict compliance with the requirements of section 345(b) of the Bankruptcy Code.

52.     In addition, in the ordinary course of business, Stallion maintains a large and complex system of Intercompany Transactions for, among other reasons, facilitating

intercompany sales, centralizing accounting and purchasing departments, and moving cash between entities. If the Intercompany Transactions are discontinued, a number of services provided by and to Stallion would be disrupted and could affect Stallion's ability to pay wages and benefits to its employees and make timely payments to vendors.

53. The relief requested in the Cash Management Motion is vital to ensuring Stallion's seamless transition into bankruptcy. Authorizing Stallion to maintain its Cash Management System will avoid many of the possible disruptions and distractions that could divert its attention from more critical matters during the initial days of these chapter 11 cases.

54. I believe that the relief requested in the Cash Management Motion is in the best interests of Stallion's estates, its creditors, and all other parties in interest, and will enable Stallion to continue to operate its businesses in chapter 11 without disruption. Accordingly, on behalf of Stallion, I respectfully submit that the Cash Management Motion should be approved.

**C.      Motion of Stallion Oilfield Services Ltd., *et al.*, for Entry of Interim and Final Orders (a) Authorizing the Use of Cash Collateral, (b) Granting Adequate Protection to Prepetition Secured Parties, and (c) Scheduling a Final Hearing (the "<u>Cash Collateral Motion</u>").**

55. Stallion requests entry of interim and final orders: (a) authorizing Stallion to use cash collateral pursuant to sections 361 and 363 of the Bankruptcy Code; (b) approving the form of adequate protection provided to the Lenders pursuant to sections 361(a) and 363(c) of the Bankruptcy Code; (c) scheduling the final hearing on the Motion to consider entry of the Final Cash Collateral Order authorizing and granting the relief requested in the Motion; and (d) granting related relief and such other and further relief as the Court deems just and proper.

56. Stallion believes that the proposed adequate protection for the Senior Lenders is necessary and appropriate to ensure that Stallion can continue to use the Cash Collateral. Accordingly, the proposed adequate protection is fair and reasonable and sufficient to satisfy the

requirements of sections 363(c)(2) and (e) of the Bankruptcy Code. Without use of the Cash Collateral, Stallion will have little or no cash to pay trade creditors and, therefore, Stallion's trade creditors may cease to provide goods and services to Stallion on credit, and Stallion will not be able to pay its payroll and other direct operating expenses or obtain goods and services needed to run its businesses and meet customer demands in a manner that will avoid immediate and irreparable harm to Stallion's estates. Stallion's ability to finance its operations and the availability to Stallion of sufficient working capital and liquidity through the use of cash collateral is vital to the confidence of Stallion's employees, major suppliers, and to the preservation and maintenance of the going-concern values and other values of Stallion's estates. Moreover, the Senior Lenders have consented to the use of the Cash Collateral on the terms described in the Cash Collateral Motion.

57. I believe that the relief requested in the Cash Collateral Motion is in the best interests of Stallion's estates, its creditors, and all other parties in interest, and will enable Stallion to continue to operate its businesses in chapter 11 without disruption. Accordingly, on behalf of Stallion, I respectfully submit that the Cash Collateral Motion should be approved.

**D. Motion of Stallion Oilfield Services Ltd., *et al.*, for Entry of an Order Authorizing Stallion to Pay Prepetition (a) Wages, Salaries, and Other Compensation; (b) Reimbursable Employee Expenses; and (c) Employee Medical and Similar Benefits (the "<u>Wages and Benefits Motion</u>").**

58. Stallion requests the authority, in its sole discretion, to pay prepetition claims, honor obligations, and to continue programs, in the ordinary course of business and consistent with past practices, relating to the Employee Obligations. In addition, Stallion seeks a waiver of the automatic stay under section 362 of the Bankruptcy Code as it applies to workers' compensation claims.

59.     As of the Petition Date, Stallion employs approximately 1,700 employees, of which approximately 1,400 are paid on an hourly basis.  Although Stallion is current with respect to its wage, salary, and other employee-related obligations as of the Petition Date, as of the date hereof, certain prepetition Employee Obligations nevertheless will become due and owing postpetition.

60.     The majority of Stallion's Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses.  Consequently, these Employees will be exposed to significant financial difficulties if Stallion is not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses.  Moreover, if Stallion is unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical to Stallion.  In the absence of such payments, Stallion believes its Employees may seek alternative employment opportunities, perhaps with Stallion's competitors, thereby hindering Stallion's ability to meet its customer obligations, and likely diminish creditors' confidence in Stallion.  Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when Stallion should be focusing on stabilizing its operations.

61.     In addition, Stallion seeks authorization, under section 362(d) of the Bankruptcy Code, to permit the Employees to proceed with their workers' compensation claims in the appropriate judicial or administrative forum.  Stallion believes that cause exists to modify the Automatic Stay because staying the workers compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture.

K&E 15763060.1

62.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of Stallion's estates, its creditors, and all other parties in interest, and will enable Stallion to continue to operate its businesses in chapter 11 without disruption.  Accordingly, on behalf of Stallion, I respectfully submit that the Wages and Benefits Motion should be approved.

**E.     Motion of Stallion Oilfield Services Ltd., *et al.*, for Entry of Interim and Final Orders Authorizing, but not Directing, Stallion to Pay Prepetition Claims of General Unsecured Creditors in the Ordinary Course of Business (the "<u>Accounts Payable Motion</u>").**

63.     Stallion requests the entry of interim and final orders authorizing it to pay the Accounts Payable Claims in the ordinary course of business in an amount not to exceed $8.0 million on an interim basis and $11.0 million on a final basis.

64.     In the ordinary course of business, Stallion incurs obligations to trade creditors and other unsecured creditors that provide, among other things, raw materials, equipment, consulting, logistics, shipping services, and various other goods and services that are necessary for the continued operation of its businesses.

65.     I believe and have been advised that the maintenance of Stallion's relationships with the holders of the Accounts Payable Claims is essential to maximizing the value of Stallion's estates.  Stallion's industry is in a significant downturn.  As a result of the deterioration of the oil and natural gas industry, many suppliers and service providers have become reluctant to continue doing business with, or extending credit to, customers who operate in the industry.  If the holders of the Accounts Payable Claims refuse to transact with Stallion or limit credit or other trade terms—as such suppliers and service providers have done to other firms in Stallion's industry—the operations and continued viability of Stallion's business will be jeopardized.

66.     Further, Stallion has been able to negotiate and reach an agreement with the constituent groups that hold virtually all of the economic interests in Stallion that contemplates

continued payment of Accounts Payable Claim in the ordinary course of business. All Accounts Payable Claims are unimpaired under the proposed Plan. The relief requested in the Accounts Payable Motion merely expedites the treatment and distribution to the Unsecured Creditors that hold Accounts Payable Claims that would otherwise be made at a later date under the proposed Plan.

67.     I believe that the relief requested in the Accounts Payable Motion is in the best interests of Stallion's estates, its creditors, and all other parties in interest, and will enable Stallion to continue to operate its businesses in chapter 11 without disruption. Accordingly, on behalf of Stallion, I respectfully submit that the Accounts Payable Motion should be approved.

**F.**     **Motion of Stallion Oilfield Services Ltd.,** *et al.,* **for an Order Authorizing Stallion to (a) Continue Insurance Coverage Entered into Prepetition, (b) Maintain Postpetition Financing of Insurance Premiums, and (c) Enter into New Postpetition Financing Arrangements of Insurance Premiums (the "<u>Insurance Motion</u>").**

68.     Stallion requests authority to continue insurance coverage currently in effect and pay any prepetition amounts related thereto, including prepetition deductibles and self-insured retentions and payments under two premium financing agreements. Stallion also seeks authority to renew or enter into new premium financing agreements to the extent that Stallion determines in its discretion that such financing is necessary or appropriate.

69.     Stallion's insurance policies are essential to the preservation of the value of Stallion's business, properties, and assets. In many cases, insurance coverage such as that provided by the Policies is required by the diverse regulations, laws, and contracts that govern Stallion's commercial activities. By financing the premiums of certain of its insurance policies and broker's fees pursuant to secured premium financing agreements, Stallion is able to spread out those premiums and fees over the applicable coverage periods and better manage its cash flow. Generally, lenders are unwilling to finance insurance premiums on an unsecured basis.

26

Here, the PFAs provide financing at an interest rate that is considerably less than Stallion's other financing sources.

70.     I believe that the relief requested in the Insurance Motion is in the best interests of Stallion's estates, its creditors, and all other parties in interest, and will enable Stallion to continue to operate its businesses in chapter 11 without disruption.  Accordingly, on behalf of Stallion, I respectfully submit that the Insurance Motion should be approved.

G.      **Motion of Stallion Oilfield Services Ltd.,** *et al.,* **for Entry of an Order Authorizing Stallion to Pay Certain Prepetition Taxes and Fees (the "Taxes and Fees Motion").**

71.     Stallion requests authority to pay any Taxes and Fees that, in the ordinary course of business, accrued or arose before the Petition Date.   In the ordinary course of business, Stallion incurs and/or collects certain Taxes and Fees and remits such Taxes and Fees to various Authorities.  Stallion must continue to pay the Taxes and Fees to continue operating in certain jurisdictions and to avoid costly distractions during these chapter 11 cases.   Specifically, Stallion's failure to pay the Taxes and Fees could affect adversely Stallion's business operations because the Authorities could suspend Stallion's operations, file liens, or seek to lift the automatic stay.   In addition, certain Authorities may take precipitous action against Stallion's directors and officers for unpaid Taxes that undoubtedly would distract those individuals from their duties related to Stallion's restructuring.

72.     I believe that the relief requested in the Taxes and Fees Motion is in the best interests of Stallion's estates, its creditors, and all other parties in interest, and will enable Stallion to continue to operate its businesses in chapter 11 without disruption.  Accordingly, on behalf of Stallion, I respectfully submit that the Taxes and Fees Motion should be approved.

K&E 15763060.1

**H.     Motion of Stallion Oilfield Services Ltd., *et al.*, for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "<u>Utilities Motion</u>").**

73.     Stallion requests the entry of interim and final orders: (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving Stallion's proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of Stallion's proposed adequate assurance pending entry of the Final Order; (d) determining Stallion is not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion, pending entry of the Final Order; and (v) setting a final hearing on Stallion's proposed adequate assurance.

74.     In the ordinary course of business, Stallion incurs expenses for gas, water, sewer, electric, telecommunications, and other similar utility services provided by approximately 160 utility providers.  Uninterrupted utility services are essential to Stallion's ongoing operations and, therefore, to the success of its reorganization.  Indeed, any interruption of utility services, even for a brief period of time, would negatively affect Stallion's operations, customer relationships, revenues, and profits, seriously jeopardizing Stallion's reorganization efforts and, ultimately, value and creditor recoveries.  It is, therefore, critical that utility services continue uninterrupted during these chapter 11 cases.

75.     I believe and am advised that the proposed procedures are necessary in these chapter 11 cases, because if such procedures were not approved, Stallion could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of these chapter 11 cases.  Moreover, a Utility Provider could blindside Stallion by

unilaterally deciding—on or after the 30th day following the Petition Date—that it is not adequately assured of future performance and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of utility service could shut down operations, and any significant disruption of operations could jeopardize a successful reorganization in these chapter 11 cases.

76.     I believe that the relief requested in the Utilities Motion is in the best interests of Stallion's estates, its creditors, and all other parties in interest, and will enable Stallion to continue to operate its businesses in chapter 11 without disruption. Accordingly, on behalf of Stallion, I respectfully submit that the Utilities Motion should be approved.

**I.     Motion of Stallion Oilfield Services Ltd.,** *et al.,* **For Entry of an Order Authorizing the Employment and Retention of Epiq Systems, Inc., as Notice and Claims Agent** *Nunc Pro Tunc* **to the Petition Date (the "Epiq Retention Motion").**

77.     Stallion requests entry of an order pursuant to section 156(c) of title 28 of the United States Code, section 503(b) of the Bankruptcy Code, and Local Bankruptcy Rule 2002-1(f) authorizing the employment and retention of Epiq Systems, Inc., effective as of the Petition Date as the notice and claims agent in accordance with the terms and conditions set forth in the Services Agreement.

78.     I believe that the relief requested in the Epiq Retention Motion is in the best interests of Stallion's estates, its creditors, and all other parties in interest, and will enable Stallion to continue to operate its businesses in chapter 11 without disruption. Accordingly, on behalf of Stallion, I respectfully submit that the Epiq Retention Motion should be approved.

K&E 15763060.1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

New York, New York

Dated: October 19, 2009

By: _____
John R. Castellano
Chief Restructuring Officer
Stallion Oilfield Services Ltd.

## EXHIBIT A

## Restructuring and Lock-Up Agreement

## *RESTRUCTURING AND LOCK-UP AGREEMENT*

      This RESTRUCTURING AND LOCK-UP AGREEMENT (this "**Agreement**")[1] is made and entered into as of October 17, 2009, by and among (i) Stallion Oilfield Services Ltd., Central Industries, Inc., Salty's Disposal Wells, LP, Salty's Manufacturing, Ltd., Stallion Acquisition, LLC, Stallion Heavy Haulers, LP, Stallion Interests, LLC, Stallion Offshore Quarters, Inc., Stallion Oilfield Construction, LLC, Stallion Oilfield Finance Corp., Stallion Oilfield Holdings GP, LLC, Stallion Oilfield Holdings, Ltd., Stallion Oilfield Services, Inc., Stallion Production Services, LP, Stallion Production, LLC, Stallion Rockies Ltd., Stallion Solids Control, Inc., and Stallion Stables, LLC (collectively, the "**Company**"); (ii) the undersigned lenders under the Prepetition Secured Credit Agreement (each, a "**Consenting Secured Lender**"); (iii) the undersigned lenders under the Prepetition Unsecured Bridge Credit Agreement (each, a "**Consenting Bridge Lender**"); (iv) the undersigned holders or investment advisers or managers of discretionary accounts that hold the Unsecured Notes (each, a "**Consenting Noteholder**"); and (v) the undersigned holders of equity in Stallion Oilfield Holdings, Ltd. and Stallion Oilfield Holdings GP, LLC (each, a "**Consenting Equity Holder**") (each of the foregoing, a "**Party**," and, collectively, the "**Parties**"). Each Consenting Secured Lender, each Consenting Bridge Lender, each Consenting Noteholder, and each Consenting Equity Holder (collectively, the "**Consenting Parties**") shall be referred to herein as the "**Plan Support Parties**."

## *RECITALS*

      **WHEREAS**, the Company and the Plan Support Parties are negotiating restructuring and recapitalization transactions (collectively, the "**Transactions**"), pursuant to the terms and conditions set forth in the Term Sheet and in this Agreement, with respect to the capital structure of the Company, including: (a) the Company's obligations under (i) the Prepetition Secured Credit Agreement, (ii) the Prepetition Unsecured Bridge Credit Agreement, and (iii) the Unsecured Notes Indenture (collectively, the "**Claims**"); and (b) the existing equity interests in Stallion Oilfield Holdings, Ltd. and Stallion Oilfield Holdings GP, LLC (including any partnership interest in the Company and its non-filing affiliates and options, warrants, or other agreements to acquire the same (whether or not arising under or in connection with any employment agreement)) (each, an "**Existing Equity Interest**");

      **WHEREAS**, Stallion intends to commence voluntary reorganization cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101—1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") to effect the Transactions through a prearranged plan of reorganization that implements and is otherwise materially consistent with the terms and conditions set forth in the Term Sheet and in this Agreement (the "**Plan of Reorganization**"); and

      **NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

---

1     Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Stallion Oilfield Services Ltd. Joint Plain of Reorganization Term Sheet (the "**Term Sheet**"), attached hereto as Exhibit A.

## AGREEMENT

**Section 1.**    *Agreement Effective Date*.  This Agreement shall become effective and binding upon each of the Parties at 12:01 a.m., prevailing Eastern Time, on the first day immediately following the date on which:

(a)    the following conditions have been satisfied:  (i) the Company has executed and delivered counterpart signature pages of this Agreement to counsel to the Prepetition Secured Administrative Agent, to counsel to the informal committee of Prepetition Bridge Lenders and holders of Unsecured Notes (the "**Informal Funded Debt Committee**"), and to counsel to the Consenting Equity Holders; (ii) holders of at least two-thirds in amount and more than one-half in number of outstanding Prepetition Secured Credit Agreement Claims shall have executed and delivered to the Company counterpart signature pages of this Agreement; (iii) holders of at least two-thirds in amount and more than one-half in number of outstanding Prepetition Unsecured Bridge Credit Agreement Claims shall have executed and delivered to the Company counterpart signature pages of this Agreement; (iv) holders of at least two-thirds in amount and more than one-half in number of outstanding Unsecured Note Claims shall have executed and delivered to the Company counterpart signature pages of this Agreement; and (v) holders of at least two-thirds in amount of the Existing Equity Interests shall have executed and delivered to the Company counterpart signature pages of this Agreement; and

(b)    the Company has given notice to the Prepetition Secured Administrative Agent, the Informal Funded Debt Committee, and the Consenting Equity Holders in accordance with Section 8.11 hereof that the conditions in (a)(i) through (iv) have been satisfied and this Agreement is effective (the "**Agreement Effective Date**").

**Section 2.**    *Term Sheet*.  The Term Sheet is expressly incorporated herein and is made part of this Agreement.  The general terms and conditions of the Transactions are set forth in the Term Sheet; *provided*, *however*, that the Term Sheet is supplemented by the terms and conditions of this Agreement.  In the event of any inconsistencies between the terms of this Agreement and the Term Sheet, this Agreement shall govern.

**Section 3.**    *Commitments Regarding the Transactions.*

3.01.    Agreement to Vote.

(a)    As long as this Agreement has not been terminated in accordance with the terms hereof, each of the Plan Support Parties, agrees that it shall, subject to (i) the receipt by such Plan Support Party of a disclosure statement and other solicitation materials in respect of the Plan of Reorganization, which disclosure statement and solicitation materials reflect the agreement set forth in the Term Sheet (it being understood and agreed that (x) any terms not set forth in the Term Sheet that are set forth in such disclosure statement and other solicitation materials shall be in form and substance reasonably acceptable to the Prepetition Secured Administrative Agent (solely as to provisions which (i) affect, or could be reasonably expected to affect, the Consenting Secured Lenders' rights, claims, recoveries, and/or interests or (ii) are not materially consistent with the Term Sheet) and counsel to the Informal Funded Debt Committee (solely as to provisions which (i) affect, or could be reasonably expected to affect, the Consenting Bridge

Lenders' and Consenting Noteholders' rights, claims, recoveries, and/or interests or (ii) are not materially consistent with the Term Sheet) and (y) each of the Plan Support Parties must be entitled to vote to accept or reject the Plan of Reorganization) and have been approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code (collectively, the "**Solicitation Materials**"):

(i)     vote its Claims and Existing Equity Interests to accept the Plan of Reorganization by delivering its duly executed and completed ballot accepting the Plan of Reorganization on a timely basis following the commencement of the solicitation and its actual receipt of the Solicitation Materials and ballot;

(ii)     not change or withdraw (or cause to be changed or withdrawn) such vote; and

(iii)     not, in any material respect, (A) object to, delay, impede, or take any other action to interfere with acceptance or implementation of the Plan of Reorganization or (B) propose, file, support, or vote for any restructuring, workout, or plan of reorganization for the Company other than the Plan of Reorganization and shall, in the case of the Consenting Secured Lenders, the Consenting Bridge Lenders, and the Consenting Noteholders direct the Prepetition Secured Administrative Agent, the Prepetition Bridge Administrative Agent, and the Unsecured Notes Trustee, respectively, not to take any action contemplated in (A) and (B) of this Section 3.01(a)(iii).

(b)     For the avoidance of doubt, each Plan Support Party also agrees that upon the commencement by the Company of the chapter 11 cases, the automatic stay is invoked and each Plan Support Party agrees that it will not, and, in the case of the Consenting Secured Lenders, the Consenting Bridge Lenders, and the Consenting Noteholders, it will direct the Prepetition Secured Administrative Agent, the Prepetition Bridge Administrative Agent, and the Unsecured Notes Trustee, respectively, not to exercise any right or remedy for the enforcement, collection, or recovery of any of the Claims against (i) for so long as this Agreement has not been terminated in accordance with the terms hereof, the Company or (ii) any direct or indirect affiliates of Stallion Oilfield Services Ltd. that have not filed voluntary petitions in the chapter 11 cases (or have not had involuntary petitions filed on their behalf); *provided*, *however*, that, except as otherwise set forth in this Agreement, the foregoing prohibition will not limit any Plan Support Parties' rights under any applicable indenture, credit agreement, other loan document, and/or applicable law to: (A) terminate or close out any swap agreement, repurchase agreement, or similar transaction with the Company to the extent the underlying agreement permits such termination or close-out or (B) to appear and participate as a party in interest in any matter to be adjudicated in any case under the Bankruptcy Code concerning the Company, so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with the Term Sheet, this Agreement, or the Plan of Reorganization and does not directly hinder, delay, or prevent consummation of the Transactions contemplated by the Term Sheet.

3.02.     <u>Commitment of Company</u>. The Company shall (a) support and complete the Transactions on the terms set forth in the Term Sheet, (b) do all things necessary and appropriate in furtherance of the Transactions embodied in the Term Sheet, including, without limitation (i) commencing the chapter 11 cases on or before October 20, 2009 (the "**Outside Petition**

**Date**," and the actual commencement date, the "**Petition Date**"), (ii) taking all steps reasonably necessary to obtain an order of the Bankruptcy Court, reasonably acceptable in all material respects to the Prepetition Secured Administrative Agent and counsel to the Informal Funded Debt Committee, confirming the Plan of Reorganization within the timeframes contemplated by this Agreement, and (iii) taking all steps reasonably necessary and desirable to cause the effective date of the Plan of Reorganization to occur within the timeframes contemplated by this Agreement, (c) obtain any and all required regulatory and/or third-party approvals for the Transactions embodied in the Term Sheet, (d) not take any action that is inconsistent with, or is intended or is likely to interfere with consummation of, the restructuring and the Transactions embodied in the Term Sheet, and (e) if a member of the Company's management knows of a breach by the Company in any material respect of any of the obligations, representations, warranties, or covenants of the Company set forth in this Agreement, furnish prompt written notice (and in any event within three Business Days of such actual knowledge) to the Prepetition Secured Administrative Agent and counsel to the Informal Funded Debt Committee. Regardless of whether the Transactions are consummated, the Company shall promptly pay in cash upon demand any and all reasonable accrued and unpaid out-of-pocket expenses incurred by the Prepetition Secured Administrative Agent and the Informal Funded Debt Committee (including all reasonable fees and out-of-pocket expenses of the legal counsel and financial advisors for the Prepetition Secured Administrative Agent and the Informal Funded Debt Committee) in connection with the negotiation, documentation, consummation, and performance of this Agreement, the Term Sheet, the Solicitation Materials, all other documents related to the Plan of Reorganization and the Transactions.

3.03.   Transfer of Interests and Securities.  Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Consenting Party to sell, use, assign, transfer, or otherwise dispose of ("**Transfer**") any of the Claims or Existing Equity Interests; *provided, however,* that for the period commencing as of the date such Consenting Party, executes this Agreement until termination of this Agreement pursuant to the terms hereof (such period, the "**Restricted Period**"), no Consenting Party shall Transfer any Claims or Existing Equity Interests and any purported Transfer of any Claims or Existing Equity Interests shall be void and without effect, unless (a) the transferee is a Consenting Party or (b) if the transferee is not a Consenting Party prior to the Transfer, such transferee delivers to the Company, at or prior to the time of the proposed Transfer, an executed copy of **Exhibit B** attached hereto pursuant to which such Transferee shall assume all obligations of the Consenting Party transferor, hereunder in respect of the Claims or Existing Equity Interests being transferred (such transferee, if any, to also be a Consenting Secured Lender, a Consenting Bridge Lender, a Consenting Noteholder, or a Consenting Equity Holder, as applicable, hereunder).  This Agreement shall in no way be construed to preclude the Consenting Parties from acquiring additional Claims or Existing Equity Interests; *provided, however*, that (a) any Consenting Party that acquires, as legal owner, additional Claims or Existing Equity Interests after executing this Agreement shall notify the Company, the Prepetition Secured Administrative Agent, and the Informal Funded Debt Committee of such acquisition within five business days after the closing of such trade and (b) additional Claims and Existing Equity Interests shall automatically and immediately upon acquisition by a Consenting Party, as legal owner, be deemed subject to all of the terms of this Agreement whether or not notice is given to the Company, the Prepetition Secured Administrative Agent, or the Informal Funded Debt Committee of such acquisition. This Section 3.03 shall not impose any obligation on (a) the Company to issue any "cleansing

letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Party to Transfer any Claims or Existing Equity Interests or (b) the Prepetition Secured Administrative Agent or the Informal Funded Debt Committee to monitor or enforce the provisions of this Section 3.03 as they relate to the Consenting Parties.

3.04.    <u>Representation of Consenting Secured Lenders</u>.  Each of the Consenting Secured Lenders severally and not jointly represents and warrants that, as of the date such Consenting Secured Lender executes and delivers this Agreement:

(a)    it is the beneficial owner of the face amount of the Prepetition Secured Credit Agreement Claims, or is the nominee, investment manager, or advisor for beneficial holders of the Prepetition Secured Credit Agreement Claims, as reflected in such Consenting Secured Lender's signature block to this Agreement, which amount the Company and each Consenting Secured Lender understands and acknowledges is proprietary and confidential to such Consenting Secured Lender; and

(b)    other than pursuant to this Agreement, such Prepetition Secured Credit Agreement Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would adversely affect in any material way such Consenting Secured Lender's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

3.05.    <u>Representations of Consenting Bridge Lenders</u>.  Each of the Consenting Bridge Lenders severally and not jointly represents and warrants that, as of the date such Consenting Bridge Lender executes and delivers this Agreement:

(a)    it is the beneficial owner of the face amount of the Prepetition Unsecured Bridge Credit Agreement Claims, or is the nominee, investment manager, or advisor for beneficial holders of the Prepetition Unsecured Bridge Credit Agreement Claims, as reflected in such Consenting Bridge Lender's signature block to this Agreement, which amount the Company and each Consenting Bridge Lender understands and acknowledges is proprietary and confidential to such Consenting Bridge Lender;

(b)    other than pursuant to this Agreement, such Prepetition Unsecured Bridge Credit Agreement Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would adversely affect in any way such Consenting Bridge Lender's performance of its obligations contained in this Agreement at the time such obligations are required to be performed; and

(c)    (i) it is either (a) a qualified institutional buyer as defined in Rule 144A of the Securities Act of 1933, as amended (the "<u>Securities Act</u>") or (b) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act (the "<u>Rules</u>")) and (ii) any securities acquired by the Consenting Bridge Lender in connection with the transactions described herein will not have been acquired with a view to distribution.

3.06.    <u>Representations of Consenting Noteholders</u>.  Each of the Consenting Noteholders severally and not jointly represents and warrants that, as of the date such Consenting Noteholder executes and delivers this Agreement:

(a)    it is the beneficial owner of the face amount of the Unsecured Notes, or is the nominee, investment manager, or advisor for beneficial holders of the Unsecured Notes, as reflected in such Consenting Noteholder's signature block to this Agreement, which amount the Company and each Consenting Noteholder understands and acknowledges is proprietary and confidential to such Consenting Noteholder;

(b)    other than pursuant to this Agreement and applicable law, such Unsecured Notes are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would adversely affect in any way such Consenting Noteholder's performance of its obligations contained in this Agreement at the time such obligations are required to be performed; and

(c)    (i) it is either (a) a qualified institutional buyer as defined in Rule 144A of the Securities Act or (b) an institutional accredited investor (as defined in the Rules) and (ii) any securities acquired by the Consenting Noteholder in connection with the transactions described herein will not have been acquired with a view to distribution.

3.07.    <u>Representations of Consenting Equity Holders</u>.  Each of the Consenting Equity Holders severally and not jointly represents and warrants that, as of the date such Consenting Equity Holder executes and delivers this Agreement:

(a)    it is the beneficial owner of the number of shares of Existing Equity Interests as set forth below its name on the signature block to this Agreement, or is the nominee, investment manager, or advisor for beneficial holders of the Existing Equity Interests, as reflected in such Consenting Equity Holder's signature block to this Agreement, which number of shares the Company and each Consenting Equity Holder understands and acknowledges is proprietary and confidential to such Consenting Equity Holder;

(b)    other than pursuant to this Agreement, such Existing Equity Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would adversely affect in any way such Consenting Equity Holder's performance of its obligations contained in this Agreement at the time such obligations are required to be performed;

(c)    (i) it is an accredited investor (as defined in the Rules) and (ii) any securities acquired by the Consenting Equity Holder in connection with the transactions described herein will not have been acquired with a view to distribution; and

(d)    other than its Existing Equity Interests, it does not hold any other issued and outstanding securities rights or obligations which are convertible into, exchangeable for, or exercisable to acquire any capital stock or other equity securities of the Company.

**Section 4.** *Certain Additional Chapter 11 Related Matters.* The Company shall provide draft copies of all "first day" motions or applications and other documents the Company intends to file with the Bankruptcy Court to counsel to the Prepetition Secured Administrative Agent and to counsel to the Informal Funded Debt Committee at least one day prior to the date when the Company intends to file such document and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court. The Company will use its reasonable best efforts to provide draft copies of all other pleadings the Company intends to file with the Bankruptcy Court to counsel to the Prepetition Secured Administrative Agent and to counsel to the Informal Funded Debt Committee at least two days prior to filing such pleading and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading.

**Section 5.** *Mutual Representations, Warranties, and Covenants.* Each of the Parties, severally and not jointly, represents, warrants, and covenants to each other Party, as of the date of this Agreement, as follows (each of which is a continuing representation, warranty, and covenant):

5.01. <u>Enforceability</u>. It is validly existing and in good standing under the laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditor's rights generally or by equitable principles relating to enforceability.

5.02. <u>No Consent or Approval</u>. Except as expressly provided in this Agreement or the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to carry out the Transactions contemplated by, and perform the respective obligations under, this Agreement.

5.03. <u>Power and Authority</u>. Except as expressly provided in this Agreement, it has all requisite power and authority to enter into this Agreement and to carry out the Transactions contemplated by, and perform its respective obligations under, this Agreement.

5.04. <u>Authorization</u>. The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

5.05. <u>Representation by Counsel</u>. It has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.

5.06. <u>Actions under this Agreement</u>. It is not aware of any event that, due to any fiduciary or similar duty to any other person, would prevent it from taking any action required of it under this Agreement.

**Section 6.** *Termination Events.*

6.01. <u>Consenting Party Termination Events</u>. This Agreement may be terminated by the delivery to the Company and, as applicable, the Prepetition Secured Administrative Agent or the Informal Funded Debt Committee of a written notice in accordance with Section 8.11 hereof by

Consenting Secured Lenders holding no less than a majority in principal amount of the Prepetition Secured Credit Agreement Claims held at such time by the Consenting Secured Lenders, by the Consenting Bridge Lenders holding no less than a majority in principal amount of the Prepetition Unsecured Bridge Credit Agreement Claims held at such time by the Consenting Bridge Lenders, or by the Consenting Noteholders holding no less than a majority in principal amount of the Unsecured Note Claims held at such time by the Consenting Noteholders (unless otherwise provided in this Section 6.01), each in the exercise of its sole discretion, upon the occurrence and continuation of any of the following events (each a "**Consenting Party Termination Event**"):

(a)     failure of the Company to commence the chapter 11 cases on or before the Outside Petition Date;

(b)     counsel to the Informal Funded Debt Committee shall have reasonably determined that there are General Unsecured Claims, not previously disclosed to it, the existence of which could have a material adverse effect on the Company, and provided reasonably prompt written notice of such determination to the Company and the Prepetition Secured Administrative Agent;

(c)     failure of the Company to file a Plan of Reorganization and related disclosure statement with the Bankruptcy Court within 10 days after the Petition Date, each of which shall be materially consistent with this Agreement and the Term Sheet and shall be in a form and substance reasonably acceptable to the Prepetition Secured Administrative Agent and to counsel to the Informal Funded Debt Committee;

(d)     the Bankruptcy Court's orders approving the Solicitation Materials and setting a hearing to confirm the Plan of Reorganization shall not have been entered by the Bankruptcy Court within 40 days after the filing of the Plan of Reorganization, or as soon thereafter as the Bankruptcy Court's schedule permits;

(e)     the Bankruptcy Court's order confirming the Plan of Reorganization (the "**Confirmation Order**"), which Plan of Reorganization, including all exhibits, appendices, plan supplement documents, and related documents, shall be reasonably acceptable to the Prepetition Secured Administrative Agent (solely as to provisions which (i) affect, or could be reasonably expected to affect, the Consenting Secured Lenders' rights, claims, recoveries, and/or interests or (ii) are not materially consistent with the Term Sheet) and to counsel to the Informal Funded Debt Committee (solely as to the provisions which (i) affect, or could be reasonably expected to affect Consenting Bridge Lenders' and Consenting Noteholders' rights, claims, recoveries, and/or interests or (ii) are not materially consistent with the Term Sheet), shall not have been entered by the Bankruptcy Court within 60 days after the date that the Solicitation Materials are approved; *provided*, *however*, that so long as the Company is proceeding in good faith towards confirmation of the Plan of Reorganization, upon written notice from the Company to counsel to the Prepetition Secured Administrative Agent and to counsel to the Informal Funded Debt Committee in accordance with Section 8.11 hereof, there shall be a 15-day extension of such 60-day period;

(f)　the effective date of the Plan of Reorganization shall not have occurred within 25 days after the date that the Plan of Reorganization is confirmed; *provided*, *however*, that so long as the Company is proceeding in good faith towards confirmation of the Plan of Reorganization, upon written notice from the Company to counsel to the Prepetition Secured Administrative Agent and to counsel to the Informal Funded Debt Committee in accordance with Section 8.11 hereof, there shall be a 15-day extension of such 25-day period;

(g)　other than with respect to the covenant and agreement in Section 3.02(e) of this Agreement, the breach in any material respect by the Company of any of the obligations, representations, warranties, or covenants of the Company set forth in this Agreement; *provided*, *however*, that the Company shall have five business days to cure any such breach;

(h)　failure to duly observe and perform the covenant and agreement contained in Section 3.02(e) of this Agreement;

(i)　the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of the Transactions in a way that cannot be reasonably remedied by the Company in a manner that does not prevent or diminish in a material way compliance with the terms of the Term Sheet and this Agreement; *provided*, *however*, that the Company shall have five business days after receiving such ruling or order to cure any breach in a manner that does not prevent or diminish in a material way compliance with the terms of the Term Sheet and this Agreement;

(j)　the conversion of one or more of the chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, unless such conversion is made with the prior written consent of the Prepetition Secured Administrative Agent and counsel to the Informal Funded Debt Committee;

(k)　the appointment of a trustee, receiver, or examiner with expanded powers in one or more of the chapter 11 cases, unless such appointment is made with the prior written consent of the Prepetition Secured Administrative Agent and counsel to the Informal Funded Debt Committee;

(l)　the amendment, modification, or filing of a pleading by the Company seeking to amend or modify the Plan of Reorganization, Solicitation Materials, or any documents related to the foregoing, including motions, notices, exhibits, appendices, and orders, in a manner not reasonably acceptable to the Prepetition Secured Administrative Agent (solely as to provisions which (i) affect, or could be reasonably expected to affect, the Consenting Secured Lenders' rights, claims, recoveries, and/or interests or (ii) are not materially consistent with the Term Sheet) and counsel to the Informal Funded Debt Committee (solely as to the provisions which (i) affect, or could be reasonably expected to affect Consenting Bridge Lenders' and Consenting Noteholders' rights, claims, recoveries, and/or interests or (ii) are not materially consistent with the Term Sheet);

(m)　the Company files any motion or pleading with the Bankruptcy Court that is not materially consistent in any respect to this Agreement or the Term Sheet and such motion or pleading has not been withdrawn prior to the earlier of (i) five business days of the Company receiving written notice in accordance with Section 8.11 hereof from either the Prepetition

Secured Administrative Agent or counsel to the Informal Funded Debt Committee that such motion or pleading is inconsistent with this Agreement or the Term Sheet and (ii) entry of an order of the Bankruptcy Court approving such motion;

(n)     if the Company has not paid a fee to each Consenting Secured Lender equal to the product of (i) 1.50% and (ii) the aggregate principal amount of Loans and Commitments (in each case as defined in the Prepetition Secured Credit Agreement in effect immediately prior to the Agreement Effective Date) held by such Consenting Secured Lender immediately prior to the Agreement Effective Date (without giving effect to any recent or contemplated payments of principal on such Loans or terminations of Commitments) (such fee, the "Consenting Secured Lender Fee") on or prior to the effective date of the Plan of Reorganization, failure by the Company to obtain a final, non-appealable order from the Bankruptcy Court that ensures treatment of the Consenting Secured Lender Fee as an administrative claim in the chapter 11 cases within 30 days after the Petition Date or as soon thereafter as the Bankruptcy Court's schedule permits (but in no event later than 45 days after the Petition Date); or

(o)     failure by the Company to make mandatory prepayments of principal with respect to the Loans and Commitments (in each case as defined in the Prepetition Secured Credit Agreement in effect immediately prior to the Agreement Effective Date) in accordance with that certain Consent, dated as of September 8, 2009, by and among the Company and the lenders under the Prepetition Secured Credit Agreement party to such Consent, and payable pursuant to the terms of Section 2.10 of the Prepetition Secured Credit Agreement.

Notwithstanding any provision in this Agreement to the contrary, upon the written consent of the (i) Consenting Secured Lenders holding a majority in principal amount of the Prepetition Secured Credit Agreement Claims held at such time by the Consenting Secured Lenders, (ii) Consenting Bridge Lenders holding a majority in principal amount of the Prepetition Unsecured Bridge Credit Agreement Claims, and (iii) Consenting Noteholders holding a majority in principal amount of the Unsecured Note Claims held at such time by the Consenting Noteholders, the dates set forth in this Section 6.01 may be extended prior to or upon each such date and such later dates agreed to in lieu thereof and shall be of the same force and effect as the dates provided herein.  If this Agreement is terminated by the Consenting Parties pursuant to this Section 6.01, this Agreement shall be automatically and simultaneously terminated as to any other Party that is a signatory to this Agreement.  No Party shall terminate this Agreement if such Party is in breach of any provision hereof.

6.02.   Company Termination Events.  The Company may terminate this Agreement as to all Parties upon five business days' prior written notice, delivered in accordance with Section 8.11 hereof, upon the occurrence of any of the following events (each, a "**Company Termination Event**"):  (a) the breach by any of the Plan Support Parties of any of the representations, warranties, or covenants of such Plan Support Parties set forth in this Agreement that would have a material adverse impact on the Company or the consummation of the Transactions that remains uncured for a period of five business days after the receipt by the Plan Support Parties of written notice of such breach from the Company; (b) the board of directors of the Company reasonably determines based upon the advice of counsel that proceeding with the Transactions would be inconsistent with the exercise of its fiduciary duties, or (c) the issuance by any governmental authority, including any regulatory authority or court of

competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Transactions.

6.03. <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement among (a) the Company, (b) Consenting Secured Lenders holding a majority in principal amount of the Prepetition Secured Credit Agreement Claims held at such time by the Consenting Secured Lenders, (c) Consenting Bridge Lenders holding a majority in principal amount of the Prepetition Unsecured Bridge Credit Agreement Claims held at such time by the Consenting Bridge Lenders, (d) Consenting Noteholders holding a majority in principal amount of the Unsecured Note Claims held at such time by the Consenting Noteholders, and (e) the Consenting Equity Holders holding a majority of the Existing Equity Interests held at such time by the Existing Equity Holders.

6.04. <u>Effect of Termination</u>. Upon termination of this Agreement under Section 6.01, 6.02, or 6.03, this Agreement shall be of no further force and effect and each Party hereto shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement. Upon the occurrence of any termination of this Agreement, any and all consents tendered by the Plan Support Parties prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Transactions and this Agreement or otherwise.

6.05. <u>Termination Upon Effective Date of Plan</u>. This Agreement shall terminate automatically without any further required action or notice on the date that the Plan of Reorganization becomes effective (immediately following the effectiveness of the Plan of Reorganization).

**Section 7.** *Amendments*. This Agreement, including the Term Sheet, may not be modified, amended, or supplemented (except as expressly provided herein or therein) except in writing signed by the Company, a majority in principal amount of the Consenting Secured Lenders, a majority in principal amount of the Consenting Bridge Lenders, a majority in principal amount of the Consenting Noteholders, and, solely as to the provisions which affect, or could be reasonably expected to affect Consenting Equity Holders' rights, claims, recoveries, and/or interests, a majority in amount of the Consenting Equity Holders.

**Section 8.** *Miscellaneous*.

8.01. <u>Further Assurances</u>. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Transactions in a manner materially consistent with the terms set forth in the Term Sheet, as applicable.

8.02. <u>Complete Agreement</u>. This Agreement and the annexes hereto represent the entire agreement between the Parties with respect to the subject matter hereof and supersede all

prior agreements, oral or written, between the Parties with respect thereto. No claim of waiver, modification, consent, or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party.

8.03.   Parties.  This Agreement shall be binding upon, and inure to the benefit of, the Parties.  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in Section 3.03 hereof.  Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy, or claim under this Agreement.

8.04.   Headings.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

8.05.   GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in either the United States District Court for the Southern District of New York or any New York State court sitting in New York City (the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto; *provided, however*, that if the Company commences one or more chapter 11 cases, then the Bankruptcy Court shall be the sole Chosen Court.  Each Party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

8.06.   Execution of Agreement.  This Agreement may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

8.07.   Interpretation.  This Agreement is the product of negotiations between the Company, the Prepetition Secured Administrative Agent, the Informal Funded Debt Committee, the Consenting Secured Lenders, the Consenting Bridge Lenders, the Consenting Noteholders, and the Consenting Equity Holders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

8.08. <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives, other than a trustee or similar representative appointed in a bankruptcy case.

8.09. <u>Creditors' Committee</u>. Notwithstanding anything herein to the contrary, if any Consenting Bridge Lender or Consenting Noteholder is appointed to and serves on an official committee of creditors in the chapter 11 cases, the terms of this Agreement shall not be construed so as to limit such Consenting Bridge Lender's or Consenting Noteholder's exercise (in its sole discretion) of its fiduciary duties to any person arising from its service on such committee, and any such exercise (in the sole discretion of such Consenting Bridge Lender or Consenting Noteholder) of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement; *provided*, *however*, that nothing in this Agreement shall be construed as requiring any Consenting Bridge Lender or Consenting Noteholder to serve on any official committee in any such chapter 11 case.

8.10. <u>Relationship Among Parties</u>. It is understood and agreed that no Plan Support Party has any fiduciary duty or other duty of trust or confidence in any form with any other Plan Support Party, and, except as provided in this Agreement, there are no commitments among or between them.

8.11. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, if sent by telecopy, electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses and telecopier numbers (or at such other addresses or telecopier numbers as shall be specified by like notice):

(a)  if to the Company, to:

Stallion Oilfield Services Ltd.
950 Corbindale Road
Suite 300
Houston, Texas 77024
Attention:  Douglas Stewart, Vice-President and General Counsel
E-mail address:  dstewart@sofs.cc

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Attention:  Jonathan S. Henes
E-mail address:  jonathan.henes@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention: Chad J. Husnick and Jeffrey D. Pawlitz
Email addresses: chad.husnick@kirkland.com and jeffrey.pawlitz@kirkland.com

(b)     if to the Prepetition Secured Administrative Agent, to:

UBS Investment Bank
677 Washington Boulevard
6th Floor
Stamford, Connecticut 06901
Attention: Thomas Donnelly
Email address: Thomas.Donnelly@UBS.com

with copies (which shall not constitute notice) to:

Latham & Watkins LLP
233 South Wacker Drive
Suite 5800
Chicago, Illinois 60606
Attention: David S. Heller
E-mail address: david.heller@lw.com

(c)     if to a Consenting Secured Lender or a transferee thereof, to the addresses or telecopier numbers set forth below following the Consenting Secured Lender's signature (or as directed by any transferee thereof), as the case may be

with copies (which shall not constitute notice) to:

Latham & Watkins LLP
233 South Wacker Drive
Suite 5800
Chicago, Illinois 60606
Attention: David S. Heller
E-mail address: david.heller@lw.com

(d)     if to a Consenting Bridge Lender or a Consenting Noteholder or a transferee thereof, to the addresses or telecopier numbers set forth below following the Consenting Bridge Lender's signature (or as directed by any transferee thereof), as the case may be

with copies (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention:  Andrew N. Rosenberg and Sarah Harnett
E-mail addresses:  arosenberg@paulweiss.com and sharnett@paulweiss.com

(e)     if to the Informal Funded Debt Committee, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention:  Andrew N. Rosenberg and Sarah Harnett
E-mail addresses:  arosenberg@paulweiss.com and sharnett@paulweiss.com

(f)     if to a Consenting Equity Holder or a transferee thereof, to the addresses or telecopier numbers set forth below the Consenting Equity Holder's Signature (or as directed by any transferee thereof), as the case may be

with copies (which shall not constitute notice) to:

Riverstone Holdings, LLC
712 Fifth Avenue, 51st Floor
New York, NY 10019
Attention:  Stephen Coats
E-mail address:  scoats@riverstonellc.com

Any notice given by delivery, mail, or courier shall be effective when received.  Any notice given by telecopier shall be effective upon oral or machine confirmation of transmission.

8.12.   <u>Access</u>.  The Company will afford the Plan Support Parties and their respective attorneys, consultants, accountants, and other authorized representatives reasonable access, upon reasonable notice during normal business hours, to all properties, books, contracts, commitments, records, management personnel, lenders, and advisors of the Company; *provided, however,* that the Company's obligation hereunder shall be conditioned upon such Plan Support Party being party to an executed confidentiality agreement approved by and with the Company.  The Company acknowledges and agrees that the Prepetition Secured Administrative Agent, the lenders under the Prepetition Secured Credit Agreement, and certain members of the Informal Funded Debt Committee have complied with the requirements of this Section 8.12 by virtue of their existing confidentiality arrangements with the Company.

8.13.   <u>Waiver</u>.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Consenting

Party or the ability of each of the Consenting Party to protect and preserve its rights, remedies, and interests, including, without limitation, its claims against or interests in the Company.  If the Transactions are not consummated, or if this Agreement is terminated for any reason (other than Section 6.05 hereof, in which case the Parties shall have any rights set forth in the confirmed Plan of Reorganization, any other court-approved documents, and any other agreements between the Parties entered into after the Petition Date), the Parties fully reserve any and all of their rights.  Pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

8.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

8.15.  <u>Several, Not Joint, Obligations</u>.  The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

8.16.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

8.17.  <u>No Third-Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof.

**Section 9.**     ***Disclosure***.  The Company shall publicly disclose (a) the existence of this Agreement and the material terms of the Term Sheet in a press release and/or filing with the Bankruptcy Court on or before October 20, 2009 and (b) any material amendment to this Agreement and the Term Sheet in a filing with the Bankruptcy Court following the effective date of such amendment in form and substance reasonably acceptable to counsel to the Prepetition Secured Administrative Agent and counsel to the Informal Funded Debt Committee.  To the extent reasonably practicable, the Company will submit to counsel for the Prepetition Secured Administrative Agent and counsel for the Informal Funded Debt Committee all press releases and public filings relating to this Agreement, the Term Sheet, or the transactions contemplated hereby and thereby and any amendments thereof at least two days prior to releasing such press releases or making such public filings and shall consult in good faith with such counsel regarding the form and substance of such press releases and public filings.  To the extent that the Company fails to make such initial disclosure within two business days of October 20, 2009, or the effective date of any amendment hereto, the Prepetition Secured Administrative Agent, the Bridge Agent, and each of the Consenting Parties shall have the right, but not the obligation, to disclose such terms publicly.  The Company shall not (a) use the name of any Plan Support Party in any press release without such Plan Support Party's prior written consent or (b) disclose to any

person other than legal and financial advisors to the Company the principal amount or percentage of any Prepetition Secured Credit Agreement Claims, Prepetition Unsecured Bridge Credit Agreement Claims, or Unsecured Notes Claims or any securities of the Company or any of their respective subsidiaries held by any Consenting Secured Lender, Consenting Bridge Lender, and Consenting Noteholder; *provided, however*, that the Company shall be permitted to disclose at any time the aggregate principal amount of and aggregate percentage of the Prepetition Secured Credit Agreement Claims, Prepetition Unsecured Bridge Credit Agreement Claims, or Unsecured Notes Claims held by the Consenting Secured Lenders, Consenting Bridge Lenders, and Consenting Noteholders or by persons who have otherwise agreed to participate in the Solicitation as a group; *provided further, however*, that the legal and financial advisors to the Company may disclose the names of holders of Prepetition Secured Credit Agreement Claims, Prepetition Unsecured Bridge Credit Agreement Claims, or Unsecured Notes Claims to the extent such advisors deem necessary to satisfy the obligations to make disclosures of connections to parties in interest in connection with being retained to advise the Company under section 327(a) of the Bankruptcy Code.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

*[signature pages follow]*

**Signature Page to the Restructuring and Lock-Up Agreement**

**STALLION OILFIELD SERVICES LTD.,** a Texas limited partnership

By: Stallion Interests, LLC, its general partner

By: _John R. Castellano_
Name: John R. Castellano
Title: Chief Restructuring Officer

**STALLION OILFIELD HOLDINGS, LTD.,** a Texas limited partnership

By: Stallion Oilfield Holdings GP, LLC, its general partner

By: _John R. Castellano_
Name: John R. Castellano
Title: Chief Restructuring Officer

**STALLION INTERESTS, LLC,** a Texas limited liability company

By: _John R. Castellano_
Name: John R. Castellano
Title: Chief Restructuring Officer

**STALLION ACQUISITION, LLC,** a Texas limited liability company

By: Stallion Oilfield Services Ltd., its sole member
By: Stallion Interests, LLC, the general partner of Stallion Oilfield Services Ltd.

By: _John R. Castellano_
Name: John R. Castellano
Title: Chief Restructuring Officer

**STALLION SOLIDS CONTROL, INC.,** a Texas
corporation

By: _____
    Name: John R. Castellano
    Title:   Chief Restructuring Officer

**STALLION ROCKIES LTD.,** a Texas limited
partnership

By:  Stallion Acquisition, LLC, its general partner
By: Stallion Oilfield Services Ltd., the sole member of
    Stallion Acquisition, LLC
By: Stallion Interests, LLC, the general partner of
    Stallion Oilfield Services Ltd.

By: _____
    Name: John R. Castellano
    Title:   Chief Restructuring Officer

**STALLION OILFIELD CONSTRUCTION, LLC,** a
Louisiana limited liability company

By:Stallion Oilfield Services Ltd., its sole member
By: Stallion Interests, LLC, the general partner of
    Stallion Oilfield Services Ltd.

By: _____
    Name: John R. Castellano
    Title:   Chief Restructuring Officer

**STALLION HEAVY HAULERS, LP,** a Texas
limited partnership

By:  Stallion Acquisition, LLC, its general partner
By: Stallion Oilfield Services Ltd., the sole member of
    Stallion Acquisition, LLC
By: Stallion Interests, LLC, the general partner of
    Stallion Oilfield Services Ltd.

By: _____
    Name: John R. Castellano
    Title:   Chief Restructuring Officer

**STALLION OFFSHORE QUARTERS, INC.**, a
Louisiana corporation

By: _____
    Name: John R. Castellano
    Title:   Chief Restructuring Officer

**CENTRAL INDUSTRIES, INC.**, a Louisiana
corporation

By: _____
    Name: John R. Castellano
    Title:   Chief Restructuring Officer

**STALLION PRODUCTION SERVICES, LP**, a
Texas limited partnership

By:  Stallion Acquisition, LLC, the general partner of
      Stallion Production Services, LP
By:  Stallion Oilfield Services Ltd., the sole member of
      Stallion Acquisition, LLC
By:  Stallion Interests, LLC, the general partner of
      Stallion Oilfield Services Ltd.

By: _____
    Name: John R. Castellano
    Title:   Chief Restructuring Officer

**STALLION PRODUCTION, LLC**, a Texas limited
liability company

By:  Stallion Production Services, LP, the sole member
      of Stallion Production, LLC
By:  Stallion Acquisition, LLC, the general partner of
      Stallion Production Services, LP
By:  Stallion Oilfield Services Ltd., the sole member of
      Stallion Acquisition, LLC
By:  Stallion Interests, LLC, the general partner of
      Stallion Oilfield Services Ltd.

By: _____
    Name: John R. Castellano
    Title:   Chief Restructuring Officer

**SALTY'S DISPOSAL WELLS, LP,** a Texas limited
    partnership

By: Stallion Production, LLC, the general partner of
    Salty's Disposal Wells, LP
By: Stallion Production Services, LP, the sole member
    of Stallion Production, LLC
By: Stallion Acquisition, LLC, the general partner of
    Stallion Production Services, LP
By: Stallion Oilfield Services Ltd., the sole member of
    Stallion Acquisition, LLC
By: Stallion Interests, LLC, the general partner of
    Stallion Oilfield Services Ltd.

By: _____

    Name: John R. Castellano
    Title: Chief Restructuring Officer

**SALTY'S MANUFACTURING, LTD.,** a Texas
    limited partnership

By: Stallion Production, LLC, the general partner of
    Salty's Manufacturing, Ltd.
By: Stallion Production Services, LP, the sole member
    of Stallion Production, LLC
By: Stallion Acquisition, LLC, the general partner of
    Stallion Production Services, LP
By: Stallion Oilfield Services Ltd., the sole member of
    Stallion Acquisition, LLC
By: Stallion Interests, LLC, the general partner of
    Stallion Oilfield Services Ltd.

By: _____

    Name: John R. Castellano
    Title: Chief Restructuring Officer

**STALLION STABLES, LLC,** a Delaware limited
    liability company

By: _____

    Name: John R. Castellano
    Title: Chief Restructuring Officer

# EXHIBIT A
# TERM SHEET

_____

## STALLION OILFIELD SERVICES LTD.

## JOINT PLAN OF REORGANIZATION TERM SHEET

_____

**THIS TERM SHEET (THIS "TERM SHEET") DESCRIBES A PROPOSED RESTRUCTURING (THE "RESTRUCTURING") FOR STALLION OILFIELD HOLDINGS, LTD. AND CERTAIN OF ITS AFFILIATES (COLLECTIVELY, THE "DEBTORS" AND, TOGETHER WITH THEIR NON-FILING AFFILIATES, "STALLION") PURSUANT TO A JOINT PLAN OF REORGANIZATION (THE "PLAN OF REORGANIZATION"), WHICH WOULD BE FILED BY THE DEBTORS IN CONNECTION WITH A CONTEMPLATED CHAPTER 11 FILING IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT").**

**THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF STALLION. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**THIS TERM SHEET IS PROVIDED IN CONFIDENCE AND MAY NOT BE DISTRIBUTED WITHOUT THE EXPRESS WRITTEN CONSENT OF STALLION. THIS TERM SHEET IS A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. ACCORDINGLY, THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS TERM SHEET IS SUBJECT TO ONGOING REVIEW AND APPROVAL BY, AND IS NOT BINDING UPON, STALLION, IS SUBJECT TO MATERIAL CHANGE, AND IS BEING DISTRIBUTED FOR DISCUSSION PURPOSES ONLY.**

| OVERVIEW | |
|---|---|
| **Restructuring Summary** | Prior to the commencement of the Debtors' chapter 11 cases, the requisite threshold of Prepetition Secured Credit Agreement Lenders, Prepetition Bridge Lenders, holders of Unsecured Note Claims, holders of Existing Equity Interests (as such terms are defined herein), and the Debtors, shall have executed a Plan Support Agreement (the "**Plan Support Agreement**"), pursuant to which the Debtors will agree to pursue and implement a Plan of Reorganization consistent in form and substance in all material respects with this Term Sheet. This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the Plan of Reorganization and the related definitive documentation governing the Restructuring. |
| **Debt to be Repaid/ Restructured** | Indebtedness that will be treated under the Plan of Reorganization includes:<br><br>(i) approximately $245.8 million in obligations (together with any accrued |

| | |
|---|---|
| | and unpaid interest, unutilized line fee, and L/C fronting fees through October 11, 2009, including outstanding obligations under outstanding letters of credit, the "**Prepetition Secured Credit Agreement Claims**") outstanding under that certain Third Amended and Restated Credit Agreement (the "**Prepetition Secured Credit Agreement**"), dated as of June 12, 2007, by and among Stallion Oilfield Services Ltd., certain affiliate guarantors, UBS AG, as administrative agent and collateral agent (in such capacity, the "**Prepetition Secured Administrative Agent**"), and the lenders party thereto (together with the Prepetition Secured Administrative Agent, the "**Prepetition Credit Agreement Lenders**"); |
| | (ii) approximately $258.9 million in obligations (together with any accrued and unpaid interest through October 11, 2009, the "**Prepetition Unsecured Bridge Credit Agreement Claims**") outstanding under that certain Credit Agreement (the "**Prepetition Unsecured Bridge Credit Agreement**"), dated as of August 1, 2007, by and among Stallion Oilfield Services Ltd., certain affiliate guarantors, Wilmington Trust, as administrative agent (in such capacity, the "**Prepetition Bridge Administrative Agent**"), and the lenders party thereto (together with the Prepetition Bridge Administrative Agent, the "**Prepetition Bridge Lenders**"); |
| | (iii) approximately $283.3 million in obligations (together with any accrued and unpaid interest through October 11, 2009, the "**Unsecured Note Claims**" and, together with the Prepetition Unsecured Bridge Credit Agreement Claims, the "**Unsecured Funded Debt Claims**") outstanding on account of the 9.75% senior unsecured notes due February 1, 2015 (the "**Unsecured Notes**"), issued by Stallion Oilfield Services Ltd. and Stallion Oilfield Finance Corp. pursuant to that certain Indenture, dated as of January 24, 2007 (the "**Unsecured Notes Indenture**"), by and among Stallion Oilfield Services Ltd., Stallion Oilfield Finance Corp., and certain affiliate guarantors, and The Bank of New York Trust Company, N.A., as trustee (the "**Unsecured Notes Trustee**"); and |
| | (iv) amounts due under certain hedging agreements related to the Prepetition Secured Credit Agreement Claims and the Prepetition Unsecured Bridge Credit Agreement Claims (the "**Secured Swap Claims**"). |
| **Securities to be Issued under the Plan of Reorganization** | **New Equity.** Reorganized Stallion Holdings, a newly formed corporation, ("**Reorganized Stallion Holdings**") shall issue equity (the "**New Equity**") on the effective date of the Plan of Reorganization (the "**Effective Date**"), which equity shall be deemed fully paid and non-assessable.<br><br>**Warrants.** Warrants to acquire 1% of the New Equity in Reorganized Stallion Holdings exercisable at an enterprise value of $750 million (subject to dilution by the MEIP (as defined herein)) (the "**Warrants**"). |

| CLASSIFICATION AND TREATMENT OF CLAIMS | |
|---|---|
| **Unclassified Claims** | |
| **Administrative Claims** | **Treatment.** Each holder of an allowed administrative claim, including claims of the type described in section 503(b)(9) of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") to the extent such claim has not already been paid during the chapter 11 cases, (each, an "**Administrative Claim**") shall receive payment in full, in cash, of the unpaid portion of its allowed Administrative Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such Administrative Claim and the Debtors.<br><br>**Voting.** Unimpaired. Holders of Administrative Claims (solely on account of such Administrative Claims) will be conclusively deemed to have accepted the Plan of Reorganization pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Administrative Claims will not be entitled to vote to accept or reject the Plan of Reorganization. |
| **Priority Tax Claims** | **Treatment.** Priority tax claims ("**Priority Tax Claims**") shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.<br><br>**Voting.** Unimpaired. Each holder of a Priority Tax Claim will be conclusively deemed to have accepted the Plan of Reorganization pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of a Priority Tax Claim will not be entitled to vote to accept or reject the Plan of Reorganization. |
| **Classified Claims and Interests** | |
| **Other Priority Claims** | **Treatment.** Each holder of an allowed claim described in section 507(a) of the Bankruptcy Code, to the extent such claim has not already been paid during the chapter 11 cases, (each, an "**Other Priority Claim**") shall receive payment in full, in cash, of the unpaid portion of its Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of an Other Priority Claim and the Debtors.<br><br>**Voting.** Unimpaired. Each holder of an Other Priority Claims will be conclusively deemed to have accepted the Plan of Reorganization pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Other Priority Claim will not be entitled to vote to accept or reject the Plan of Reorganization. |
| **Other Secured Claims** | **Treatment.** Each holder of an allowed secured claim, including Secured Swap Claims, other than a Prepetition Secured Credit Agreement Claim (each, an "**Other Secured Claim**"), shall receive payment in full, in cash, of the unpaid portion of its Other Secured Claim on the Effective Date or as |

| | soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such Other Secured Claim and the Debtors. |
|---|---|
| | **Voting.** Unimpaired. Each holder of an Other Secured Claim will be conclusively deemed to have accepted the Plan of Reorganization pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Other Secured Claim will not be entitled to vote to accept or reject the Plan of Reorganization. |
| **Prepetition Secured Credit Agreement Claims** | **Allowance.** The Prepetition Secured Credit Agreement Claims shall be allowed in an aggregate amount equal to approximately $245.8 million.<br><br>**Treatment.** On the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a holder of a Prepetition Secured Credit Agreement Claim agrees to less favorable treatment of its allowed Prepetition Secured Credit Agreement Claim, each holder of a Prepetition Secured Credit Agreement Claim shall receive, at the sole and absolute discretion of Stallion, either (a) its pro rata share of (i) $25 million of cash (as further described in Exhibit 1) and (ii) $220.8 million[1] in secured debt pursuant to an amended and restated credit agreement on the terms and conditions set forth in Exhibit 1 or (b) payment in full, in cash, of the unpaid portion of its Prepetition Secured Credit Agreement Claim; *provided*, *however*, that Stallion must elect the same option for all holders of Prepetition Secured Credit Agreement Claims.<br><br>**Voting.** Impaired. Each holder of a Prepetition Secured Credit Agreement Claim will be entitled to vote to accept or reject the Plan of Reorganization; *provided*, *however*, that if Stallion elects to satisfy Prepetition Secured Credit Agreement Claims pursuant to (b) above, then each holder of a Prepetition Secured Credit Agreement Claim will be conclusively deemed to have accepted the Plan of Reorganization pursuant to section 1126(f) of the Bankruptcy Code and, therefore, will not be entitled to vote to accept or reject the Plan of Reorganization. |
| **Unsecured Funded Debt Claims** | **Allowance.** The Prepetition Unsecured Bridge Credit Agreement Claims shall be allowed in an aggregate amount equal to approximately $258.0 million. The Unsecured Note Claims shall be allowed in an aggregate amount equal to approximately $283.1 million.<br><br>**Treatment.** On the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a holder of an Unsecured Funded Debt Claim agrees to less favorable treatment of its allowed Unsecured Funded Debt Claim, each holder of an allowed Unsecured Funded Debt Claim against the Debtors shall receive its pro rata share of 98% of the New |

---

[1]    Number equals total allowed Prepetition Secured Credit Agreement Claims less the cash portion. Debt consideration subject to adjustment for paydown using asset sale proceeds and accrued and unpaid interest and fees at such time.

| | |
|---|---|
| | Equity (the "**Equity Consideration**"), subject to dilution from the MEIP and the Warrants.<br><br>**Voting.** Impaired. Each holder of an Unsecured Funded Debt Claim will be entitled to vote to accept or reject the Plan of Reorganization. |
| **General Unsecured Claims** | **Treatment.** On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an allowed general unsecured claim (each, a "**General Unsecured Claim**") agrees to less favorable treatment of its allowed General Unsecured Claim or has been paid prior to the Effective Date, each allowed General Unsecured Claim shall be paid in full, in cash, in the ordinary course of business or otherwise rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.[2]<br><br>**Voting.** Unimpaired. Each holder of a General Unsecured Claim will be conclusively deemed to have accepted the Plan of Reorganization pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of a General Unsecured Claim will not be entitled to vote to accept or reject the Plan of Reorganization. |
| **Existing Equity Interests** | **Treatment.** On the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a holder of an existing equity interest in Stallion Oilfield Holdings, Ltd. (including any partnership interest in Stallion and options, warrants, or other agreements to acquire the same (whether or not arising under or in connection with any employment agreement)) (each, an "**Existing Equity Interest**") agrees to less favorable treatment of its allowed Existing Equity Interest, each holder of an allowed Existing Equity Interest shall receive a pro rata share of (i) 2% of the New Equity (subject to dilution from the MEIP and the Warrants) and (ii) the Warrants.<br><br>**Voting.** Impaired. Each holder of an Existing Equity Interest will be entitled to vote to accept or reject the Plan of Reorganization. |
| **GENERAL PROVISIONS** | |
| **Management Equity Incentive Plan** | On the Effective Date, the Reorganized Debtors shall implement the Management Equity Incentive Plan (the "**MEIP**") for the benefit of certain continuing employees of the Reorganized Debtors on the following terms:<br><br>**Equity Pool.** On the Effective Date, the Reorganized Debtors shall reserve 10% of the fully diluted New Equity for equity grants to officers and employees of the Reorganized Debtors (the "**Equity Pool**"). In the event shares of New Equity also are made available to the initial members of the board of directors of the Reorganized Debtors, such shares shall be in addition to and not out of the Equity Pool. |

---

[2]      Stallion reserves the right to impair certain General Unsecured Claims, including, but not limited to, rejection damage claims and litigation claims.

**Emergence Grants.** A minimum of 4% of the fully diluted New Equity will be issued to officers and employees as emergence grants within 30 days of the Effective Date (the "**Emergence Grants**"). Emergence Grants shall vest 50% on the date that is one year after the Effective Date, 25% on the date that is two years after the Effective Date, and 25% on the date that is three years after the Effective Date. Form of Emergence Grants TBD, but a material portion of such Emergence Grants will consist of grants of the equivalent of restricted New Equity.

**Future Grants.** All New Equity remaining in the Equity Pool may be granted to officers and employees within 5 years of the Effective Date at the discretion of the Board (as defined herein). In the event that a liquidity event occurs before the fifth anniversary of the Effective Date, all New Equity remaining in the Equity Pool may be, in the discretion of the Board, granted (in the form of stock) to and vested with officers and employees participating in the MEIP.

**Officer Loans.** Reorganized Stallion Holdings shall guarantee the obligations of the CEO, CFO, and COO (each, an "**Officer**," and collectively, the "**Officers**") under the officer loans (each, an "**Officer Loan**," and collectively, the "**Officer Loans**") and shall have the right to purchase the Officer Loans from the banks. Reorganized Stallion Holdings shall make payments to the Officers equal to their required interest payments plus a gross up for taxes due on account of such payment. For each scheduled amortization payment, Reorganized Stallion Holdings will loan, as requested, to each Officer an amount equal to the required amortization payment, with interest on such loan equal to the applicable federal rate (AFR) on the Effective Date. The Officers will seek a 5-year extension of the existing Officer Loans with a 10-year amortization payment schedule for the outstanding amounts. The first forgiveness period will be 18 months long beginning on the Effective Date (the "**First Forgiveness Period**") and thereafter each successive forgiveness period will be 12 months long ("**Successive Forgiveness Period**, and, collectively with the First Forgiveness Period, the "**Forgiveness Periods**"). At the end of each Forgiveness Period, if the Officer remains employed in good standing with Reorganized Stallion Holdings or the Officer was terminated without cause during such period, 50% of any principal payments made on such Officer's behalf by Reorganized Stallion Holdings during the applicable Forgiveness Period will be forgiven. Reorganized Stallion Holdings will not provide a gross up payment with regard to any taxable income incurred as a result of such forgiveness. Each Officer shall use a minimum of 50% of, and may use up to 100% of, the after tax proceeds of any annual cash incentive bonuses such Officer receives to reduce the bank loan balance.

| | |
|---|---|
| **Employment Agreements/Other Incentive Plans** | All obligations of Stallion and its subsidiaries to officers, directors, employees, and agents thereof shall be assumed in the Plan of Reorganization. Stallion to establish other incentive-based compensation programs, the terms and conditions of which shall be subject to approval by the Board (as defined herein). Agreements with certain management TBD. |

| Cancellation of Instruments, Certificates and Other Documents | On the Effective Date, except to the extent otherwise provided above, all instruments, certificates, and other documents evidencing debt or equity interests in the Debtors shall be cancelled, and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged. |
|---|---|

### CORPORATE GOVERNANCE/CHARTER PROVISIONS/RELEASES

| Board of Directors of Reorganized Stallion Oilfield Services Ltd. | Reorganized Stallion Holdings shall have a 5-person board of directors (the "**Board**"), which shall consist of Reorganized Stallion Holdings' Chief Executive Officer and 4 directors, including a non-executive Chairman, to be selected by the Informal Funded Debt Committee (as defined in the Plan Support Agreement) on or before the hearing to approve the disclos ure statement. |
|---|---|
| **Shareholders Agreement** | The holders of New Equity shall be parties to a shareholders agreement that is in form and substance reasonably acceptable to the Informal Funded Debt Committee and the Existing Equity Interests, provided, however, that so long as the Informal Funded Debt Committee and the holders of the Existing Equity Interests, working in good faith, agree upon certain reasonable provisions requested by the holders of the Existing Equity Interests which are not considered material economic terms by the Informal Funded Debt Committee, such shareholders agreement shall be deemed to be in form and substance reasonably acceptable to the holders of a majority of the Existing Equity Interests. |
| **Charter; Bylaws** | The charter, bylaws, and/or other organizational documents of each of the Debtors shall be amended and restated in a manner consistent with section 1123(a)(6) of the Bankruptcy Code. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan of Reorganization will be exempt from SEC registration under section 1145 of the Bankruptcy Code. |
| **Debtor Releases** | "**Released Party**" means each of: (a) the Prepetition Secured Administrative Agent; (b) the Prepetition Secured Credit Agreement Lenders; (c) the Prepetition Bridge Administrative Agent; (d) the Prepetition Bridge Lenders; (e) the Unsecured Notes Trustee; (f) holders of Unsecured Note Claims; (g) holders of Existing Equity Interests; (h) with respect to each of the foregoing entities in clauses (a) through (g), such entity's current and former affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such; and (h) the Debtors' and the Reorganized Debtors' current and former affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such, and only if serving in such capacity.

**Releases by the Debtors.** Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, the Released |

Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and their estates from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, their estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or equity interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the chapter 11 cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated in the Plan of Reorganization, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of claims and equity interests prior to or in the chapter 11 cases, the negotiation, formulation, or preparation of the Plan of Reorganization and related disclosure statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the confirmation date of the Plan of Reorganization, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.

**Releases by Holders of Claims and Equity Interests.**  As of the Effective Date, each holder of a claim or an equity interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all claims, equity interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of a debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the chapter 11 cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated in the Plan of Reorganization, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of claims and equity interests prior to or in the chapter 11 cases, the negotiation, formulation, or preparation of the Plan of Reorganization, the related disclosure statement, the related plan supplement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the confirmation date of the Plan of Reorganization, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-effective date obligations of any party under the Plan of Reorganization or any

| | |
|---|---|
| | document, instrument, or agreement (including those set forth in the plan supplement) executed to implement the Plan of Reorganization. |
| **Exculpation** | Customary exculpation provisions, including all Released Parties. |
| **Discharge** | Customary discharge provisions. |
| **Injunction** | Customary injunction provisions, including all Released Parties. |
| **Indemnification of Prepetition Officers and Directors** | Under the Plan of Reorganization, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation, board resolutions, indemnification agreements, or employment contracts) for the current and former directors, officers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors shall be assumed and irrevocable and shall survive the effectiveness of the Plan of Reorganization. |
| **Tax Issues** | The terms of the Plan of Reorganization and the restructuring contemplated by this Term Sheet shall be structured to preserve favorable tax attributes of the Debtors to the extent practicable. |
| **Restructuring Transactions** | The Debtors anticipate that all of the assets of Stallion Oilfield Services Ltd. will be transferred to Reorganized Stallion Holdings in exchange for 100% of the New Equity and such New Equity will then be transferred to the holders of claims as set forth above. |
| **PLAN IMPLEMENTATION AND PROPOSED REORGANIZATION SCHEDULE** | |
| **Plan Support Agreement** | Prior to the commencement of the Debtors' chapter 11 cases, (a) holders of at least two-thirds in amount and more than one-half in number of outstanding Prepetition Secured Credit Agreement Claims, (b) holders of at least two-thirds in amount and more than one-half in number of outstanding Prepetition Unsecured Bridge Credit Agreement Claims, (c) holders of at least two-thirds in amount and more than one-half in number of outstanding Unsecured Note Claims, (d) holders of at least two-thirds in amount of Existing Equity Interests, and (e) the Debtors shall execute and deliver the Plan Support Agreement. |
| **Conditions Precedent to Plan Confirmation** | Confirmation of the Plan of Reorganization shall be subject to the following conditions precedent: (a) the Plan of Reorganization must be in form and substance acceptable to the Debtors and reasonably acceptable to the Prepetition Secured Administrative Agent and counsel to the Ad Hoc Committee of Unsecured Funded Debt Claims; and (b) the Bankruptcy Court shall have entered an order confirming the Plan of Reorganization in form and substance acceptable to the Debtors and reasonably acceptable to the Prepetition Secured Administrative Agent and counsel to the Ad Hoc Committee of Unsecured Funded Debt Claims. |

# Amendment Terms of Prepetition Senior Secured Credit Agreement—Exhibit 1

| | |
|---|---|
| Fees | 150 bps, payable to all lenders consenting to the amendment (keyed off aggregate principal amount of loans and commitments prior to giving effect to any of the paydowns or commitment reductions noted below). This fee shall be secured by the collateral and an amendment to that effect shall be executed at the same time as the lock up, and shall be deemed earned upon the entering into of the lock-up agreement and payable immediately, provided however that Stallion may defer payment of this fee until the date Stallion emerges from its bankruptcy if payment of such fee is assured as an administrative claim in Stallion's bankruptcy case and such status is reflected in a final, non-appealable order within 30 days of the petition date or as soon thereafter as the bankruptcy court's schedule permits but in no event later than 45 days. Failure to comply with the foregoing shall constitute a "Consenting Party Termination Event" under the lock-up agreement.<br><br>0 bps, payable to all lenders at maturity or repayment. |
| LIBOR Floor | 3.00% |
| Applicable Margin | Initial pricing of L+550 bps on revolver and L+650 bps on term loan, future pricing subject to the following grid: |
| Commitment Fee Increase | 25 bps (from 50 bps to 75 bps) |
| Paydown | $25 million pro rata from balance sheet cash upon effectiveness of the plan, plus thruster sale net proceeds ($15 million) consistent with asset sale consent (payable after receipt of net cash proceeds by Stallion), plus $2.5 million pro rata incremental principal payment, payable quarterly beginning June 30, 2010 and ending December 31, 2010 ($7.5 million in aggregate)- Full commitment reduction on revolving loans for $25 million paydown, thruster proceeds paydown, and $7.5 million incremental quarterly principal payments |
| Financial Covenants | Minimum Liquidity (unrestricted cash and revolver availability): $5 million through June 30, 2010, $10 million thereafter<br>- Tested monthly<br>- Total Leverage and Fixed Charge Coverage (defined in a manner to be agreed, but with fixed charges to include at a minimum interest expense, capital expenditure, net cash payments for income taxes, amortization payments on debt and certain dividends (if permitted)), subject to the following grid: |
| Permitted Acquisitions | Not permitted through September 30, 2010, unless funded with Qualified Capital Stock<br>Permitted thereafter, provided pro forma covenant compliance and less than 2.0x total leverage |
| Reporting | Submission of monthly financials within 30 days of each of the first two months of each fiscal quarter |
| Equity Cure | Permitted with cash purchasing common equity, provided that (a) only up to the amount necessary to cure financial covenant breach may be contributed, (b) no more than 4 cures permitted during life of loan, (c) cannot exercise cure more than 2 times in any four fiscal quarter period and cannot exercise cure in two consecutive fiscal quarters, (d) EBITDA shall only be increased by the amount of cash contributed for purposes of financial covenant compliance and (e) 100% of the cure amount must be used to prepay the loans (and reduce revolving commitments). |
| Unsecured Debt | Fully equitized |

Applicable Margin grid:

| Secured Debt Outstanding | | Margin on Eurodollar Loans (TL/Revolver) |
|---|---|---|
| Less than or equal to: | Greater than | |
| | $175.0 million | 650 bps/550 bps |
| $175.0 million | $125.0 million | 550 bps/450 bps |
| $125.0 million | | 450 bps/350 bps |

Financial Covenants grid:

| | 2009 | 2010 | | | 2011 | | Thereafter |
|---|---|---|---|---|---|---|---|
| Covenant | 12/31 | 3/31 | 6/30 | 9/30 | 12/31 | 3/31 | 6/30 |
| Total Leverage | 5.25x | 5.25x | 4.50x | 4.50x | 4.25x | 3.75x | 3.75x | 3.25x |
| Fixed Charge Coverage | 1.15x | 1.15x | 1.15x | 1.25x | 1.25x | 1.25x | 1.25x | 1.25x |

| | |
|---|---|
| Location of Cash | All cash must be maintained at a RC or TL Syndicate Bank (and control agreements satisfactory to the agent covering such cash to be entered into between Stallion, UBS and the relevant syndicate bank).<br>-Subject to small carve-out not in excess of $5mm, subject to the first lien of the agent in a control agreement satisfactory to the agent |
| Changes to Covenants and Other Provisions | To be modified in a manner to be agreed, but:<br>- To limit Stallion's ability to move inventory and equipment outside of continental United States during life of loan to the inventory and equipment currently outside the continental United States (approximately $24mm worth) plus an additional $15mm of inventory and equipment going forward (4.5 of the Security Agreement)<br>- To limit Permitted Unsecured Indebtedness to $5mm (6.01(m) of the Credit Agreement)<br>- To remove second lien debt basket (6.01(n) of the Credit Agreement)<br>- To remove basket permitting bridge loan (6.01(o) of the Credit Agreement)<br>- To prohibit L/Cs and bank guarantees not in USD for lease of a vessel in excess of $10mm (currently $15mm as per 6.01(p) of the Credit Agreement)<br>- To add a new basket for unsecured guarantees of existing (as may be modified) loans to officers and directors in an amount not to exceed $10mm.<br>- To increase the basket for bid, performance or surety bonds from $3mm to $5mm (6.01(f) of the Credit Agreement)<br>- To remove lien basket permitting liens on the senior notes and second lien facility (6.02(r) of the Credit Agreement)<br>- To limit investment basket permitting investments in foreign subsidiaries from (x) up to $30mm plus the Available Equity Amount to (y) up to $10mm plus Available Equity Amount (for equity issued after emergence from bankruptcy); provided that the net cash proceeds of such issuance are used substantially contemporaneously with the issuance thereof for the purposes specified in the notice required by the definition of Available Equity Amount (6.04(j) of the Credit Agreement)<br>- To modify the general investments basket from (x) greater of $15mm or 5% consolidated tangible assets to (y) $15mm (6.04(l) of the Credit Agreement)<br>- To add an investment basket for existing (as may be modified) loans to officers and directors for the purpose of paying principal and interest on such loans in an amount not to exceed $10mm.<br>- To modify Stallion's reinvestment rights for asset sale and casualty proceeds to a flat 180 days (removing 360 day reinvestment period) (2.10 of the Credit Agreement)<br>- To modify 6.08(b) of the Credit Agreement to make it clear that clause (y) is limited only to net cash proceeds of qualified capital stock issued after emergence from bankruptcy and may only be used to purchase or redeem qualified capital stock issued after emergence from bankruptcy.<br>- To remove ability to pay Annual Monitoring Fee and any other fees to current or future equityholders as currently permitted under 6.08(e) and (g) of the Credit Agreement.<br>- To remove the ability to pay other debt with equity or junior financing (6.11(a) of the Credit Agreement) (other than Permitted Unsecured Debt, Subordinated Debt and Non-Recourse Debt which can be refinanced with equity issued after emergence from bankruptcy or other permitted unsecured indebtedness not prohibited for use for such purpose (but in the case of Subordinated Debt or Non-Recourse Debt, to the extent such debt is refinanced with debt, such debt must be either Subordinated Debt or Non-Recourse Debt, as applicable)<br>- Changes to related provisions to reflect the foregoing changes. |
| Treatment of Lehman | Subject to the requirements of the credit agreement and applicable bankruptcy law as it relates to Lehman, the parties will endeavor to obtain the following treatment for Lehman's funded and unfunded revolver commitments:<br>- Upon Stallion's emergence from bankruptcy, Lehman's funded revolver will be converted into a term loan that will (a) mature on March 1, 2011 (same date as the revolver) and (b) have the same applicable margin as the revolver. Other than (a) and (b), Lehman's funded revolver will be treated as a term loan for all purposes under the credit agreement, including mandatory prepayments.<br>- Lehman's unfunded revolver commitments will be terminated in Stallion's bankruptcy. |

**EXHIBIT B**
**PROVISION FOR TRANSFER AGREEMENT**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring and Lock-Up Agreement (the "**Agreement**"),[1] dated as of [DATE], 2009, by and among the Company, and certain lenders, noteholders, and equity holders, including the transferor to the Transferee of any Prepetition Secured Credit Agreement Claims, Prepetition Unsecured Bridge Credit Agreement Claims, Unsecured Note Claims, or Existing Equity Interests (the "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed a Consenting Secured Lender, Consenting Bridge Lender, Consenting Noteholder, or Consenting Equity Holder, (as applicable) under the terms of the Agreement.

The Transferee specifically agrees (i) to be bound by the terms and conditions of the Prepetition Secured Credit Agreement, the Prepetition Unsecured Bridge Credit Agreement, or the Unsecured Notes Indenture, as applicable, and the Agreement and (ii) to be bound by the vote of the Transferor if cast prior to the effectiveness of the transfer of the loans or notes, as applicable.

Date Executed: _____, 2009

_____
**Print name of Transferee**

_____
**Name:**
**Title:**

**Address:**     _____

_____

**Attention:**     _____
**Telephone:**     _____
**Facsimile:**     _____

| Principal Amount Held | |
|---|---|
| **Claim or Equity Interest** | **Amount** |
| Prepetition Secured Credit Agreement Claims | |
| Prepetition Unsecured Bridge Credit Agreement Claims | |
| Unsecured Note Claims | |
| Existing Equity Interests | |

---

[1]     Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

## EXHIBIT 1

## Restructuring Term Sheet

---

## STALLION OILFIELD SERVICES LTD.

## <u>JOINT PLAN OF REORGANIZATION TERM SHEET</u>

---

**THIS TERM SHEET (THIS "<u>TERM SHEET</u>") DESCRIBES A PROPOSED RESTRUCTURING (THE "<u>RESTRUCTURING</u>") FOR STALLION OILFIELD HOLDINGS, LTD. AND CERTAIN OF ITS AFFILIATES (COLLECTIVELY, THE "<u>DEBTORS</u>" AND, TOGETHER WITH THEIR NON-FILING AFFILIATES, "<u>STALLION</u>") PURSUANT TO A JOINT PLAN OF REORGANIZATION (THE "<u>PLAN OF REORGANIZATION</u>"), WHICH WOULD BE FILED BY THE DEBTORS IN CONNECTION WITH A CONTEMPLATED CHAPTER 11 FILING IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "<u>BANKRUPTCY COURT</u>").**

**THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF STALLION. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**THIS TERM SHEET IS PROVIDED IN CONFIDENCE AND MAY NOT BE DISTRIBUTED WITHOUT THE EXPRESS WRITTEN CONSENT OF STALLION. THIS TERM SHEET IS A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. ACCORDINGLY, THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS TERM SHEET IS SUBJECT TO ONGOING REVIEW AND APPROVAL BY, AND IS NOT BINDING UPON, STALLION, IS SUBJECT TO MATERIAL CHANGE, AND IS BEING DISTRIBUTED FOR DISCUSSION PURPOSES ONLY.**

| OVERVIEW | |
|---|---|
| **Restructuring Summary** | Prior to the commencement of the Debtors' chapter 11 cases, the requisite threshold of Prepetition Secured Credit Agreement Lenders, Prepetition Bridge Lenders, holders of Unsecured Note Claims, holders of Existing Equity Interests (as such terms are defined herein), and the Debtors, shall have executed a Plan Support Agreement (the "**Plan Support Agreement**"), pursuant to which the Debtors will agree to pursue and implement a Plan of Reorganization consistent in form and substance in all material respects with this Term Sheet. This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the Plan of Reorganization and the related definitive documentation governing the Restructuring. |
| **Debt to be Repaid/ Restructured** | Indebtedness that will be treated under the Plan of Reorganization includes:<br><br>(i) approximately $245.8 million in obligations (together with any accrued |

| | |
|---|---|
| | and unpaid interest, unutilized line fee, and L/C fronting fees through October 11, 2009, including outstanding obligations under outstanding letters of credit, the "**Prepetition Secured Credit Agreement Claims**") outstanding under that certain Third Amended and Restated Credit Agreement (the "**Prepetition Secured Credit Agreement**"), dated as of June 12, 2007, by and among Stallion Oilfield Services Ltd., certain affiliate guarantors, UBS AG, as administrative agent and collateral agent (in such capacity, the "**Prepetition Secured Administrative Agent**"), and the lenders party thereto (together with the Prepetition Secured Administrative Agent, the "**Prepetition Credit Agreement Lenders**"); |
| | (ii) approximately $258.9 million in obligations (together with any accrued and unpaid interest through October 11, 2009, the "**Prepetition Unsecured Bridge Credit Agreement Claims**") outstanding under that certain Credit Agreement (the "**Prepetition Unsecured Bridge Credit Agreement**"), dated as of August 1, 2007, by and among Stallion Oilfield Services Ltd., certain affiliate guarantors, Wilmington Trust, as administrative agent (in such capacity, the "**Prepetition Bridge Administrative Agent**"), and the lenders party thereto (together with the Prepetition Bridge Administrative Agent, the "**Prepetition Bridge Lenders**"); |
| | (iii) approximately $283.3 million in obligations (together with any accrued and unpaid interest through October 11, 2009, the "**Unsecured Note Claims**" and, together with the Prepetition Unsecured Bridge Credit Agreement Claims, the "**Unsecured Funded Debt Claims**") outstanding on account of the 9.75% senior unsecured notes due February 1, 2015 (the "**Unsecured Notes**"), issued by Stallion Oilfield Services Ltd. and Stallion Oilfield Finance Corp. pursuant to that certain Indenture, dated as of January 24, 2007 (the "**Unsecured Notes Indenture**"), by and among Stallion Oilfield Services Ltd., Stallion Oilfield Finance Corp., and certain affiliate guarantors, and The Bank of New York Trust Company, N.A., as trustee (the "**Unsecured Notes Trustee**"); and |
| | (iv) amounts due under certain hedging agreements related to the Prepetition Secured Credit Agreement Claims and the Prepetition Unsecured Bridge Credit Agreement Claims (the "**Secured Swap Claims**"). |
| **Securities to be Issued under the Plan of Reorganization** | **New Equity.** Reorganized Stallion Holdings, a newly formed corporation, ("**Reorganized Stallion Holdings**") shall issue equity (the "**New Equity**") on the effective date of the Plan of Reorganization (the "**Effective Date**"), which equity shall be deemed fully paid and non-assessable. |
| | **Warrants.** Warrants to acquire 1% of the New Equity in Reorganized Stallion Holdings exercisable at an enterprise value of $750 million (subject to dilution by the MEIP (as defined herein)) (the "**Warrants**"). |

| **CLASSIFICATION AND TREATMENT OF CLAIMS** |
|---|
| **Unclassified Claims** |

| **Administrative Claims** | **Treatment.** Each holder of an allowed administrative claim, including claims of the type described in section 503(b)(9) of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") to the extent such claim has not already been paid during the chapter 11 cases, (each, an "**Administrative Claim**") shall receive payment in full, in cash, of the unpaid portion of its allowed Administrative Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such Administrative Claim and the Debtors.

**Voting.** Unimpaired. Holders of Administrative Claims (solely on account of such Administrative Claims) will be conclusively deemed to have accepted the Plan of Reorganization pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Administrative Claims will not be entitled to vote to accept or reject the Plan of Reorganization. |
|---|---|
| **Priority Tax Claims** | **Treatment.** Priority tax claims ("**Priority Tax Claims**") shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

**Voting.** Unimpaired. Each holder of a Priority Tax Claim will be conclusively deemed to have accepted the Plan of Reorganization pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of a Priority Tax Claim will not be entitled to vote to accept or reject the Plan of Reorganization. |

| **Classified Claims and Interests** |
|---|

| **Other Priority Claims** | **Treatment.** Each holder of an allowed claim described in section 507(a) of the Bankruptcy Code, to the extent such claim has not already been paid during the chapter 11 cases, (each, an "**Other Priority Claim**") shall receive payment in full, in cash, of the unpaid portion of its Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of an Other Priority Claim and the Debtors.

**Voting.** Unimpaired. Each holder of an Other Priority Claims will be conclusively deemed to have accepted the Plan of Reorganization pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Other Priority Claim will not be entitled to vote to accept or reject the Plan of Reorganization. |
|---|---|
| **Other Secured Claims** | **Treatment.** Each holder of an allowed secured claim, including Secured Swap Claims, other than a Prepetition Secured Credit Agreement Claim (each, an "**Other Secured Claim**"), shall receive payment in full, in cash, of the unpaid portion of its Other Secured Claim on the Effective Date or as |

| | |
|---|---|
| | soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such Other Secured Claim and the Debtors.<br><br>**Voting.** Unimpaired. Each holder of an Other Secured Claim will be conclusively deemed to have accepted the Plan of Reorganization pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Other Secured Claim will not be entitled to vote to accept or reject the Plan of Reorganization. |
| **Prepetition Secured Credit Agreement Claims** | **Allowance.** The Prepetition Secured Credit Agreement Claims shall be allowed in an aggregate amount equal to approximately $245.8 million.<br><br>**Treatment.** On the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a holder of a Prepetition Secured Credit Agreement Claim agrees to less favorable treatment of its allowed Prepetition Secured Credit Agreement Claim, each holder of a Prepetition Secured Credit Agreement Claim shall receive, at the sole and absolute discretion of Stallion, either (a) its pro rata share of (i) $25 million of cash (as further described in Exhibit 1) and (ii) $220.8 million[1] in secured debt pursuant to an amended and restated credit agreement on the terms and conditions set forth in Exhibit 1 or (b) payment in full, in cash, of the unpaid portion of its Prepetition Secured Credit Agreement Claim; *provided*, *however*, that Stallion must elect the same option for all holders of Prepetition Secured Credit Agreement Claims.<br><br>**Voting.** Impaired. Each holder of a Prepetition Secured Credit Agreement Claim will be entitled to vote to accept or reject the Plan of Reorganization; *provided*, *however*, that if Stallion elects to satisfy Prepetition Secured Credit Agreement Claims pursuant to (b) above, then each holder of a Prepetition Secured Credit Agreement Claim will be conclusively deemed to have accepted the Plan of Reorganization pursuant to section 1126(f) of the Bankruptcy Code and, therefore, will not be entitled to vote to accept or reject the Plan of Reorganization. |
| **Unsecured Funded Debt Claims** | **Allowance.** The Prepetition Unsecured Bridge Credit Agreement Claims shall be allowed in an aggregate amount equal to approximately $258.0 million. The Unsecured Note Claims shall be allowed in an aggregate amount equal to approximately $283.1 million.<br><br>**Treatment.** On the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a holder of an Unsecured Funded Debt Claim agrees to less favorable treatment of its allowed Unsecured Funded Debt Claim, each holder of an allowed Unsecured Funded Debt Claim against the Debtors shall receive its pro rata share of 98% of the New |

---

[1] Number equals total allowed Prepetition Secured Credit Agreement Claims less the cash portion. Debt consideration subject to adjustment for paydown using asset sale proceeds and accrued and unpaid interest and fees at such time.

| | |
|---|---|
| | Equity (the "**Equity Consideration**"), subject to dilution from the MEIP and the Warrants.<br><br>**Voting.** Impaired. Each holder of an Unsecured Funded Debt Claim will be entitled to vote to accept or reject the Plan of Reorganization. |
| **General Unsecured Claims** | **Treatment.** On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an allowed general unsecured claim (each, a "**General Unsecured Claim**") agrees to less favorable treatment of its allowed General Unsecured Claim or has been paid prior to the Effective Date, each allowed General Unsecured Claim shall be paid in full, in cash, in the ordinary course of business or otherwise rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.[2]<br><br>**Voting.** Unimpaired. Each holder of a General Unsecured Claim will be conclusively deemed to have accepted the Plan of Reorganization pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of a General Unsecured Claim will not be entitled to vote to accept or reject the Plan of Reorganization. |
| **Existing Equity Interests** | **Treatment.** On the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a holder of an existing equity interest in Stallion Oilfield Holdings, Ltd. (including any partnership interest in Stallion and options, warrants, or other agreements to acquire the same (whether or not arising under or in connection with any employment agreement)) (each, an "**Existing Equity Interest**") agrees to less favorable treatment of its allowed Existing Equity Interest, each holder of an allowed Existing Equity Interest shall receive a pro rata share of (i) 2% of the New Equity (subject to dilution from the MEIP and the Warrants) and (ii) the Warrants.<br><br>**Voting.** Impaired. Each holder of an Existing Equity Interest will be entitled to vote to accept or reject the Plan of Reorganization. |
| <div align="center">**GENERAL PROVISIONS**</div> | |
| **Management Equity Incentive Plan** | On the Effective Date, the Reorganized Debtors shall implement the Management Equity Incentive Plan (the "**MEIP**") for the benefit of certain continuing employees of the Reorganized Debtors on the following terms:<br><br>**Equity Pool.** On the Effective Date, the Reorganized Debtors shall reserve 10% of the fully diluted New Equity for equity grants to officers and employees of the Reorganized Debtors (the "**Equity Pool**"). In the event shares of New Equity also are made available to the initial members of the board of directors of the Reorganized Debtors, such shares shall be in addition to and not out of the Equity Pool. |

---

[2]      Stallion reserves the right to impair certain General Unsecured Claims, including, but not limited to, rejection damage claims and litigation claims.

| | |
|---|---|
| | **Emergence Grants.** A minimum of 4% of the fully diluted New Equity will be issued to officers and employees as emergence grants within 30 days of the Effective Date (the "**Emergence Grants**"). Emergence Grants shall vest 50% on the date that is one year after the Effective Date, 25% on the date that is two years after the Effective Date, and 25% on the date that is three years after the Effective Date. Form of Emergence Grants TBD, but a material portion of such Emergence Grants will consist of grants of the equivalent of restricted New Equity.<br><br>**Future Grants.** All New Equity remaining in the Equity Pool may be granted to officers and employees within 5 years of the Effective Date at the discretion of the Board (as defined herein). In the event that a liquidity event occurs before the fifth anniversary of the Effective Date, all New Equity remaining in the Equity Pool may be, in the discretion of the Board, granted (in the form of stock) to and vested with officers and employees participating in the MEIP.<br><br>**Officer Loans.** Reorganized Stallion Holdings shall guarantee the obligations of the CEO, CFO, and COO (each, an "**Officer**," and collectively, the "**Officers**") under the officer loans (each, an "**Officer Loan**," and collectively, the "**Officer Loans**") and shall have the right to purchase the Officer Loans from the banks. Reorganized Stallion Holdings shall make payments to the Officers equal to their required interest payments plus a gross up for taxes due on account of such payment. For each scheduled amortization payment, Reorganized Stallion Holdings will loan, as requested, to each Officer an amount equal to the required amortization payment, with interest on such loan equal to the applicable federal rate (AFR) on the Effective Date. The Officers will seek a 5-year extension of the existing Officer Loans with a 10-year amortization payment schedule for the outstanding amounts. The first forgiveness period will be 18 months long beginning on the Effective Date (the "**First Forgiveness Period**") and thereafter each successive forgiveness period will be 12 months long ("**Successive Forgiveness Period**, and, collectively with the First Forgiveness Period, the "**Forgiveness Periods**"). At the end of each Forgiveness Period, if the Officer remains employed in good standing with Reorganized Stallion Holdings or the Officer was terminated without cause during such period, 50% of any principal payments made on such Officer's behalf by Reorganized Stallion Holdings during the applicable Forgiveness Period will be forgiven. Reorganized Stallion Holdings will not provide a gross up payment with regard to any taxable income incurred as a result of such forgiveness. Each Officer shall use a minimum of 50% of, and may use up to 100% of, the after tax proceeds of any annual cash incentive bonuses such Officer receives to reduce the bank loan balance. |
| **Employment Agreements/Other Incentive Plans** | All obligations of Stallion and its subsidiaries to officers, directors, employees, and agents thereof shall be assumed in the Plan of Reorganization. Stallion to establish other incentive-based compensation programs, the terms and conditions of which shall be subject to approval by the Board (as defined herein). Agreements with certain management TBD. |

| | |
|---|---|
| **Cancellation of Instruments, Certificates and Other Documents** | On the Effective Date, except to the extent otherwise provided above, all instruments, certificates, and other documents evidencing debt or equity interests in the Debtors shall be cancelled, and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged. |

<div align="center">

**CORPORATE GOVERNANCE/CHARTER PROVISIONS/RELEASES**

</div>

| | |
|---|---|
| **Board of Directors of Reorganized Stallion Oilfield Services Ltd.** | Reorganized Stallion Holdings shall have a 5-person board of directors (the "**Board**"), which shall consist of Reorganized Stallion Holdings' Chief Executive Officer and 4 directors, including a non-executive Chairman, to be selected by the Informal Funded Debt Committee (as defined in the Plan Support Agreement) on or before the hearing to approve the disclos ure statement. |
| **Shareholders Agreement** | The holders of New Equity shall be parties to a shareholders agreement that is in form and substance reasonably acceptable to the Informal Funded Debt Committee and the Existing Equity Interests, provided, however, that so long as the Informal Funded Debt Committee and the holders of the Existing Equity Interests, working in good faith, agree upon certain reasonable provisions requested by the holders of the Existing Equity Interests which are not considered material economic terms by the Informal Funded Debt Committee, such shareholders agreement shall be deemed to be in form and substance reasonably acceptable to the holders of a majority of the Existing Equity Interests. |
| **Charter; Bylaws** | The charter, bylaws, and/or other organizational documents of each of the Debtors shall be amended and restated in a manner consistent with section 1123(a)(6) of the Bankruptcy Code. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan of Reorganization will be exempt from SEC registration under section 1145 of the Bankruptcy Code. |
| **Debtor Releases** | "**Released Party**" means each of: (a) the Prepetition Secured Administrative Agent; (b) the Prepetition Secured Credit Agreement Lenders; (c) the Prepetition Bridge Administrative Agent; (d) the Prepetition Bridge Lenders; (e) the Unsecured Notes Trustee; (f) holders of Unsecured Note Claims; (g) holders of Existing Equity Interests; (h) with respect to each of the foregoing entities in clauses (a) through (g), such entity's current and former affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such; and (h) the Debtors' and the Reorganized Debtors' current and former affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such, and only if serving in such capacity. <br><br> **Releases by the Debtors.** Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, the Released |

Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and their estates from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, their estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or equity interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the chapter 11 cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated in the Plan of Reorganization, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of claims and equity interests prior to or in the chapter 11 cases, the negotiation, formulation, or preparation of the Plan of Reorganization and related disclosure statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the confirmation date of the Plan of Reorganization, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.

**Releases by Holders of Claims and Equity Interests.** As of the Effective Date, each holder of a claim or an equity interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all claims, equity interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of a debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the chapter 11 cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated in the Plan of Reorganization, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of claims and equity interests prior to or in the chapter 11 cases, the negotiation, formulation, or preparation of the Plan of Reorganization, the related disclosure statement, the related plan supplement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the confirmation date of the Plan of Reorganization, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-effective date obligations of any party under the Plan of Reorganization or any

| | |
|---|---|
| | document, instrument, or agreement (including those set forth in the plan supplement) executed to implement the Plan of Reorganization. |
| **Exculpation** | Customary exculpation provisions, including all Released Parties. |
| **Discharge** | Customary discharge provisions. |
| **Injunction** | Customary injunction provisions, including all Released Parties. |
| **Indemnification of Prepetition Officers and Directors** | Under the Plan of Reorganization, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation, board resolutions, indemnification agreements, or employment contracts) for the current and former directors, officers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors shall be assumed and irrevocable and shall survive the effectiveness of the Plan of Reorganization. |
| **Tax Issues** | The terms of the Plan of Reorganization and the restructuring contemplated by this Term Sheet shall be structured to preserve favorable tax attributes of the Debtors to the extent practicable. |
| **Restructuring Transactions** | The Debtors anticipate that all of the assets of Stallion Oilfield Services Ltd. will be transferred to Reorganized Stallion Holdings in exchange for 100% of the New Equity and such New Equity will then be transferred to the holders of claims as set forth above. |
| **PLAN IMPLEMENTATION AND PROPOSED REORGANIZATION SCHEDULE** | |
| **Plan Support Agreement** | Prior to the commencement of the Debtors' chapter 11 cases, (a) holders of at least two-thirds in amount and more than one-half in number of outstanding Prepetition Secured Credit Agreement Claims, (b) holders of at least two-thirds in amount and more than one-half in number of outstanding Prepetition Unsecured Bridge Credit Agreement Claims, (c) holders of at least two-thirds in amount and more than one-half in number of outstanding Unsecured Note Claims, (d) holders of at least two-thirds in amount of Existing Equity Interests, and (e) the Debtors shall execute and deliver the Plan Support Agreement. |
| **Conditions Precedent to Plan Confirmation** | Confirmation of the Plan of Reorganization shall be subject to the following conditions precedent: (a) the Plan of Reorganization must be in form and substance acceptable to the Debtors and reasonably acceptable to the Prepetition Secured Administrative Agent and counsel to the Ad Hoc Committee of Unsecured Funded Debt Claims; and (b) the Bankruptcy Court shall have entered an order confirming the Plan of Reorganization in form and substance acceptable to the Debtors and reasonably acceptable to the Prepetition Secured Administrative Agent and counsel to the Ad Hoc Committee of Unsecured Funded Debt Claims. |

# Amendment Terms of Prepetition Senior Secured Credit Agreement—Exhibit 1

| | |
|---|---|
| Fees | 150 bps, payable to all lenders consenting to the amendment (keyed off aggregate principal amount of loans and commitments prior to giving effect to any of the paydowns or commitment reductions noted below). This fee shall be secured by the collateral and an amendment to that effect shall be executed at the same time as the lock up, and shall be deemed earned upon the entering into of the lock-up agreement and payable immediately, provided however that Stallion may defer payment of this fee until the date Stallion emerges from its bankruptcy if payment of such fee is assured as an administrative claim in Stallion's bankruptcy case and such status is reflected in a final, non-appealable order within 30 days of the petition date or as soon thereafter as the bankruptcy court's schedule permits but in no event later than 45 days. Failure to comply with the foregoing shall constitute a "Consenting Party Termination Event" under the lock-up agreement.<br><br>0 bps, payable to all lenders at maturity or repayment. |
| LIBOR Floor | 3.00% |
| Applicable Margin | Initial pricing of L+550 bps on revolver and L+650 bps on term loan, future pricing subject to the following grid: |

| Secured Debt Outstanding | | Margin on Eurodollar Loans (TL/Revolver) | |
|---|---|---|---|
| Less than or equal to: | Greater than | | |
| | $175.0 million | 650 bps/550 bps | |
| $175.0 million | $125.0 million | 550 bps/450 bps | |
| $125.0 million | | 450 bps/350 bps | |

| | |
|---|---|
| Commitment Fee Increase | 25 bps (from 50 bps to 75 bps) |
| Paydown | $25 million pro rata from balance sheet cash upon effectiveness of the plan, plus thruster sale net proceeds ($15 million) consistent with asset sale consent (payable after receipt of net cash proceeds by Stallion), plus $2.5 million pro rata incremental principal payment, payable quarterly beginning June 30, 2010 and ending December 31, 2010 ($7.5 million in aggregate)- Full commitment reduction on revolving loans for $25 million paydown, thruster proceeds paydown, and $7.5 million incremental quarterly principal payments |
| Financial Covenants | Minimum Liquidity (unrestricted cash and revolver availability): $5 million through June 30, 2010, $10 million thereafter<br>- Tested monthly<br>- Total Leverage and Fixed Charge Coverage (defined in a manner to be agreed, but with fixed charges to include at a minimum interest expense, capital expenditure, net cash payments for income taxes, amortization payments on debt and certain dividends (if permitted)), subject to the following grid: |

| | 2009 | | | 2010 | | | 2011 | There-after |
|---|---|---|---|---|---|---|---|---|
| Covenant | 12/31 | 3/31 | 6/30 | 9/30 | 12/31 | 3/31 | 6/30 | |
| Total Leverage | 5.25x | 5.25x | 4.50x | 4.50x | 4.25x | 3.75x | 3.75x | 3.25x |
| Fixed Charge Coverage | 1.15x | 1.15x | 1.15x | 1.25x | 1.25x | 1.25x | 1.25x | 1.25x |

| | |
|---|---|
| Permitted Acquisitions | Not permitted through September 30, 2010, unless funded with Qualified Capital Stock<br>Permitted thereafter, provided pro forma covenant compliance and less than 2.0x total leverage |
| Reporting | Submission of monthly financials within 30 days of each of the first two months of each fiscal quarter |
| Equity Cure | Permitted with cash purchasing common equity, provided that (a) only up to the amount necessary to cure financial covenant breach may be contributed, (b) no more than 4 cures permitted during life of loan, (c) cannot exercise cure more than 2 times in any four fiscal quarter period and cannot exercise cure in two consecutive fiscal quarters, (d) EBITDA shall only be increased by the amount of cash contributed for purposes of financial covenant compliance and (e) 100% of the cure amount must be used to prepay the loans (and reduce revolving commitments). |
| Unsecured Debt | Fully equitized |

| | |
|---|---|
| Location of Cash | All cash must be maintained at a RC or TL Syndicate Bank (and control agreements satisfactory to the agent covering such cash to be entered into between Stallion, UBS and the relevant syndicate bank).<br>-Subject to small carve-out not in excess of $5mm, subject to the first lien of the agent in a control agreement satisfactory to the agent |
| Changes to Covenants and Other Provisions | To be modified in a manner to be agreed, but:<br>- To limit Stallion's ability to move inventory and equipment outside of continental United States during life of loan to the inventory and equipment currently outside the continental United States (approximately $24mm worth) plus an additional $15mm of inventory and equipment going forward (4.5 of the Security Agreement)<br>- To limit Permitted Unsecured Indebtedness to $5mm (6.01(m) of the Credit Agreement)<br>- To remove second lien debt basket (6.01(n) of the Credit Agreement)<br>- To remove basket permitting bridge loan (6.01(o) of the Credit Agreement)<br>- To prohibit L/Cs and bank guarantees not in USD for lease of a vessel in excess of $10mm (currently $15mm as per 6.01(p) of the Credit Agreement)<br>- To add a new basket for unsecured guarantees of existing (as may be modified) loans to officers and directors in an amount not to exceed $10mm.<br>- To increase the basket for bid, performance or surety bonds from $3mm to $5mm (6.01(f) of the Credit Agreement)<br>- To remove lien basket permitting liens on the senior notes and second lien facility (6.02(r) of the Credit Agreement)<br>- To limit investment basket permitting investments in foreign subsidiaries from (x) up to $30mm plus the Available Equity Amount to (y) up to $10mm plus Available Equity Amount (for equity issued after emergence from bankruptcy); provided that the net cash proceeds of such issuance are used substantially contemporaneously with the issuance thereof for the purposes specified in the notice required by the definition of Available Equity Amount (6.04(j) of the Credit Agreement)<br>- To modify the general investments basket from (x) greater of $15mm or 5% consolidated tangible assets to (y) $15mm (6.04(l) of the Credit Agreement)<br>- To add an investment basket for existing (as may be modified) loans to officers and directors for the purpose of paying principal and interest on such loans in an amount not to exceed $10mm.<br>- To modify Stallion's reinvestment rights for asset sale and casualty proceeds to a flat 180 days (removing 360 day reinvestment period) (2.10 of the Credit Agreement)<br>- To modify 6.08(b) of the Credit Agreement to make it clear that clause (y) is limited only to net cash proceeds of qualified capital stock issued after emergence from bankruptcy and may only be used to purchase or redeem qualified capital stock issued after emergence from bankruptcy.<br>- To remove ability to pay Annual Monitoring Fee and any other fees to current or future equityholders as currently permitted under 6.08(e) and (g) of the Credit Agreement.<br>- To remove the ability to pay other debt with equity or junior financing (6.11(a) of the Credit Agreement) (other than Permitted Unsecured Debt, Subordinated Debt and Non-Recourse Debt which can be refinanced with equity issued after emergence from bankruptcy or other permitted unsecured indebtedness not prohibited for use for such purpose (but in the case of Subordinated Debt or Non-Recourse Debt, to the extent such debt is refinanced with debt, such debt must be either Subordinated Debt or Non-Recourse Debt, as applicable)<br>- Changes to related provisions to reflect the foregoing changes. |
| Treatment of Lehman | Subject to the requirements of the credit agreement and applicable bankruptcy law as it relates to Lehman, the parties will endeavor to obtain the following treatment for Lehman's funded and unfunded revolver commitments:<br>- Upon Stallion's emergence from bankruptcy, Lehman's funded revolver will be converted into a term loan that will (a) mature on March 1, 2011 (same date as the revolver) and (b) have the same applicable margin as the revolver. Other than (a) and (b), Lehman's funded revolver will be treated as a term loan for all purposes under the credit agreement, including mandatory prepayments.<br>- Lehman's unfunded revolver commitments will be terminated in Stallion's bankruptcy. |