**THIS DISCLOSURE STATEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT HAVING JURISDICTION OVER THE BELOW–CAPTIONED CHAPTER 11 CASES.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STALLION OILFIELD SERVICES LTD., *et al.*,[1] | ) | Case No. 09-_____(___) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

### *DISCLOSURE STATEMENT RELATING TO THE JOINT PLAN OF REORGANIZATION OF STALLION OILFIELD SERVICES LTD., ET AL., PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE*

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware
Telephone:     (302) 651-7700
Facsimile:      (302) 651-7701

Attorneys for the Debtors

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, include: Stallion Oilfield Services Ltd. (2101); Central Industries, Inc. (3594); Salty's Disposal Wells, LP (0682); Salty's Manufacturing, Ltd. (0679); Stallion Acquisition, LLC (2495); Stallion Heavy Haulers, LP (3203); Stallion Interests, LLC (4416); Stallion Offshore Quarters, Inc. (7410); Stallion Oilfield Construction, LLC (1600); Stallion Oilfield Finance Corp. (7114); Stallion Oilfield Holdings GP, LLC (7889); Stallion Oilfield Holdings, Ltd. (7890); Stallion Oilfield Services, Inc. (8455); Stallion Production Services, LP (2038); Stallion Production, LLC (2040); Stallion Rockies Ltd. (9473); Stallion Solids Control, Inc. (4425); and Stallion Stables, LLC (7522). The location of Stallion Oilfield Services Ltd.'s corporate headquarters and the service address for the Debtors is: 950 Corbindale Road, Suite 300, Houston, Texas 77024.

# TABLE OF CONTENTS

Page

Important Information About this Disclosure Statement ..................................................................................3

Questions and Answers Regarding this Disclosure Statement and the Plan ...........................................................5

The Debtors' History and the Chapter 11 Cases ......................................................................................9

Events Leading to these Chapter 11 Cases ............................................................................................14

Initial Motions of the Chapter 11 Cases and Certain Related Relief ..................................................................19

Treatment of Claims and Interests...................................................................................................20

Management of the Company..........................................................................................................25

Composition of New Board of Directors ..............................................................................................26

Capital Structure of the Reorganized Debtors upon Consummation ..................................................................26

Summary of Legal Proceedings.......................................................................................................28

Valuation Analysis..................................................................................................................29

Liquidation Analysis................................................................................................................31

Projected Financial Information .....................................................................................................36

Risk Factors .......................................................................................................................41

Confirmation of the Plan............................................................................................................55

Effect of Confirmation of the Plan ..................................................................................................60

Important Securities Laws Disclosure ................................................................................................64

Nominee Voting Instructions .........................................................................................................65

Certain U.S. Federal Income Tax Consequences of the Plan............................................................................67

Recommendation of the Debtors ......................................................................................................74

K&E 15554052.32

## *<u>EXHIBITS</u>*

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Liquidation Analysis

EXHIBIT C    Reorganized Debtors' Financial Projections

K&E 15554052.32

## Important Information About this Disclosure Statement

This disclosure statement (this "Disclosure Statement") provides information regarding the *Joint Plan of Reorganization of Stallion Oilfield Services Ltd., et al., Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") that Stallion Oilfield Services Ltd. and the other debtors in the above-captioned Chapter 11 Cases (collectively, the "Debtors") are seeking to have confirmed by the Bankruptcy Court. A copy of the Plan is attached as **Exhibit A** hereto. All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan. The Debtors believe that the Plan is in the best interests of all Holders of Claims and Interests. The Debtors urge all Holders of a Claim or Interest entitled to vote on the Plan to vote in favor of the Plan.

Confirmation and Consummation of the Plan are subject to certain material conditions precedent described in Article IX of the Plan. There is no assurance that the Plan will be confirmed or, if confirmed, that such material conditions precedent will be satisfied or waived.

You are encouraged to read this Disclosure Statement in its entirety, including the Plan, which is attached as Exhibit A hereto, and the Section herein entitled "Risk Factors" prior to submitting your ballot to vote to accept or reject the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court.**

Summaries of the Plan and statements made in this Disclosure Statement in connection therewith are qualified in their entirety by reference to the Plan, the exhibits and schedules attached to the Plan, and the Plan Supplement. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to the Plan and obtaining Confirmation and may not be relied upon for any other purpose. The Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate. The summaries of the financial information and the documents attached to this Disclosure Statement, or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents. In the event of any inconsistency between this Disclosure Statement and the Plan, the relevant provision of the Plan, as it relates to such inconsistency, shall govern.

No representations concerning the Debtors or the value of the Debtors' property has been authorized by the Debtors other than as set forth in this Disclosure Statement. Any information, representations, or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement and in the Plan, should not be relied upon any Holder of a Claim or Interest entitled to vote to accept or reject the Plan.

Neither the United States Securities and Exchange Commission ("SEC") nor any similar federal, state, local, or foreign regulatory agency, has approved or disapproved of the offered securities or the Plan or passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this

Disclosure Statement has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

The shares of the common stock to be issued pursuant to the Plan (the "New Equity") as described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, as amended (the "Securities Act"), or similar federal, state, local, or foreign laws, in reliance on the exemptions from the registration requirements of those laws and the exemption set forth in section 1145 of the Bankruptcy Code and other applicable exemptions in foreign jurisdictions. Other shares of the New Equity may be issued pursuant to other applicable exemptions under the federal and foreign securities laws. To the extent exemptions from registration other than section 1145 apply, such securities may not be offered or sold except pursuant to a valid exemption or registration under the Securities Act or similar foreign laws.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;
- growth opportunities for existing services;
- financing plans;
- results of litigation;
- competitive position;
- disruption of operations;
- business strategy;
- contractual obligations;
- budgets;
- projected general market conditions;
- projected cost reductions;
- potential asset sales; and
- plans and objectives of management for future operations;
- projected and estimated liability costs, including tort, and environmental costs and costs of environmental remediation.
- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows;

Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement. These risks, uncertainties, and factors include:

- labor costs;
- multinational business risks;
- limited access to capital resources;
- adverse tax changes;
- lower prices for the Debtors' services or a decline in the Debtors' market share due to competition or price pressure by customers;
- continued decline in the general economic, business, and market conditions where the Debtors operate;

- the Debtors' ability to confirm and consummate the Plan;

- the Debtors' ability to reduce their overall financial leverage;

- inability to have claims discharged or settled during the Chapter 11 Cases;

- customer response to the Chapter 11 Cases;

- financial conditions of the Debtors' customers;

- commodity prices;

- price increases or shortages of raw materials and energy;

- the Debtors' ability to implement cost reduction initiatives in a timely and effective manner;

- changes in domestic and foreign laws and regulations;

- trade balance;

- interest rate fluctuations;

- seasonality and weather conditions;

- geopolitical instability;

- levels of oil and natural gas drilling activity; and

- disruptions in the Debtors' operations due to hurricanes, earthquakes, and other natural disasters.

## Questions and Answers Regarding this Disclosure Statement and the Plan

**Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Prior to soliciting acceptances of a proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding whether to accept or reject the Plan. This Disclosure Statement is being submitted in respect of the Plan in accordance with such requirements.

**Am I entitled to vote to accept or reject the Plan? What will I receive from the Debtors if the Plan is consummated?**

Your ability to vote and your distribution, if any, depend on what kind of Claim or Interest that you hold. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified. Such Claims must be satisfied in full in Cash on the Effective Date or, in the case of Priority Tax Claims, within 5 years of the Effective Date in accordance with section 1129(a)(9)(C). Administrative Claims and Priority Tax Claims are not entitled to vote to accept or reject the Plan and are conclusively deemed to have accepted the Plan. The remainder of Claims and Interests are classified into the following Classes and their respective voting statuses and anticipated recoveries are as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Senior Secured Claims | Impaired | Entitled to Vote |

K&E 15554052.32

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 4 | Unsecured Funded Debt Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 6 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 7 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 8 | Interests in Stallion Oilfield Holdings GP, LLC | Impaired | Entitled to Vote |
| Class 9 | Interests in Stallion Oilfield Holdings, Ltd. | Impaired | Entitled to Vote |
| Class 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

For more information about the treatment of Claims and Interests, see the Section herein entitled "Treatment of Claims and Interests."

**If the Plan provides that I get a distribution, when do I get it, and what do you mean when you refer to "Confirmation," "Effective Date," and "Consummation?"**

Confirmation of the Plan refers to the Bankruptcy Court's approval of the Plan. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan, there are conditions (described in Article IX of the Plan) that need to be satisfied or waived so that the Plan can be consummated and go effective. References to the Effective Date mean the date that all conditions to the Plan have been satisfied or waived, at which point the Plan may be "consummated." Distributions only will be made after Consummation of the Plan. See the Section herein entitled "Confirmation of the Plan," for a discussion of the conditions to Consummation.

**How will the Reorganized Debtors fund distributions under the Plan?**

The Reorganized Debtors will fund distributions under the Plan with cash on hand, including cash from operations, as well as proceeds from either (a) the Amended and Restated Prepetition Secured Credit Agreement or (b) New Financing.

**How is the Plan going to be implemented?**

The Restructuring Transactions will be effected in accordance with the Restructuring Transactions Memorandum. New Stallion Holdings, a newly formed corporation, shall issue the New Equity on the Effective Date.

**What are the contents of the solicitation packages to be sent to Holders of Claims and Interests who are eligible to vote to accept or reject the Plan?**

Holders of Claims and Interests who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials including:

- the appropriate ballot (each, a "Ballot"), beneficial holder ballot (each, a "Beneficial Holder Ballot," or master ballot (each a "Master Ballot") (where any broker, dealer, commercial bank, trust company, savings and loan financial institution, or other party (a "Nominee") is

entitled to cast a vote to accept or reject the Plan on behalf of an Entity holding the beneficial interest in such Claim, as applicable) and applicable voting instructions;

- a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement with all exhibits, including the Plan.

The notices sent to parties in interest will indicate that this Disclosure Statement, the Plan, and all of the exhibits thereto are (and, in the future, the Plan Supplement will be) available for viewing by any party by (a) contacting the Balloting Agent by telephone at (866) 734-9393, or by writing to Stallion Balloting, c/o Epiq Financial Balloting Group LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017; or (b) downloading such documents (excluding the Ballots) from the Debtors' restructuring website at http://chapter11.epiqsystems.com/stallion or by visiting the Bankruptcy Court's website at http://www.deb.uscourts.gov.

**Will the Debtors file reports with the SEC?**

The Debtors do not expect to file reports with the U.S. Securities Exchange Commission after the filing of the Chapter 11 Cases because they do not expect to be subject to the public reporting requirements of the Exchange Act or the regulations promulgated thereunder, nor do they expect to be a reporting issuer in the United States after the filing of the Chapter 11 Cases.

**What rights will the Debtors' new stockholders have?**

Each holder of New Equity issued under the Plan will be entitled to one vote per share of New Equity on all matters subject to a vote of holders of New Equity under applicable law and will be entitled to a pro rata share of any dividends that are declared by the board of directors of New Stallion Holdings to the extent such dividends are permitted. The New Equity will be the sole class of voting stock of New Stallion Holdings.

Holders of the New Equity of New Stallion Holdings may be parties to the Shareholders' Agreement. Any such Shareholders' Agreement may include provisions with respect to voting, drag-along and tag-along rights, share transfers, and information rights. Such Shareholders' Agreement will be in the form substantially set forth in the Plan Supplement, which will be filed with the Bankruptcy Court no later that ten days prior to the Confirmation Hearing. On the Effective Date, New Stallion Holdings will authorize and issue a number of shares of New Equity sufficient to satisfy the Debtors' obligations under the Plan.

**Where will New Stallion Holdings be organized?**

New Stallion Holdings will be organized in the United States under the Delaware General Corporation Law.

**How will the New Equity be distributed?  Will holders be entitled to stock certificates?**

The New Equity delivered to Holders of Unsecured Funded Debt Claims and Interests is expected to be delivered to Depository Trust Company ("DTC"). DTC will then distribute the New Equity to accounts at DTC designated by Holders Claims and Interests entitled to a distribution of New Equity under the Plan.

It is not expected that holders of New Equity will be entitled to stock certificates. DTC or its nominee will initially be considered the sole owner or holder of the New Equity issued. Holders of Claims and Interests that receive New Equity will be owners of beneficial interests in such New Equity and will not receive or be entitled to receive physical delivery of such securities.

**What is the deadline to vote on the Plan?**

5:00 p.m., prevailing Eastern Time, on [●], 2009.

**How do I vote to accept or reject the Plan?**

The Debtors are distributing this Disclosure Statement, accompanied by a Ballot, Beneficial Holder Ballot, or Master Ballot, as applicable, to be used for voting to accept or reject the Plan, to the Holders of Claims and Interests entitled to vote to accept or reject the Plan (and Nominees, as applicable). If you are a Holder of Claims or Interests in the following Classes, you may vote to accept or reject the Plan by completing the Ballot or Beneficial Holder Ballot and returning them in the envelopes provided: Classes 3, 4, 8, and 9.

The Debtors have engaged Epiq Bankruptcy Solutions, LLC to serve as the Claims Agent and Epiq Financial Balloting Group, LLC to serve as the Balloting Agent. The Claims Agent and the Balloting Agent are available to answer questions, provide additional copies of all materials, and oversee the voting process. The Balloting Agent will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

---

**BALLOTS**

Ballots and Master Ballots must be actually received by the Balloting Agent by the Voting Deadline, which is 5:00 p.m., prevailing Eastern Time, on [●], 2009 at the following address:

Stallion Balloting
c/o Epiq Financial Balloting Group LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

If you received an envelope addressed to your Nominee, please allow enough time when you return your Ballot for your Nominee to cast your vote on a Master Ballot before the Voting Deadline.

If you have any questions on the procedure for voting on the Plan, please call the Balloting Agent at the following telephone number:

(866) 734-9393

---

More detailed instructions regarding how to vote on the Plan are contained on the Ballots and Beneficial Holder Ballots distributed to Holders of Claims and Interests that are entitled to vote to accept or reject the Plan and the Master Ballots distributed to Nominees. For your vote to be counted, your Ballot or Beneficial Holder Ballot must be completed, signed, and received by the Voting Deadline;

*provided*, *however*, that Ballots and Master Ballots received by the Balloting Agent after the Voting Deadline may be counted only in the sole and absolute discretion of the Debtors.

Any Ballot, Beneficial Holder Ballot, or Master Ballot that is properly executed by the Holder of a Claim or Interest or a Nominee, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, will not be counted.

Each Holder of a Claim or Interest entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim or Interest held by such Holder. By signing and returning a Ballot, each Holder of a Claim or Interest in Classes 3, 4, 8, and 9 will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim or Interest have been cast or, if any other Ballots have been cast with respect to such Class of Claims or Interests, such earlier Ballots are superseded and revoked.

All Ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each Ballot. For information regarding voting by Nominees, see the Section herein entitled "Nominee Voting Instructions."

**When is the Confirmation Hearing expected to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for [●] at [●] [_.m.], prevailing Eastern Time. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or by notice of any adjournment of the Confirmation Hearing filed by the Debtors and posted on their website at http://chapter11.epiqsystems.com/stallion.

**The Debtors' History and the Chapter 11 Cases**

**Historical Overview**

The Debtors and their non-Debtor affiliates (collectively, "Stallion" and each, a "Stallion Entity") are privately-held and primarily operate through Stallion Oilfield Services Ltd., which was formed in December 2002. Founded by Mr. Craig M. Johnson, Stallion quickly has become a leading provider of comprehensive wellsite support services and production and logistics services to exploration and production companies and drilling companies throughout the United States. Since its formation, Stallion has focused on strategic growth, completing more than 37 acquisitions of a variety of smaller service providers in the fragmented and competitive oil and natural gas services industry.

In April 2007, Stallion filed documents with the SEC in preparation for a proposed initial public offering of Stallion's equity. Stallion planned to use the proceeds from the initial public offering to repay the Bridge Loan Obligations (as defined herein). As discussed below, however, Stallion withdrew the proposed initial public offering in January 2009.

**Stallion's Business Operations**

To distinguish itself from its competitors, Stallion promotes its history of experience, scale, and ability to provide a single, comprehensive supply source for many of its customers' needs. Stallion's range of critical wellsite services includes providing reliable housing, water and sewer systems, trash containers, satellite systems, communications services, IT networks, solids control, fluids transportation, disposal, and storage, tank rentals, production services, wellsite construction, heavy equipment hauling to and from the wellsite, and wellsite relocation services. Indeed, Stallion offers detailed services that

provide its customers with a "one-stop" source for their cross-section of needs, whether before, during, or after drilling and throughout the production life cycle of the wellsite.

Stallion's principal executive offices are located at 950 Corbindale Road, Suite 300, Houston, Texas 77024. Stallion is one of the largest providers of wellsite support services in the United States, employing approximately 1,700 people throughout 65 field offices. Each field office typically includes a yard, administrative office, and maintenance facility.

Geographically diversified across some of the most active domestic drilling and producing regions, Stallion's U.S. field offices are located in Texas, Louisiana, Arkansas, Oklahoma, Colorado, Wyoming, North Dakota, New Mexico, Alaska, Pennsylvania, and Ohio. In addition, Stallion maintains accommodation units on approximately six platforms and floating vessels in Trinidad and Tobago, the Gulf of Mexico, Bay of Campeche near Mexico, and off the coast of Equatorial Guinea. Stallion currently focuses on oil and natural gas regions within North America that it believes have stable drilling activity and provide attractive long-term potential for growth, including: South Texas; the Gulf Coast; ArkLaTex; the Fort Worth Basin; the Permian Basin; the Mid-Continent; the Marcellus Shale in the Appalachian Basin; the Rocky Mountain regions; and Prudhoe Bay, Alaska.

Stallion maintains long-standing customer relations with leading players in the oil and natural gas industry. Indeed, Stallion provides services to a diversified group of more than 3,300 customers, with its top 10 customers comprising less than 42% of revenue and no one customer representing more than 7% of revenue as of August 31, 2009.

In 2008, Stallion's service revenue totaled $607.4 million. Stallion's Wellsite Support Services and Production and Logistics segments accounted for approximately 47% and 53% of total 2008 service revenue, respectively. Stallion's adjusted EBITDA ("Adjusted EBITDA") for 2008 was $168.4 million. As of December 31, 2008, the book value of Stallion's assets totaled approximately $944.4 million and its liabilities totaled $887.6 million.

**Stallion's Services**

Stallion's slogan, Everything but the Rig[TM], reflects Stallion's business strategy of providing a broad and comprehensive range of critical services to support wellsite operations. Stallion's services span the entire life-cycle of the land-based wellsite—wellsite preparation, rig deployment, drilling activities, production activities, and decommissioning of the wellsite. Stallion typically is the first service provider on the wellsite, as Stallion assists in the initial preparation of the wellsite and often hauls the rig and related heavy equipment onto the wellsite using Stallion's fleet of tractor trucks, trailers, pole trucks, and cranes. Throughout the drilling and completion phases of the land-based well, Stallion provides rental equipment and required support services to the wellsite. In some cases, Stallion also provides continuing support services during the production phase of the well, including the construction of production facilities and well connections to existing pipeline infrastructure. Stallion also frequently is the last service provider to leave the wellsite as it performs production facility disassembly, wellsite restoration, and rig and heavy equipment relocation, which are the last phases of the wellsite decommissioning process. As part of this process, Stallion is often contracted to transport the drilling rig and other heavy equipment to a new wellsite following decommission of the old wellsite. In addition, Stallion's offshore workforce accommodations business serves Stallion's offshore customers during many phases of the offshore drilling and production life-cycle.

K&E 15554052.32

More specifically, Stallion's business is comprised of two segments.

*Wellsite Support Services.*  Through Stallion's Wellsite Support Services segment, Stallion offers integral services used by oil and natural gas companies, drilling contractors, and other wellsite service providers to support wellsite operations.  This segment includes the following primary service lines:

- *Workforce accommodation*s.  Stallion provides onshore workforce accommodations in the United States with, as of September 30, 2009, approximately 2,000 transportable units in its inventory.  Stallion's fleet of land-based units is designed to accommodate various personnel on wellsite locations before, during, and after drilling operations.  Camp complexes typically range from 30-man onshore to 450-man offshore "flotels."  In addition, Stallion designs, manufactures, leases, and repairs offshore workforce accommodation structures.

- *Surface equipment rental.*  Stallion provides a variety of surface rental equipment used in and critical to wellsite activities, including forklifts, manlifts, power generators, compressors, loaders, and water systems.

- *Communications services.*  Stallion provides integrated communications services through its StaRComm satellite system that provides wireless communications via intercoms and telephone, fax, and internet/data services throughout the wellsite location.

- *Solids control.*  Stallion provides customized solids control services, closed-loop mud systems, and fluid recovery services to help lower customers' costs through planning, assisting, and/or managing of solids control equipment, waste minimization, and fluid recovery.

*Production & Logistics Services.*  Through its Production & Logistics Services segment, Stallion offers services that are critical to establish, maintain, and decommission the wellsite and position key equipment prior to, during, and after drilling operations.  This segment includes the following primary service lines:

- *Production services.*  Stallion provides a fleet of vacuum and winch trucks, frac tanks, saltwater injection wells, and other assets used for fluid provision, transportation, and disposal services.  These specialized assets allow Stallion's customers to obtain, move, store, and dispose of fluids that are involved in the development and production of the well.

- *Wellsite construction.*  Stallion provides construction equipment and services to build and reclaim infrastructure at wellsites before, during, and after drilling operations.  Stallion's services include wellsite clearing, road construction, mat placement, production facility assembly and construction, pipeline installation, pit remediation, production decommissioning, and wellsite restoration.  Stallion provides services for wellsites in both land and inland marine environments.

- *Rig relocation and heavy equipment hauling.*  Stallion maintains a fleet of 1,275 tractor trucks, trailers, pole trucks, and cranes used for the demobilization, relocation, and mobilization of drilling rigs and related heavy equipment. Stallion also utilizes these logistics services as a cross-selling point for other wellsite support services.

Through the combination of its two business segments, the Wellsite Support Services segment and the Production & Logistics Services segment, Stallion is able to provide a broad and comprehensive range of critical services to support wellsite operations, including onshore and offshore workforce accommodations, surface equipment rental, communications services, solids control, production services,

11

wellsite construction, rig relocation, and heavy equipment hauling. Stallion's service offerings are designed to improve living and working conditions at the wellsite, wellsite safety, and its customers' drilling and production operations.

**Sales and Marketing**

Stallion's sales and marketing activities generally are performed through its local operations in each geographic region. Stallion believes its local field sales personnel understand basin-specific issues and customer operating procedures and, therefore, effectively can target marketing activities. Stallion also has a corporate sales team located in its Houston headquarters that supplements its field sales efforts and focuses on large accounts and selling its complementary services.

**Stallion's Prepetition Organizational Structure**

The following chart generally depicts Stallion's prepetition organizational structure:



**Stallion's Prepetition Capital Structure**

As of the Petition Date, Stallion had total consolidated funded debt of approximately $755.1 million, including $240.1 million in secured bank debt, $250 million in unsecured bridge loan debt, and $265 million in principal amount of 9.750% unsecured notes. These amounts exclude accrued interest and fees outstanding through the Petition Date as well as open but undrawn letters of credit and hedging obligations.

12

### Senior Credit Agreement

Stallion Oilfield Services Ltd., as borrower, and certain of its affiliates, as guarantors, UBS AG, Stamford Branch, as administrative agent (the "Senior Secured Agent"), and the lenders party thereto (together with the Senior Secured Agent, the "Senior Lenders") are parties to that certain Third Amended and Restated Credit Agreement, as further amended (the "Senior Secured Credit Agreement"), dated as of June 12, 2007. The Senior Secured Credit Agreement provides for a $175 million revolving credit facility (the "Senior Revolving Facility"), of which $166.8 million remains outstanding, excluding $5.2 million of which consists of unfunded letters of credit obligations, and a $75 million term loan (the "Senior Term Loan"), of which $73.3 million remains outstanding (collectively, the "Senior Secured Credit Agreement Obligations"). The Senior Revolving Facility and the Senior Term Loan mature on March 1, 2011, and June 12, 2013, respectively. Apart from Stallion Oilfield Services Ltd., which serves as borrower, and Stallion Oilfield Holdings GP, LLC, Stallion Oilfield Services, Inc., and Stallion Oilfield Finance Corp., each of the domestic Stallion Entities guarantee the Senior Secured Credit Agreement Obligations.

Stallion Oilfield Services Ltd., as borrower, certain of its affiliates, as guarantors, and UBS AG, Stamford Branch, as collateral agent for the Senior Lenders (the "Security Agreement Collateral Agent") are parties to that certain Security Agreement, as amended (the "Security Agreement"), dated as of March 1, 2006. Under the Security Agreement, Stallion provided the Security Agreement Collateral Agent with a security interest in substantially all of its assets. Stallion utilizes the Senior Term Loan to finance its day-to-day operations and for other general corporate purposes.

### Unsecured Bridge Loan

Stallion Oilfield Services Ltd., as borrower, and certain of its affiliates, as guarantors, Wilmington Trust FSB, as administrative agent (the "Bridge Agent"), and the lenders party thereto (together with the Bridge Agent, the "Bridge Lenders") are parties to that certain Credit Agreement (the "Bridge Loan Agreement"), dated as of August 1, 2007. The Bridge Loan Agreement provided for a $250 million bridge loan (all of which remains outstanding) (the "Bridge Loan Obligations"). The Bridge Loan Obligations mature on August 1, 2012. Apart from Stallion Oilfield Services Ltd., which serves as borrower, and Stallion Oilfield Holdings GP, LLC, Stallion Oilfield Services, Inc., Stallion Oilfield Finance Corp., and Stallion Stables, LLC, each of the domestic Stallion Entities guarantee the Bridge Loan Obligations. Stallion intended to repay the Bridge Loan Obligations using the proceeds of Stallion's proposed initial public offering.

### 9.750% Unsecured Notes Due 2015

Stallion Oilfield Services Ltd. and Stallion Oilfield Finance Corp., as issuers, certain of their affiliates, as guarantors, and The Bank of New York Trust Company, N.A., as indenture trustee, are parties to that certain Indenture, as supplemented by a Supplemental Indenture (the "Notes Indenture" and, together with the Senior Secured Credit Agreement and the Bridge Loan Agreement, the "Debt Instruments"), dated as of January 24, 2007. Under the Notes Indenture, Stallion Oilfield Services Ltd. and Stallion Oilfield Finance Corp. issued a total of $300 million in 9.750% Unsecured Notes due 2015 (the "Notes," and, together with the Bridge Loan Obligations, the "Unsecured Funded Debt") to holders (the "Noteholders," and together with the Bridge Lenders, the "Unsecured Funded Debt Lenders," and collectively, with the Senior Lenders, the "Lenders")). Stallion issued the Notes to obtain additional liquidity to fund strategic acquisitions. In October 2008, Stallion repurchased in the open market and retired $35 million in Notes. As of the Petition Date, $265 million in Notes remain outstanding. Apart from Stallion Oilfield Services Ltd. and Stallion Oilfield Finance Corp., who serve as issuers, and Stallion Oilfield Holdings GP, LLC, Stallion Oilfield Holdings Ltd., Stallion Interests, LLC, Stallion Stables, LLC, and Stallion Oilfield Services, Inc., each of the domestic Stallion Entities guarantees the Notes.

***Hedging Agreements***

Stallion Oilfield Services Ltd. entered into certain hedging agreements with Credit Suisse International in connection with the Debt Instruments. Specifically, Stallion hedged $250 million of the Bridge Loan Obligations pursuant to a confirmation dated March 4, 2008, which is scheduled to terminate on August 7, 2010 (the "Bridge Swap"). In addition, Stallion hedged $70 million of Senior Term Loan obligations pursuant to a confirmation dated October 31, 2008, which is scheduled to terminate on August 7, 2010 (the "Senior Term Swap"). Finally, Stallion also hedged $100 million of Senior Revolving Facility obligations pursuant to a confirmation dated December 4, 2008, which is scheduled to terminate on December 31, 2009 (the "Senior Revolver Swap," and, together with the Bridge Swap and the Senior Term Swap, the "Swap Agreements"). On December 4, 2008, the Swap Parties entered into that certain Master Agreement, which governs the Swap Agreements. Obligations under the Swap Agreements are secured pursuant to the Senior Secured Credit Agreement.

***Equity Interests in Stallion***

As shown in the corporate organizational chart above, Stallion Oilfield Holdings GP, LLC and Stallion Oilfield Holdings, Ltd. are Stallion's top-level entities. As of the Petition Date, the Holders of the existing membership interests of Stallion Oilfield Holdings GP, LLC include C/R Stallion GP, LLC (50%) and Cardigan Holdings, Inc. (50%) (together, the "Holdings GP, LLC Equity Interests"). As of the Petition Date, the Holders of the existing partnership interests of Stallion Oilfield Holdings, Ltd. include C/R Stallion GP, LLC (62.53%), C/R Energy Coinvestment II, L.P. (5.84%), Laminar Direct Capital, L.P. (1.64%), Cardigan Holdings, Inc. (15.44%), C/R Laminar Coinvestment L.P. (1.57%), Stallion Value, LP (6.83%), and PPHB, LP (0.44%) (collectively, the "Holdings, Ltd. Equity Interests," and, together with the Holdings GP, LLC Equity, the "Stallion Equity Interests").[2]

## Events Leading to these Chapter 11 Cases

As discussed above, Stallion has approximately $755.1 million of indebtedness, excluding accrued interest and fees outstanding through the Petition Date as well as open but undrawn letters of credit and hedging obligations. A series of unforeseen events placed significant strain on Stallion's ability to comply with certain of its financial covenants contained in the Senior Secured Credit Agreement and the Bridge Loan Agreement and ultimately led to Stallion's filing of these chapter 11 cases. Those events include (A) the unprecedented downturn in the United States oil and natural gas industry, (B) the collapse of the capital markets, (C) the resulting deterioration in Stallion's financial performance, (D) Stallion's unsuccessful out-of-court restructuring efforts, (E) defaults under the Debt Instruments, and (F) Stallion's successful negotiations with its key stakeholders in connection with the prearranged Plan.

**The Downturn in the United States Oil and Natural Gas Industries**

Since June 2008, the United States oil and natural gas industry has experienced an unprecedented decline in gas prices and domestic rig count. Natural gas prices have plummeted nearly 75% during the period from June 2008, when natural gas was over $13/MMBTU, to just over $3/MMBTU in August 2009. With almost 70% of domestic drilling rigs aimed at natural gas reserves, the impact was

---

[2]  In addition, certain individuals hold *de minimus* partnership interests in Stallion Oilfield Holdings, Ltd. that aggregate to approximately 5.70%.

substantial.  Indeed, total average domestic rig count decreased over 55% during the period from nearly 1,950 in September 2008 to less than 850 in June 2009.



Moreover, despite the reduced rig count, technological advances in natural gas drilling practices caused domestic natural gas supplies to increase, further reducing natural gas prices and compounding the problem.

**The Collapse of the U.S. Credit Markets**

The substantial deterioration in the oil and gas markets was followed by the rapid softening of the economy and tightening of the U.S. financial markets in the second half of 2008, which resulted in the effective collapse of the U.S. credit markets.  In the face of such market conditions, Stallion withdrew its application for an initial public offering in January 2009.  As has been widely reported, the U.S. financial markets did not show much sign of significant improvement through the first three quarters of 2009.

**Deterioration of Stallion's Financial Performance**

The adverse market conditions have taken a toll on Stallion's financial position over the last year. With fewer rigs to service, market competition in the oilfield services industry has intensified as Stallion and its competitors seek to provide services to the remaining drill sites.  This increased competition has led to competitive price reductions and further erosion in profit margins.

In 2008, Stallion's service revenue totaled $607.4 million.  Through June 30, 2009, Stallion has recorded service revenue of only $181.1 million, down from $288.3 million during the same six month period in 2008—a drop of 37.2%.  Moreover, Stallion's Adjusted EBITDA for the six months ending June 30, 2009, was only $37.3 million, down from $74.0 million during the same six month period in 2008—a drop of 49.5%.

**Stallion's Out-of-Court Restructuring Initiatives**

In response to the downturn in the oil and natural gas industry and Stallion's depressed financial performance, Stallion embarked on a comprehensive operational restructuring to right-size its service portfolio and workforce.  These efforts included a bottom-up analysis of Stallion's entire enterprise and,

15

ultimately, resulted in the implementation of a number of operational and strategic initiatives aimed at maximizing supply chain and production efficiencies and eliminating unused capacities to increase cash flow and reduce costs.

Stallion also has effectuated significant changes to its workforce over the last year to deal with the depressed industry environment. Since October 2008, Stallion has initiated workforce reductions on all levels. As a result, Stallion's current workforce is approximately 40% smaller than its fourth quarter 2008 levels. Stallion also has taken additional employee-related measures, including reducing its discretionary spending allowance to curtail its capital, operational, and SG&A expenditures, scaling back certain workforce benefits previously provided, such as suspension of its 401(k) matching program, and reducing certain workers compensation and property/casualty insurance costs by nearly 40% within the last year.

Experts predict a recovery could begin to occur as soon as the fourth quarter of 2009 and could last through 2010. Early in 2009, analysts were estimating a significant further decline in rig counts through the third quarter of 2009. However, actual rig counts have been increasing slightly since June 2009, indicating the market has somewhat stabilized, in the short term.



U.S. drilling permit data, which traditionally has served as an accurate two-month leading indicator of rig count fluctuations, supports this current trend where rig count levels should remain stable, albeit at significantly reduced levels from the fourth quarter of 2008. Though permits have substantially declined, the level of permit use appears to have stabilized similar to rig count.

K&E 15554052.32



Initially, Stallion believed that an operational restructuring, alone, could suffice to capitalize on the predicted industry recovery. Despite Stallion's successful operational restructuring efforts over the past year, Stallion since has realized that a corresponding balance sheet restructuring is also necessary.

Over the course of the last six months Stallion has been engaged in extensive discussions with the Lenders and Holders of the Stallion Equity Interests regarding the terms of a consensual out-of-court or prearranged restructuring. Notwithstanding its best efforts, however, Stallion was unable to obtain sufficient support to effectuate an out-of-court restructuring. As a result, Stallion shifted its efforts towards accomplishing the reorganization through a consensual chapter 11 plan.

**Stallion Defaults Under the Debt Instruments**

As Stallion continued to engage in discussions with the Lenders, the depressed state of the oil and natural gas industry caused Stallion's financial performance to continue to deteriorate. Stallion's deteriorating financial performance impaired its ability to comply with certain financial covenants in the Senior Secured Credit Agreement and the Bridge Loan Agreement and, ultimately, Stallion defaulted under certain covenants in the Debt Instruments.

### *Stallion Obtains a Waiver Under the Bridge Loan Agreement*

The Bridge Loan Agreement required Stallion to meet certain financial covenants, including a maximum total leverage ratio covenant. Specifically, the Bridge Agreement requires that Stallion maintain a total debt to EBITDA ratio, as of June 30, 2009, that does not exceed 4.25x. As June 30, 2009, approached, however, Stallion determined that it likely would exceed this allowed leverage ratio. As such, Stallion engaged the Bridge Agent in discussions for a waiver of compliance with the financial covenant. Ultimately, Stallion obtained such a waiver to be effective June 29, 2009 with respect to the compliance period ending June 30, 2009.

### *Stallion Defaults Under the Unsecured Funded Debt*

Recognizing the need for maximum liquidity while Stallion continued to negotiate a prearranged restructuring with the Senior Lenders and the Unsecured Funded Debt Lenders, Stallion elected not to make two interest payments due under the Unsecured Funded Debt—an interest payment due on August 1, 2009 and payable on August 3, 2009, under the Notes Indenture, and an interest payment due and payable on August 7, 2009, under the Bridge Loan Agreement (together, the "<u>Interest Payment</u>

<u>Defaults</u>").  Both the Notes Indenture and the Bridge Loan Agreement provided for a 30-day grace period before Stallion's failure to make the payments constituted an actionable event of default.  During that time, Stallion negotiated with counsel to an informal committee of Unsecured Funded Debt Lenders (the "<u>Informal Funded Debt Committee</u>"), which represented the requisite amount of Noteholders and Bridge Lenders needed to obtain a forbearance under the Unsecured Funded Debt.

On September 2, 2009, Stallion entered into two forbearance agreements—one with the requisite amount of Noteholders and the second with the requisite amount of Bridge Lenders—pursuant to which certain Unsecured Funded Debt Lenders agreed to forbear from exercising remedies on account of, among other things, the Interest Payment Defaults (collectively, the "<u>Unsecured Funded Debt Defaults</u>"), through September 30, 2009.

### *Stallion Defaults Under the Senior Credit Agreement*

The Unsecured Funded Debt Defaults triggered a cross-default under the Senior Credit Agreement (the "<u>Senior Credit Agreement Defaults</u>"), entitling the Senior Lenders to exercise remedies under the Senior Credit Agreement.

Stallion engaged in discussions with the Senior Secured Agent to obtain a similar forbearance period as that reached with certain of the Noteholders and Bridge Lenders.  Ultimately, Stallion was able to secure a forbearance with the Senior Lenders through September 30, 2009.  Stallion also engaged in discussions with and received a forbearance through September 30, 2009, from Credit Suisse International in connection with the Swap Agreements.

## Stallion Negotiates a Prearranged Chapter 11 Plan

After good-faith, arm's-length negotiations, Stallion reached an agreement with the Lenders and the Holders of the Stallion Equity Interests with respect to a consensual restructuring on the terms set forth in the Restructuring Term Sheet (the "<u>Term Sheet</u>"), and formalized by the Restructuring and Lock-Up Agreement (the "<u>Restructuring and Lock-Up Agreement</u>"), dated October 17, 2009.

Stallion received an executed Restructuring and Lock-Up Agreement from Holders of more than (i) 90% of the Senior Secured Claims, (ii) 74% of the Bridge Loan Claims, (iii) 88% of the Notes Claims, and (iv) 68% of the Stallion Equity Interests, which ensures that the Plan has sufficient support to satisfy the confirmation requirements under section 1129 of the Bankruptcy Code.

## The Debtors Commence These Chapter 11 Cases

The Debtors filed these chapter 11 cases to effectuate the terms of the Restructuring and Lock-Up Agreement.  Based on the Restructuring and Lock-Up Agreement, the Debtors are prepared to seek confirmation of the Plan shortly after the filing of these chapter 11 cases.  Indeed, because the Plan is based on a consensual deal with the Debtors' key stakeholders and contemplates a significant de-leveraging of the Debtors' balance sheets and a full recovery for Holders of Allowed General Unsecured Claims, confirmation of the Plan is expected to occur over a relatively short timeframe.  Specifically, the Debtors and the Lenders have agreed that this Disclosure Statement and the Plan must have been filed with the Bankruptcy Court within 10 days of the Petition Date, an order approving this Disclosure Statement must be approved within 40 days of the date upon which the Plan and this Disclosure Statement were filed, the Plan must be confirmed within 60 days of the date upon which this Disclosure Statement is approved (subject to a 15-day extension under certain circumstances), and the Plan must become effective within 25 days of the confirmation date (subject to a 15-day extension under certain circumstances).

K&E 15554052.32

## Initial Motions of the Chapter 11 Cases and Certain Related Relief

In order to minimize disruption to the Debtors' operations and effectuate the terms of the Plan Term Sheet, the Debtors obtained certain relief, including the relief summarized below.

**Motion for Authority to Use Cash Collateral**

On [●], the Bankruptcy Court entered an order authorizing the Debtors to use cash collateral pursuant to sections 361 and 363 of the Bankruptcy Code on an interim basis pending the final hearing on this motion, and approving the forms of adequate protection provided to the Debtors' Secured Lenders. Pursuant to this order, the Debtors are authorized to use cash collateral for working capital and general corporate purposes, including (a) operating their business in an orderly manner, (b) maintaining business relationships with vendors, suppliers, and customers, (c) paying employees, and (d) satisfying other operational needs—all of which are necessary to preserve and maintain the Debtors' going-concern value and, ultimately, effectuate a successful reorganization. On [●], the Bankruptcy Court entered a final order authorizing use of cash collateral and approving the forms of adequate protection provided to the Senior Lenders.

**Motion to Pay Employee Wages and Associated Compensation**

On [●], the Debtors obtained interim approval authorizing it (a) to pay certain prepetition wages, salaries, and other compensation, reimbursable employee expenses, and employee medical, pension, and similar benefits and (b) to continue their workers' compensation program. The order also authorizes the Debtors to remit any outstanding payroll taxes or deductions to the appropriate third-party or taxing authority. On [●], the Bankruptcy Court entered a final order granting such relief.

**Motion to Pay Prepetition Claims of Unsecured Creditors**

On [●], the Bankruptcy Court entered an interim order authorizing the Debtors to pay up to $[●] million in prepetition amounts owed to trade creditors, consistent with the terms of such obligations existing on the Petition Date. On [●], the Bankruptcy Court entered a final order authorizing the Debtors to pay up to $[●] million in prepetition amounts owed to trade creditors in the ordinary course of business.

**Motion to Pay Taxes and Fees**

On [●], the Debtors obtained approval authorizing, but not directing them, to pay certain taxes and fees that in the ordinary course of business accrued or arose before the Petition Date.

**Motion to Prohibit Utilities from Terminating Service**

On [●], the Bankruptcy Court entered an interim order (a) setting a final hearing to approve, among other things, the Debtors' proposed adequate assurance of payment for future service to the utility providers and procedures governing any requests for additional or different adequate assurance and (b) prohibiting the utility providers from altering, refusing, or discontinuing utility services on account of any unpaid prepetition charges, or discriminating against the Debtors, or requiring payment of a deposit or receipt or any other security for continued service as a result of the Debtors' bankruptcy filing or any outstanding prepetition invoices without further Bankruptcy Court order. On [●], the Bankruptcy Court entered a final order granting such relief.

K&E 15554052.32

**Other Related Relief**

In addition, the Debtors filed the following motions, which were granted after a hearing in the Bankruptcy Court, obtaining: (a) an order directing the joint administration of the eighteen Chapter 11 Cases under a single docket, Case Number [●] ([●]); and (b) orders (i) authorizing the Debtors to continue to use their centralized cash management system, bank accounts, and perform intercompany transactions; (ii) establishing procedures for interim compensation and reimbursement of expenses of retained professionals in the Chapter 11 Cases; (iii) establishing procedures for retention and compensation of professionals utilized in the ordinary course of the Debtors' business; (iv) authorizing the Debtors to continue prepetition insurance policies and program and to maintain premium financing agreements for insurance coverage entered into prepetition; (v) approving this Disclosure Statement and the solicitation and voting procedures; and (vii) establishing certain dates and deadlines.

<u>**Treatment of Claims and Interests**</u>

**Asserted and Scheduled Claims**

Claims and Interests, except for Administrative Claims and Priority Tax Claims are classified in the Classes set forth in Article III of the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

Distributions under the Plan will be made only to Holders of Allowed Claims or Allowed Interests. As more fully described in Articles II and III of the Plan, Holders of Disputed Claims or Disputed Interests will receive no distributions unless and until their Claims or Interests become Allowed.

Pursuant to the terms of the Plan, except for Claims or Interests that are (a) expressly exempted from the discharge provisions of the Bankruptcy Code or (b) specifically identified as being reinstated, all Claims or Interests that arose prior to Confirmation will be discharged.

**Administrative Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

*General Administrative Claims*

Except as specified in Article II of the Plan, unless otherwise agreed to by the Holder of a General Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed General Administrative Claim will receive, in full satisfaction of its General Administrative Claim, Cash equal to the amount of such Allowed General Administrative Claim either: (a) on the Effective Date; (b) if the General Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which an order allowing such General Administrative Claim becomes a Final Order; or (c) if the Allowed General Administrative Claims are based on liabilities incurred by the Debtors in the ordinary course of their business during the Postpetition Period, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed General Administrative Claims, without any further action by the Holders of such Allowed General Administrative Claims.

**Professional Compensation**

### Final Fee Applications

All final requests for payment of Professional Fee Claims, including the Holdback Amount and Professional Fee Claims incurred during the period from Petition Date through the Confirmation Date, must be filed with the Bankruptcy Court and served on the Reorganized Debtors no later than 45 days after the Confirmation Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, the allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

### Payment of Interim Amounts

Subject to the Holdback Amount, on the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay all amounts owing to Professionals for all outstanding amounts payable relating to prior periods through the Confirmation Date. To receive payment, on or before Effective Date, each Professional shall submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order.

### Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge or and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### Class 1 - Priority Non-Tax Claims

- *Classification:* Class 1 consists of all Priority Non-Tax Claims.

- *Treatment:* Except to the extent that a Holder of an Allowed Class 1 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Class 1 Claim, each such Holder shall be paid in full in Cash.

- *Voting:* Class 1 is Unimpaired by the Plan. Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

21

**Class 2 - Other Secured Claims**

- *Classification*:  Class 2 consists of all Other Secured Claims.

- *Treatment*:  Except to the extent that a Holder of an Allowed Class 2 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Class 2 Claim, each such Claim shall be Reinstated or otherwise rendered Unimpaired for the benefit of the Holders thereof.

- *Voting*:  Class 2 is Unimpaired by the Plan.  Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**Class 3 - Senior Secured Claims**

- *Classification*:  Class 3 consists of all Senior Secured Claims.

- *Allowance*:  The Senior Secured Claims are Allowed in an aggregate amount equal to $245.9 million.[3]

- *Treatment*:  On the Effective Date, except to the extent that a Holder of an Allowed Claim in Class 3 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class 3, each such Holder shall receive, at the sole and absolute discretion of the Debtors, either:

  (1)     its Pro Rata share of the (A) Senior Secured Paydown and (B) $220.9 million[4] in first priority senior secured debt pursuant to the Amended and Restated Senior Secured Credit Agreement; or

  (2)     in the event that the Reorganized Debtors enter into New Financing, payment in full, in Cash, of the unpaid portion of its Senior Secured Claim.

  *provided, however*, that the Debtors must elect the same option for all Holders of Senior Secured Claims.

- *Voting:*  Class 3 is Impaired by the Plan.  Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan of Reorganization; *provided, however*, that if the Debtors elect to satisfy Senior Secured Claims pursuant to (2) above, then each Holder will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, will not be entitled to vote to accept or reject the

---

[3]     Subject to adjustment for paydown using asset sale proceeds and accrued and unpaid interest and fees.

[4]     Number equals total Allowed Senior Secured Claims less Senior Secured Paydown.  Debt consideration subject to adjustment for paydown using asset sale proceeds and accrued and unpaid interest and fees at such time.  Amount includes Existing Letters of Credit, which shall be Reinstated pursuant to  Article IV.E of the Plan.

K&E 15554052.32

Plan of Reorganization (and, to the extent such Holders already have submitted a Ballot, such Ballot shall not counted).

### Class 4 - Unsecured Funded Debt Claims

- *Classification*: Class 4 consists of all Unsecured Funded Debt Claims.

- *Allowance:* The Bridge Loan Claims shall be Allowed in an aggregate amount equal to $259.3 million. The Notes Claims shall be Allowed in an aggregate amount equal to $283.9 million.

- *Treatment*: On the Effective Date, except to the extent that a Holder of an Allowed Claim in Class 4 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class 4, each such Holder shall receive its Pro Rata share of 98% of the New Equity issued on the Effective Date (subject to dilution by amounts reserved pursuant to the Management Equity Incentive Plan and the New Warrants) based on such Holder's amount of Allowed Claim in Class 4.

- *Voting*: Class 4 is Impaired by the Plan. Holders of Allowed Claims in Class 4 are entitled to vote to accept or reject the Plan.

### Class 5 - General Unsecured Claims

- *Classification*: Class 5 consists of all General Unsecured Claims.

- *Treatment*: On the Effective Date, except to the extent that a Holder of an Allowed Claim in Class 5 agrees to less favorable treatment of its Allowed Claim or has been paid prior to the Effective Date, each such Allowed Claim shall be Unimpaired in accordance with section 1124 of the Bankruptcy Code. Each Holder of an Allowed Claim in Class 5 that is not due and payable on or before the Effective Date will receive payment in full in Cash of the unpaid portion of such Allowed Claim (including, to the extent required under applicable non bankruptcy law, interest accrued on account of such Allowed Claim following the Petition Date through the date that such Allowed Claim is paid at the Federal Judgment Rate) in the ordinary course of business or otherwise rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. The Debtors reserve their rights, however, to dispute the validity of any Claim in Class 5, whether or not objected to prior to the Effective Date.

- *Voting*: Class 5 is Unimpaired by the Plan. Holders of Claims in Class 5 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

K&E 15554052.32

**Class 6 - Intercompany Claims**

- *Classification*:  Class 6 consists of all Intercompany Claims.

- *Treatment*:  Intercompany Claims may be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, be cancelled, and no distribution shall be made on account of such Claims.

- *Voting*:  Class 6 is Unimpaired by the Plan.  Holders of Claims in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**Class 7 - Intercompany Interests**

- *Classification*:  Class 7 consists of all Intercompany Interests.

- *Treatment*:  In full and final satisfaction, settlement, release, and discharge of and in exchange for each Class 7 Interest, such Interests shall be Reinstated for the benefit of the Holders thereof.

- *Voting*:  Class 7 is Unimpaired by the Plan.  Holders of Interests in Class 7 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**Class 8 - Interests in Stallion Oilfield Holdings GP, LLC**

- *Classification*:  Class 8 consists of all Interests in Stallion Oilfield Holdings GP, LLC.

- *Treatment*:  On the Effective Date, except to the extent that a Holder of an Allowed Interest in Class 8 agrees to a less favorable treatment of its Allowed Interest, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Interest in Class 8, such Holder shall receive its Pro Rata share of 0.0002% of (i) the New Equity issued on the Effective Date (subject to dilution by amounts reserved pursuant to the Management Equity Incentive Plan and the New Warrants) and (ii) the New Warrants.

- *Voting*:  Class 8 is Impaired by the Plan.  Holders of Interests in Class 8 are entitled to vote to accept or reject the Plan.

**Class 9 - Interests in Stallion Oilfield Holdings, Ltd.**

- *Classification*:  Class 9 consists of all Interests in Stallion Oilfield Holdings, Ltd.

- *Treatment*:  On the Effective Date, except to the extent that a Holder of an Allowed Interest in Class 9 agrees to a less favorable treatment of its Allowed Interest, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Interest in Class 9, such Holder's Interest shall be Reinstated in Reorganized Stallion Oilfield Holdings, Ltd. and Reorganized Stallion Oilfield Holdings, Ltd. shall receive 1.9998% of (i) the New Equity issued on the Effective Date (subject to dilution by

24

amounts reserved pursuant to the Management Equity Incentive Plan and the New Warrants) and (ii) the New Warrants.

- *Voting*: Class 9 is Impaired by the Plan. Holders of Interests in Class 9 are entitled to vote to accept or reject the Plan.

**Class 10 - Section 510(b) Claims**

- *Classification*: Class 10 consists of all Section 510(b) Claims.

- *Treatment*: On the Effective Date, all Class 10 Claims shall be cancelled without any distribution.

- *Voting*: Class 10 is Impaired by the Plan. Holders of Claims in Class 10 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

## Management of the Company

Biographical information for Mr. Craig M. Johnson, Mr. David S. Schorlemer, Mr. Hill M. Dishman, Mr. Douglas E. Stewart, and Mr. David O. Rodrigue is set forth below:

Mr. Johnson has over 20 years of experience in the oilfield service industry. Mr. Johnson has served as Stallion's Chief Executive Officer and President and as Chairman of Stallion Oilfield Holdings GP, LLC's board of directors since December 2002. During that time, Mr. Johnson also served on the board of Remote Knowledge, Inc. between September 2004 and August 2005. From 1997 through July 2002, Mr. Johnson served as President and Chief Operating Officer of Q Services, Inc., a private production services company. In connection with an acquisition of Q Services, Inc., Mr. Johnson managed the rental and fishing tools division of Key Energy Services, Inc. ("Key"), a publicly traded well servicing and workover company from July 2002 to September 2002. Mr. Johnson earned his Bachelor of Arts degree from the University of Mississippi.

Mr. Schorlemer has served as Stallion's Chief Financial Officer and Vice President, and as a director on the board of Stallion Oilfield Holdings GP, LLC since September 2004. From July 2002 until September 2004, Mr. Schorlemer served as the Vice President of Marketing and Strategic Planning at Key. From 1997 until July 2002, Mr. Schorlemer served as the Chief Financial Officer of Q Services, Inc. Prior to that, Mr. Schorlemer was with Andersen Consulting (now Accenture) where he worked on a variety of projects for numerous oil and natural gas companies, including Shell Oil Company, Conoco, PEMEX, and Tenneco. Mr. Schorlemer earned his BBA at the University of Texas at Austin and his MBA at Texas A&M University.

Mr. Dishman has served as Stallion's Chief Operating Officer and Vice President since December 2002. From 1997 until December 2002, Mr. Dishman served as Vice President of Texas Operations for SOLOCO Texas, LP, an operating unit of Newpark Resources, Inc., an NYSE-listed oilfield service company. Mr. Dishman earned his Bachelor of Arts degree from Lamar University.

Mr. Stewart is Stallion's Vice President, General Counsel, and Secretary. Mr. Stewart joined Stallion in June 2007 from Occidental Development Company ("Occidental"), a subsidiary of Occidental Petroleum Corporation, where he served in the international business development group. Prior to joining Occidental in January 2007, he practiced corporate finance and securities law, specializing in private

equity and mergers and acquisitions, at Vinson & Elkins LLP from September 2001 through 2006. Mr. Stewart received his B.A. from Trinity University and his J.D. from the University of Texas.

Mr. Rodrigue has served as Stallion's Chief Accounting Officer since November 2008. Before his appointment as Chief Accounting Officer, Mr. Rodrigue had served as Stallion's Director of Finance since April 2006. Mr. Rodrigue has extensive experience in financial management including positions most recently at Southwest Water Company Services Group and Unidynamics, Inc. He was Vice President and Chief Financial Officer of Positron Corporation from 1993 through 1998. Mr. Rodrigue began his career with Coopers & Lybrand where he served nine years. He received his B.S. in Economics and MBA from Louisiana State University.

### Composition of New Board of Directors

The Reorganized Debtors and New Stallion Holdings shall have a five-person board of directors, which shall consist of Reorganized Stallion Holdings' Chief Executive Officer and four directors, including a non-executive Chairman, to be selected by the Informal Funded Debt Committee on or before the hearing to approve the disclosure statement.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in advance of the Plan Confirmation Hearing, to the extent known, the identity and affiliations of any Person proposed to serve on the initial board of directors or be an officer of each of the Reorganized Debtors and New Stallion Holdings. To the extent any such director or officer of the Reorganized Debtors or New Stallion Holdings is an "insider" under the Bankruptcy Code, the Debtors will also disclose the nature of any compensation to be paid to such director or officer.

### Capital Structure of the Reorganized Debtors upon Consummation

**New Financing**

On the Effective Date, the Reorganized Debtors may obtain New Financing so long as (a) all or a portion of the New Financing is used to indefeasibly pay in full in Cash all of the Senior Secured Claims, (b) all commitments to lend or otherwise provide financial accommodations under the Senior Secured Credit Agreement are terminated, (c) any amounts drawn under Existing Letters of Credit have been reimbursed in Cash in full, and (d) any Existing Letters of Credit have been cash collateralized, replaced, or backstopped in a manner reasonably acceptable to the Senior Secured Agent. Confirmation shall be deemed approval of New Financing (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith) and authorization for the Reorganized Debtors to enter into and execute New Financing documents, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary to consummate such New Financing.

**Amended and Restated Senior Secured Credit Agreement**

On the Effective Date, the Reorganized Debtors may distribute the Senior Secured Paydown in accordance with the Plan and enter into the Amended and Restated Senior Secured Credit Agreement. Confirmation shall be deemed approval of the Senior Secured Paydown and the Amended and Restated Senior Secured Credit Agreement (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith) and authorization for the Reorganized Debtors to distribute the Senior Secured Paydown to Holders of Claims and Interests entitled to such distributions under the Plan and to enter into and execute the Amended and Restated Senior Secured Credit Agreement documents, subject to such modifications as

the Reorganized Debtors may deem to be reasonably necessary to consummate such Amended and Restated Senior Secured Credit Agreement.

**Intercompany Account Settlement**

The Debtors and the Reorganized Debtors, as applicable, will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

**Issuance of New Equity**

The issuance of the New Equity, including options, or other equity awards, if any, reserved for the Management Equity Incentive Plan, by New Stallion Holdings is authorized without the need for any further corporate action or without any further action by the Holders of Claims or Interests. New Stallion Holdings shall be authorized to issue up to [●] shares of New Equity pursuant to its New Organizational Documents. On the Effective Date, an initial number of shares of New Equity shall be issued and distributed as follows: (a) [●] shares of New Equity will be issued to the Holders of Claims in Class 4; (b) [●] shares of New Equity will be issued to the Holders of Interests in Class 8; and (c) [●] shares of New Equity will be issued to Reorganized Stallion Oilfield Holdings, Ltd. In addition, within 30 days of the Effective Date, at least [●] shares of New Equity shall be issued to management of New Stallion Holdings.

All of the shares of New Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. For purposes of distribution, the New Equity shall be deemed to have the value assigned to it based upon, among other things, the New Stallion Total Enterprise Value, regardless of the date of distribution.

The Holders of New Equity may be parties to the Shareholders Agreement, which shall be in form and substance reasonably acceptable to the Informal Funded Debt Committee and Holders of Interests in Classes 8 and 9; *provided, however*, that so long as the Informal Funded Debt Committee and such Holders, working in good faith, agree upon certain reasonable provisions requested by such Holders which are not considered material economic terms by the Informal Funded Debt Committee, such Shareholders Agreement shall be deemed to be in form and substance reasonably acceptable to a majority of Holders of Interests in Class 8 and Class 9.

**Issuance of New Warrants**

On the Effective Date, New Stallion Holdings shall issue the New Warrants to the Holders of Interests in Classes 8 and to Reorganized Stallion Oilfield Holdings, Ltd., pursuant to the terms of the New Warrant Agreement. All of the New Warrants issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance

**Management Equity Incentive Plan**

On the Effective Date, 10% of the New Equity, on a fully-diluted basis, shall be reserved for issuance as grants of stock, restricted stock, options, or stock appreciation rights or similar equity awards in connection with the Management Equity Incentive Program.

A minimum of 4% of the fully-diluted New Equity will be issued to management of New Stallion Holdings within 30 days of the Effective Date, and such New Equity shall vest 50% on the date that is one year after the Effective Date, 25% on the date that is two years after the Effective Date, and 25% on the date that is three years after the Effective Date.

All New Equity reserved pursuant to the Management Equity Incentive Plan and not issued may be granted to managers of New Stallion Holdings within five years of the Effective Date at the discretion of the New Board. In the event that a liquidity event occurs before the fifth anniversary of the Effective Date, all New Equity reserved pursuant to the Management Equity Incentive Plan may be, in the discretion of the New Board, granted (in the form of stock) to and vested with managers participating in the Management Equity Incentive Plan.

Reorganized Stallion Holdings shall guarantee the obligations of the Stallion Officers under the Stallion Officer Loans and shall have the right to purchase the Stallion Officer Loans from the Banks. Reorganized Stallion Holdings shall make payments to the Stallion Officers equal to their required interest payments plus a gross up for taxes due on account of such payment. For each scheduled amortization payment, Reorganized Stallion Holdings will loan, as requested, to each Stallion Officer an amount equal to the required amortization payment, with interest on such loan equal to the applicable federal rate on the Effective Date. The Stallion Officers will seek a 5 year extension of the existing Officer Loans with a 10-year amortization payment schedule for the outstanding amounts. At the end of the First Forgiveness Period, as well as each Successive Forgiveness Period, if the Stallion Officer remains employed in good standing with Reorganized Stallion Holdings or the Stallion Officer was terminated without cause during such period, 50% of any principal payments made on such Stallion Officer's behalf by Reorganized Stallion Holdings during the applicable Forgiveness Period will be forgiven. Reorganized Stallion Holdings will not provide a gross up payment with regard to any taxable income incurred as a result of such forgiveness. Each Stallion Officer shall use a minimum of 50% of, and may use up to 100% of, the after tax proceeds of any annual cash incentive bonuses such Stallion Officer receives to reduce the bank loan balance.

## Summary of Legal Proceedings[5]

**The Debtors' Legal Proceedings**

Because of the size and nature of the Debtors' business, the Debtors' are party to numerous legal proceedings. Most of these legal proceedings have arisen in the ordinary course of the Debtors' business and involve Claims for money damages. Whether these Claims are or will be liquidated or resolved in the Bankruptcy Court or in some other jurisdiction depends upon the nature of the Claims and the debt arising therefrom. Generally, if the debt underlying such Claims was incurred by the Debtors' prior to the date the Plan is confirmed, such debt, in accordance with section 1141 of the Bankruptcy Code, will be

---

[5] This summary is not intended as an exhaustive description of all pending legal matters or proceedings in which the Debtors are involved. Certain legal proceedings may be subject to appeal in or outside the Bankruptcy Court. Nothing in this discussion is deemed to be an admission by the Debtors of any liability or wrongdoing.

K&E 15554052.32

discharged through bankruptcy, depending upon the nature of the relief sought, regardless of whether the Claim is liquidated and resolved before or after the Effective Date. Claims arising from conduct occurring after the Effective Date, unless provided for under the Plan, generally are not dischargeable through bankruptcy, and will be handled by the Reorganized Debtors in the ordinary course of their business after emergence.

## Legal Proceedings in the Bankruptcy Court

A number of transactions occurred prior to the Petition Date that may give rise to Claims, including preference actions, fraudulent transfer and conveyance actions, rights of setoff and other claims, or causes of action under sections 510, 544, 547, 548, 549, 550, and/or 553 of the Bankruptcy Code, and other applicable bankruptcy or non-bankruptcy law (collectively, the "Avoidance Actions").

Pursuant to section 546(a) of the Bankruptcy Code, the statute of limitations with respect to the commencement of avoidance or recovery actions under sections 544, 545, 547, 548, and 553 of the Bankruptcy Code will expire on October 19, 2011 (*i.e.*, two years after the Petition Date).

## Valuation Analysis

THE VALUATION SET FORTH HEREIN REPRESENTS ESTIMATED DISTRIBUTABLE VALUE AND DOES NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE VALUE OF THE NEW COMMON STOCK DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE.

In connection with developing the Plan, the Debtors directed Miller Buckfire & Co., LLC ("Miller Buckfire") to estimate the Reorganized Debtors' going-concern value. In preparing the estimated total enterprise value range, Miller Buckfire: (i) reviewed certain historical financial information of the Debtors for recent years and interim periods; (ii) met with certain members of senior management of the Debtors to discuss the Debtors' operations and future prospects; (iii) reviewed publicly available financial data and considered the market values of public companies deemed generally comparable to the operating businesses of the Debtors; (iv) considered certain economic and industry information relevant to the Debtors' operating businesses; (v) reviewed certain analyses prepared by other firms retained by the Debtors; and (vi) conducted such other analyses as Miller Buckfire deemed appropriate.

Although Miller Buckfire conducted a review and analysis of the Debtors' businesses, operating assets, and liabilities, and business plan, Miller Buckfire relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors and by other firms retained by the Debtors and publicly available information. No independent evaluations or appraisals of the Debtors' assets were sought or were obtained in connection therewith.

In performing its analysis, Miller Buckfire applied two commonly-accepted valuation methodologies: (i) the comparable public companies trading multiples methodology; and (ii) the discounted cash flow methodology. The comparable companies trading multiples methodology involved identifying a group of publicly-traded companies whose businesses, operating characteristics, and geographic footprints are generally similar to that of the Debtors. Miller Buckfire then developed a range of valuation multiples to apply to the Debtors' financial projections to derive a range of implied enterprise values for the Reorganized Debtors. The discounted cash flow methodology involved deriving the unlevered free cash flows that the Reorganized Debtors would generate assuming the financial projections were realized. To determine the Reorganized Debtors' enterprise value range, these cash flows and an

estimated enterprise value at the end of the projection period were discounted to an assumed Effective Date of December 31, 2009, using the Reorganized Debtors' estimated weighted average cost of capital.

Miller Buckfire estimates the total enterprise value of the Reorganized Debtors to be between approximately $533 million and $619 million, as of an assumed Effective Date of December 31, 2009. The range of total equity value, which takes into account the total enterprise value less estimated net debt outstanding as of an assumed Effective Date of December 31, 2009, was estimated by Miller Buckfire to be between approximately $349 million and $435 million.

This valuation is based upon information available to, and analyses undertaken by, Miller Buckfire as of October 2009, and reflects, among other factors discussed below, the Debtors' income statements and balance sheets, current financial market conditions, and the inherent uncertainty today as to the achievement of the Debtors' financial projections prepared by the Debtors with the assistance of AP Services, LLC.

This valuation also reflects a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner, achieving the forecasts reflected in the financial projections, the amount of available cash, market conditions, and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein.

Additionally, an estimate of total enterprise value is not entirely mathematical but, rather, involves complex considerations and judgments concerning various factors that could affect the value of an operating business. Moreover, the value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business.

Further, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: prevailing interest rates; conditions in the financial markets; the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Chapter 11 Cases or by other factors not possible to predict. Accordingly, the total enterprise value ascribed in the analysis does not purport to be an estimate of the post reorganization market trading value. Such trading value may be materially different from the total enterprise value ranges associated with Miller Buckfire's valuation analysis. Indeed, there can be no assurance that any trading market will develop for the New Equity.

The estimate of total enterprise value set forth herein is not necessarily indicative of actual outcomes, which outcomes may be significantly more or less favorable than those set forth herein, depending on the results of the Debtors' operations or changes in the financial markets. Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of their businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a businesses.

Because valuation estimates are inherently subject to uncertainties, neither the Debtors, Miller Buckfire, nor any other person assumes responsibility for their accuracy, but the Debtors believe the estimates have been prepared in good faith based on reasonable assumptions.

## Liquidation Analysis

### Introduction

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a Claim or Interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. To demonstrate that the Plan satisfies the "best interests of creditors test," the Debtors have prepared the hypothetical liquidation analysis attached as Exhibit B (the "Liquidation Analysis"), which is based upon certain assumptions discussed below and in the notes accompanying the Liquidation Analysis (the "Notes"). Capitalized terms not defined in the Notes shall have the meanings ascribed to them in the Plan and the Disclosure Statement.

The Liquidation Analysis estimates potential Cash distributions to Holders of Allowed Claims and Allowed Interests in a hypothetical chapter 7 liquidation of the Debtors' assets (the "Assets"). Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement. The Debtors prepared the Liquidation Analysis with the assistance of their advisors.

### Scope, Intent, and Purpose of the Liquidation Analysis

The determination of the costs of, and hypothetical proceeds from, the liquidation of the Debtors' Assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation. In addition, the Debtors' management cannot judge with any degree of certainty the effect of the forced liquidation asset sales on the recoverable value of the Debtors' Assets. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. No independent appraisals were conducted in preparing the Liquidation Analysis. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Claims contained in the Debtors' books and records. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Cases, but which could be asserted and Allowed in a chapter 7 liquidation, including Administrative Claims, wind-down costs, trustee fees, tax liabilities, and certain lease and contract rejection damages Claims. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. The Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis

should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

**Global Notes to the Liquidation Analysis**

### *Conversion Date and Appointment of a Chapter 7 Trustee*

The Liquidation Analysis assumes conversion of Chapter 11 Cases to chapter 7 liquidation cases on September 30, 2009 (the "Conversion Date"). On the Conversion Date, it is assumed that the Bankruptcy Court would appoint separate chapter 7 trustees (the "Trustee" or the "Trustees") to oversee the liquidation of each Debtor's Estate. Thus, this Liquidation Analysis estimates the recovery for Allowed Claims on a deconsolidated basis.

### *Primary Assets of the Debtors*

The Liquidation Analysis assumes a liquidation of all of the Assets, which include light and medium duty vehicles, trailers, heavy duty trucks, and equipment such as bulldozers, cranes, road and location mats, accommodation units, and a large assortment of rental equipment, such as forklifts, frac tanks, pumps, and other small machinery and equipment used for wellsite support and production located throughout the continental United States, as well as offshore locations. The Liquidation Analysis assumes a range of recoveries for these Assets assuming a forced liquidation asset sale process conducted by each of the Debtors' Trustees. The liquidation value generated for each specific Debtor's assets has been included with any other potential realizable Assets specific to each Debtor. The Debtors' management believes that values generated in the Liquidation Analysis do not generate a significant recovery for stakeholders as compared with the going concern valuation of the Assets.

### *Forced Liquidation Sale Process*

The estimated liquidation proceeds generated for each Debtor were derived assuming a forced liquidation and wind down of each Debtor's operations. The Debtors' management derived a range of potential recovery values for each class of assets based on a number of factors, including the following: (i) the age and quality of the assets; (ii) the location of such assets; (iii) the amount of inventory of such Assets in the geographic marketplace for each Debtor; and (iv) the potential alternative uses for such Assets by other competitors or other industrial uses for such Assets. Reductions to a going-concern valuation were applied to reflect the forced sale nature of a chapter 7 liquidation. These reductions were derived by considering such factors as the shortened time period involved in the sale process, discounts buyers would require given a shorter due diligence period and therefore potentially higher risks buyers might assume, potentially negative perceptions involved in liquidation sales, the current state of the capital markets as well as the over capacity situation facing the oilfield services industry, the limited universe of prospective buyers, and the "bargain hunting" mentality of liquidation sales.

The Liquidation Analysis assumes a liquidation of the Assets occurs over three months to sell all of the physical Assets of each Debtor. This reflects an estimate of the time required to dispose of the material Assets and wind down the physical operations related to the Debtors' businesses. As the Debtors operate in a highly competitive service oriented environment where very few contractual relationships exist between customer and service provider, customers would rapidly move business to competitors creating a significant burden for each Trustee in attempting to collect all of the physical Assets, which

would be on rent, and competitors would have an advantage in servicing the Debtors' customers as industry practices are not governed with performance-based contracts. The analysis further assumes an additional 12 months to wind down the legal, tax, and accounting affairs of each Estate. This period of time would provide each Trustee appointed in each of the Debtor's cases the necessary time to resolve claims as well as distribute proceeds from the sale of the physical Assets. It is further assumed that the existing service revenue and jobs in place for each of the Debtors would be significantly reduced within the first 45 days of announcing a conversion to a chapter 7 liquidation. The analysis also assumes all executory contracts would be rejected during the pendency of the liquidation and potential claim estimates have been included in the analysis. The Debtors' management cannot anticipate additional Claims by creditors for such contract rejections and assumes the amounts included in the analysis may be significantly understated. This Liquidation Analysis also assumes that the existing staff currently employed at each Debtor will remain with the Debtors through any regulatory required period of notice for announcing such a closure of each property. Costs have been included for each Trustee to maintain employment to collect and liquidate all of the Debtors' property during the property liquidation phase of this analysis. Additional labor costs have been included for staff necessary to wind down the accounting, legal, and tax affairs of each Debtor Estate. If the cash flows from the sale of each Debtor's Assets are not sufficient to fund the ongoing operations during this period, the Trustee may have to lower expectations related to potential recovery value for the material Assets and further reduce the recovery estimates contained in this Liquidation Analysis.

This Liquidation Analysis assumes that the estimated sale proceeds for each Debtor's properties would be less than the tax basis of the Assets and would not generate any additional tax liabilities. Should the tax treatment and effect of this transaction result is a tax liability that is not reduced by other tax shields, recovery percentages in the Liquidation Analysis could change materially.

### Substantive Consolidation of the Estates

This Liquidation Analysis assumes the each Debtor's case will be separately converted into a chapter 7 liquidation and a separate Trustee would be appointed for each Debtor. The model assumes the net proceeds from the sale of each Debtor Estate would be applied to classes of potential Claims consistent with a chapter 7 liquidation. Each Debtor's specific guarantee of debt has been included in the calculation of recoveries for each Debtor's hypothetical recovery analysis.

### Factors Considered in Valuing Hypothetical Liquidation Proceeds

Certain factors may limit the amount of the liquidation proceeds (the "Liquidation Proceeds") available to the Trustee. Certain of these factors that relate specifically to the liquidation of the Assets are discussed in further detail below. In addition, it is possible that distribution of the Liquidation Proceeds would be delayed while each Trustee and his or her professionals become knowledgeable about the Chapter 11 Cases and the Debtors' business and operations. This delay could materially reduce the value, on a "present value" basis, of the Liquidation Proceeds.

## Specific Notes to the Asset Assumptions Contained in the Liquidation Analysis

The Liquidation Analysis refers to certain categories of Assets. The numerical designation below corresponds to the line items listed in the attached chart with a specific note.

### Cash and Cash Equivalents

Cash and equivalents represent existing Cash that each Debtor maintains at its local bank as well as any Cash on hand for each property's daily operations. As discussed above, this Liquidation Analysis

assumes that each Debtor is separately liquidated by a separate Trustee. Certain of the Debtor's cash management systems consolidate daily cash activity with Stallion Oilfield Services Ltd. This analysis assumes this daily cash consolidation immediately ceases upon the conversion to a chapter 7 liquidation. Therefore, any Claims each Debtor may have for cash consolidation activities with Stallion Oilfield Services Ltd. prior to the conversion of a chapter 7 liquidation would become an Intercompany Claim between the specific Debtor and Stallion Oilfield Services Ltd. This analysis assumes that each Debtor and Trustee would be able to fund the wind down of each separate Estate with existing cash collections and proceeds from asset sales. Given the current state of credit markets and the nature of the Debtors' businesses, each Trustee would be forced to liquidate the Assets of each Estate in an expedited time frame in order to have cash on hand necessary to wind down the affairs of each Debtor. Recoveries for each specific Debtor's creditors could be further impacted to the extent a specific Trustee could not obtain enough cash to fund the wind down of its specific operations and was forced to further reduce the potential sales prices of its specific Assets.

### Accounts Receivable and Other Current Assets

In addition to Cash and Cash Equivalents, each Debtor has a significant amount of working capital in the form of accounts receivables and inventory. The recovery percentage related to these Assets is based on the estimated range of value that may be obtained in collecting current accounts receivable as well as the sale of existing inventory stock. These recovery percentages contemplate the Debtor's management's best estimate of collection given the parameters of this wind down analysis and that certain customers may withhold payments in light of the operational wind down. Cash received from the collection of accounts receivable and sale of inventory would be used by each Trustee for the costs necessary to wind down the affairs of each Debtor.

### Property and Plant & Equipment

The Debtors' primary physical Assets represent real property owned by certain Debtors and machinery and equipment needed for the Debtors' service business. More specifically, the Assets consist of a significant amount of light and medium duty vehicles, trailers, heavy duty trucks, and equipment such as bulldozers, cranes, road and location mats, accommodation units, and a large assortment of rental equipment such as forklifts, frac tanks, pumps, and other small machinery necessary for wellsite support. In determining the potential recovery for such Assets, the Debtors' management considered such factors as the age of the equipment, the geographic location where these Assets reside, as well as the market for used resale equipment in the industry. The recovery percentages would be affected by the time frame necessary for liquidating such Assets as well as the significant amount of overcapacity in the industry given the reduction in demand for the Debtors' services. Recovery percentages were applied against the Debtors' current net book value of such equipment to develop a range of potential recoveries. In addition to the estimates the Debtors' management used to develop these ranges of recoveries, the Debtors' management has assumed that each Trustee would be able to locate all of the Assets and collect the Assets for such a sales process. While costs to locate and gather the equipment has been included in this analysis, given the fragmented nature of wellsite support services and geographic diversity of the locations for the Debtors' rental equipment, the cost estimates may be understated and require each Trustee to incur additional costs to retrieve the physical Assets of each Estate in order to facilitate such a sale as contemplated by this analysis. Such additional costs have not been assumed in the Liquidation Analysis and could further reduce recoveries as illustrated in this Liquidation Analysis.

### Other Assets

Other Assets are comprised of goodwill, intangibles, intercompany affiliate receivables, and other miscellaneous Assets such as deposits and deferred charges. Goodwill, intangible Assets, and deposits

34

and deferred charges would have no specific recovery in the Liquidation Analysis. Intercompany affiliate receivables would only have a recovery to the extent the respective Debtor associated with an intercompany balance had value to provide recovery considering the waterfall effect of Claims recovery specific to a chapter 7 liquidation.

**Specific Notes to the Liability Assumptions Contained in the Liquidation Analysis**

The Liquidation Analysis assumes that the Liquidation Proceeds. This Liquidation Analysis sets forth an allocation of the Liquidation Proceeds to Holders of Claims and Interests in accordance with the priorities set forth in section 726 of the Bankruptcy Code. The Liquidation Analysis provides for high and low recovery percentages for Claims and Interests upon the Trustee's application of the Liquidation Proceeds. The high and low recovery ranges reflect a high and low range of estimated Liquidation Proceeds from the Trustee's sale of the Assets.

### *Estimated Chapter 7 Expenses*

Wind-down costs consist of the regularly occurring field operational labor, miscellaneous operating expenses, general and administrative costs required to operate the Assets during the liquidation process, and the costs of any professionals the Trustee employs to assist with the liquidation process, including investment bankers, attorneys, and other advisors. This Liquidation Analysis assumes that the each specific Debtor's field operations will wind down and the physical Assets will be collected and sold during the first 90 days after the liquidation process begins. These costs include estimates for any necessary labor associated with the wind down of the field operations and at least a 60 notice to comply with the Workers Adjustment and Retraining Notification Act. Chapter 7 Trustee fees necessary to facilitate the sale of each Debtor's Assets were assumed at the statutory maximum rate of 3% of available Liquidation Proceeds. These fees would be used specifically for developing marketing materials and facilitating the solicitation process for the parties, as well as other preparatory requirements to sell the physical Assets. Given the complexity and nature of the Debtors' Estates, this Liquidation Analysis assumes that in addition to the three month operational wind down and sale of Assets, an additional 12 months would be required to settle claims and wind down the accounting, legal, and tax affairs of the estate. This estimate also takes into account the time that will be required for the Trustee and any professionals to become educated with respect to the Debtors' businesses and the Chapter 11 Cases.

### *Administrative Claims*

Administrative Claims consist of Claims entitled to administrative expense priority under section 503 of the Bankruptcy Code. Among other things, this category includes postpetition payables, outstanding Professional Fees, and Claims arising from the post-conversion rejection of executory contracts and unexpired leases that were assumed during the Chapter 11 Cases or entered into after the Petition Date but before the Conversion Date. Based on the Liquidation Analysis, these Claims will be satisfied in full in a chapter 7 liquidation case.

### *Priority Tax Claims and Other Priority Claims*

Priority Tax Claims and Other Priority Claims consist of Claims that are entitled to priority under section 507 of the Bankruptcy Code. Based on the Liquidation Analysis, these Claims will be satisfied in full in a chapter 7 liquidation case.

K&E 15554052.32

***Other Secured Claims***

Other Secured Claims category includes certain miscellaneous obligations secured by Liens on certain of the Assets. The Liquidation Analysis assumes that Holders of Other Secured Claims would not be entitled to default interest or interest-on-interest (*i.e.*, compound interest). Should the Bankruptcy Court determine otherwise, projected recoveries for Holders of Claims and Interests in the Liquidation Analysis would be reduced materially. Based on the Liquidation Analysis, these Claims will be satisfied in full in a chapter 7 liquidation case.

***Secured Credit Agreement Claims and Secured Swap Claims***

Secured Credit Agreement Claims and Secured Swap claims comprise Claims arising from or related to the Prepetition Secured Credit Agreement. Based on the Liquidation Analysis, these Claims will receive between 51-76 percent of their value.

***All Other Classes***

There are insufficient Liquidation Proceeds for any recovery in the Liquidation Analysis by any Holders of Claims and Interests in any other Class.

## Projected Financial Information

### Introduction

Attached as Exhibit C are the unaudited pro forma financial statements (the "Financial Projections"), which consist of a statement of operations (the "Income Statement"), a statement of financial position (the "Balance Sheet"), and a statement of cash flow (the "Statement of Cash Flows") for the time period from January 1, 2009 through December 31, 2014. Results for the fiscal year ending December 31, 2009 have not yet been audited. Projected results for the fiscal year ending December 31, 2009 include unaudited actual results of operations through August 31, 2009 and projected results thereafter. The Financial Projections assume an Effective Date of December 31, 2009, and are based on the Debtors' current business plan. A balance sheet (the "Pro Forma Balance Sheet") has been provided as of the Effective Date with pro forma adjustments to account for (i) the reorganization and related transactions pursuant to the Plan and (ii) the implementation of "fresh start" accounting pursuant to Statement of Position 90-7 ("SOP 90-7"), Financial Reporting by Entities in Reorganization Under the Bankruptcy Code, as issued by the American Institute of Certified Public Accountants (the "AICPA"). The Balance Sheet may not be in accordance with generally accepted accounting practices. Capitalized terms used and not otherwise defined in the Financial Projections shall have those meanings ascribed to them in the Disclosure Statement

THE DEBTORS' MANAGEMENT PREPARED THE FINANCIAL PROJECTIONS WITH THE ASSISTANCE OF THEIR PROFESSIONALS. THE DEBTORS' MANAGEMENT DID NOT PREPARE SUCH FINANCIAL PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY AICPA OR THE RULES AND REGULATIONS OF THE SEC. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE FINANCIAL PROJECTIONS THAT ACCOMPANY THIS DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS. EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH FINANCIAL PROJECTIONS OF

THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. THE FINANCIAL PROJECTIONS ARE QUALIFIED IN THEIR ENTIRETY BY THE DESCRIPTION THEREOF CONTAINED HEREIN AND IN THE NOTES ACCOMPANYING THE FINANCIAL PROJECTIONS.

MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE CONSUMMATION AND IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, MAINTENANCE OF GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL DISASTERS, AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED HEREIN), AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THE FINANCIAL PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE ON WHICH THIS DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AND INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

K&E 15554052.32

**Notes to the Income Statement and Cash Flow Statement**

*Approach*

The Income Statement consolidates the financial performance of the Debtors' operating regions using an approach established by the Debtors' management and professionals to forecast operating results. The Income Statement accounts for conditions specific to each service line and region in which the Debtors' operate including competitive pressures as well as the current state of the oil and gas exploration industry. The Debtors' management team has considered various factors in developing the Financial Projections based on specific assumptions and information available to the Debtors. The Debtors considered macroeconomic factors as well in preparing the Financial Projections given that the Debtors' business can be impacted by such factors as global demand for oil and gas as well as other economic factors. The Financial Projections should be reviewed in conjunction with the risk factors contained in the Disclosure Statement.

The Financial Projections were prepared on a "bottom-up" basis, specific to each region and/or service line within a reporting segment. Revenue factors were developed specific to each region and included drivers such as revenue per rig per day and equipment utilization. Costs for each region were developed based on current relationships between actual costs incurred and revenue. Specific adjustments were made to such relationships to account for any operational improvements implemented, or to be implemented, by the Debtor's management team. Expenses specific to a region include items such as labor, benefits, insurance, and other operating expenses. Expenses to operate the Debtors' corporate infrastructure were included to arrive at consolidated operating results.

*Operational Drivers*

Total service revenue represents gross revenues derived from wellsite support services as well as production and logistic services. The Debtors' revenues are generally correlated with the number of rigs operating within each region of the Debtors' business. The Debtors' projected rig counts were derived based on reviews of third party research analysts' projections related to rig counts, as well as the Debtors' long term view of the growth and recovery related to oil and gas exploration. Using a projected rig count forecast specific to each region in which the Debtors operate, the Debtors' developed total service revenues by projecting average revenue per rig as well as utilization of equipment. Factors including the competitive nature of each region were included in determining the effect upon pricing and equipment utilization to arrive at these projections. Industry specific factors were developed by the Debtors to determine the projected timing and extent of recovery in rig count, pricing, and utilization impacting the projected service revenues. Growth in service revenues is based solely on the recovery in rig count and improvement in pricing power as a result of the projected recovery in the industry.

Wellsite support service revenues are primarily related to rental fees associated with associated offshore and land-based accommodation units and surface equipment as well as drilling support services. Production and logistic services revenues are related to rig hauling, wellsite construction, and production fluid services. Rig hauling services involve moving drilling rigs and related equipment and involve the use of the Debtors' inventory of heavy haul trucks and trailers. Production fluid services include a fleet of vacuum truck, frac tanks, and disposal wells for fluid provision, transportation, and disposal services. Construction services are also provided as an initial step for any new wellsite location. Revenue from rental agreements is recognized over the rental period and revenue from service agreements is recognized when services have been rendered. Revenue associated with construction projects is recognized using a percentage-of-completion method. Contracts typically range from two to six months.

38

### Cost of Services and Selling, General and Administrative Expenses

Cost of services represents the direct operating expenses associated with generating the service revenue. These costs include wages and benefits, repair, supply, and maintenance costs as well as utility, insurance, fuel and transportation related costs. The Debtors projected these expenses using the current run rate expenses as a percentage of revenue generated. The Debtors adjusted such percentages for any known change to the operating profile of such expense to account for any operational improvements, or potential cost increases as a result of the general economic conditions. These costs of services were projected specific to each operating region for which a revenue projection was developed.

Selling, general and administrative ("SG&A") expenses are specific to each region, as well as the costs necessary to operate the corporate infrastructure. Regional SG&A expenses include the labor related costs specific to management of each region as well as other travel related expenses. Benefit related expenses were projected based on the current costs associated with the Debtor's program of health and welfare benefits. Increases in the costs of such benefits were not projected as any cost increase was assumed to be offset with productivity improvements. Corporate SG&A primarily consists of the labor and benefits necessary to operate functions such a treasury, general accounting, legal, sales administration, information technology, and the corresponding support structure related to these functions. On-going estimates for legal and other professional fees are included in the estimates for corporate SG&A. These projected costs also include amounts associated with the interest service costs associated with the officer loans.

Projected loss on impairment of goodwill/other assets represents the amounts associated with the impairment of fixed assets and the loan forgiveness contemplated as part of the management loan structure described elsewhere in this Disclosure Statement.

### Restructuring Charges and Gain on Retirement of Debt

Management estimates that the Debtors will incur approximately $26 million of restructuring charges in 2009. These expenses represent the Professional fees relating to the Chapter 11 Cases. Professional fees were projected by examining the run-rate for professionals billing at hourly and fixed-rates and account for success fees.

Gain on retirement of debt relates to the extinguishment of the Unsecured Funded Debt Obligations as a result of the Plan and the midpoint total enterprise value of $576 million. This amount includes estimates for immediate recognition of unamortized debt issuance costs associated with the prepetition obligations.

### Interest Expense

Interest expense for 2009 includes payments incurred and/or made to Holders of Senior Secured Claims and Unsecured Funded Debt Claims. No interest expense has been recognized beyond the Petition Date for the Unsecured Funded Debt Claims.

Interest expense for the projection period has been determined based on terms of the Term Sheet for the existing Senior Secured Claims that will be outstanding after the Effective Date.

### Income Taxes

Income taxes were calculated based on an effective 40% blended United States federal and state tax rate. This tax rate assumes all Debtors will emerge as taxpayers. Additionally, Income Taxes include

an estimate for other state taxes such as the Texas margin tax. For purposes of forecasting provisions for taxes after the Effective Date, the Financial Projections assume that the Debtors do not emerge with any available net operating losses ("NOLs"). Any Debtor organized as a partnership or a "disregarded entity" owned by a partnership has no NOL as any net losses of such an entity "flow through" to its owners. Several Debtors are organized as corporations (or may be treated as corporations for federal income tax purposes). Depending upon the results of the operations of those Debtors, and other factors, those Debtors could emerge with NOLs. The availability of any such NOLs may be subject to limitation under applicable federal income tax rules. A final assessment of the Debtors' cancellation of debt income ("CODI") and usable NOLs may vary based on the structure of the Plan and events occurring after the Effective Date.

### *Capital Expenditures*

Capital expenditures projected in the Plan are primarily maintenance in nature and include estimates to replace and furbish machinery and equipment. The Debtor's operate a significant amount of physical assets necessary for wellsite support and production and logistics operations. These assets include light and medium duty trucks, heavy duty trucks and trailers, cranes, pumps, generators, disposal wells, as well as office buildings and leasehold improvements. While the projections do not contemplate any new lines of business, there will be expenditures necessary to maintain and refurbish the existing equipment as it ages over the ordinary course of operations.

## Balance Sheet and Pro Forma Balance Sheet

The Pro Forma Balance Sheet contains certain adjustments as a result of Consummation of the Plan. Liabilities subject to compromise will be extinguished and receive treatment based on the Plan. Certain Liabilities Subject to Compromise will be converted to equity as a result of the Reorganized Debtors' issuance of New Equity to satisfy certain Allowed Claims and Allowed Interests under the Plan.

The Debtors have included various line-item adjustments to the Balance Sheet, including Goodwill, and Intangibles/Deferred Taxes and Other Assets, to reflect assumed equity value as of the Effective Date based on the midpoint total enterprise value. The effect of "fresh start" accounting, when implemented, may result in further adjustments to assets and liabilities to reflect the appropriate equity value. The proposed fresh start accounting and reorganization effects have been prepared for illustrative purposes only. These adjustments may not reflect the final generally accepted accounting principles when applied.

The Pro Forma Balance Sheet reflects the Reorganized Debtors' pro forma projected consolidated Balance Sheet as of the Effective Date, based upon a midpoint total enterprise value of $576 million. The Pro Forma Balance Sheet was developed from the Debtors' unaudited August 2009 Balance Sheet, as adjusted for the projected income and cash flow for the remainder of 2009. Adjustments were made to the December 31, 2009 Balance Sheet for illustrative purposes only to demonstrate the effect of the Plan on a Pro Forma Balance Sheet.

On the Effective Date, the Reorganized Debtors will use existing Cash to satisfy Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Other Secured Claims in full in Cash. Additional Cash will be used to satisfy the Senior Secured Paydown.

The $48 million decrease in Cash reflects the Debtors' current estimate of the Cash required to satisfy the Senior Secured Paydown, other claims, and restructuring fees. Actual Cash on the Effective

Date may vary from Cash reflected in the Pro Forma Balance Sheet because of variances in the Financial Projections and potential changes in the Debtors' need for Cash in connection with Consummation.

Property and Equipment on the Pro Forma Balance Sheet has been stated at its estimated net book value after assessing any potential impairment in fair market value. As a result of the midpoint total enterprise value of $576 million, the surplus of total enterprise value over the fair market value of the assets results in an estimated Goodwill balance of approximately $137.9 million.

The Financial Projections assume the Debtors emerge with approximately $215 million of senior secured debt pursuant to the Amended and Restated Senior Secured Credit Agreement after giving effect to the Senior Secured Paydown. While the terms of the Amended and Restated Senior Secured Credit Agreement currently do not extend through 2014, the Financial Projections assume the existing Senior Secured Obligations (less the Senior Secured Paydown) would be refinanced on terms similar to the Senior Secured Credit Agreement.

### Risk Factors

*Holders of Claims and Interests entitled to vote should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to or incorporated by reference herein, prior to voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.*

**The conditions precedent to the Confirmation and Consummation of the Plan may not occur.**

As more fully set forth in Article IX of the Plan, the occurrence of Confirmation of the Plan and the Effective Date are each subject to a number of conditions precedent.

*-The Bankruptcy Court May Not Authorize Substantive Consolidation of the Debtors' Estates.* The Plan provides for substantive consolidation of the Debtors' Estates into a single Estate for purposes of Confirmation and Consummation. The Debtors, however, can provide no assurance that the Bankruptcy Court will authorize the Debtors to substantively consolidate all of their Estates.

*-Parties in Interest May Object to the Plan's Classification of Claims and Interests.* Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or an Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

*-The Debtors May Not Be Able to Satisfy Vote Requirements.* Pursuant to section 1126(c) of the Bankruptcy Code, section 1129(a)(7)(A)(i) of the Bankruptcy Code will be satisfied with respect to Class 3 and Class 4 if at least two-thirds in amount and more than one-half in number of the Allowed Claims that vote in each such Class, vote to accept the Plan, and pursuant to section 1126(d) of the Bankruptcy Code, section 1129(a)(7)(A)(i) of the Bankruptcy Code will be satisfied with respect to Class 8 and Class 9 if at least two-thirds in amount of Allowed Interests that vote in each such Class, vote to accept the Plan. There is no guarantee that the Debtors will receive the necessary acceptances from Holders of Claims in Class 3 and Class 4 or Holders of Interests in Class 8 and Class 9. If Class 3, Class 4, Class 8, or Class 9 vote to reject the Plan, the Debtors may elect to amend the Plan with the

reasonable consent of the Senior Secured Agent and counsel to the Informal Funded Debt Committee, seek Confirmation regardless of the rejection, or proceed with liquidation.

*-The Debtors May Not Be Able to Secure Confirmation of the Plan*.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A dissenting Holder of an Allowed Claim or Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and the voting results are appropriate, the Bankruptcy Court still can decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

*-The Debtors May Pursue Nonconsensual Confirmation*.  In the event that any impaired class of claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation may result in, among other things, increased expenses relating to Professional Fee Claims.

*-The Debtors May Object to the Amount or Classification of a Claim or Interest*.  Except as otherwise provided in the Plan, the Debtors and the Reorganized Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or

Interest is subject to an objection. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

*-The Debtor May Not Secure Adequate Financing to Consummate the Plan.* Consummation of the Plan is predicated upon the execution of New Financing or the Amended and Restated Senior Secured Agreement (with the corresponding Senior Secured Paydown). The Debtors have not yet received a commitment in connection with the contemplated New Financing, and, though material terms of the Amended and Restated Senior Secured Agreement already have been negotiated between the Debtors and the Senior Lenders, there can be no assurance that the Debtors will be able to secure such financing upon the Effective Date.

*-The Effective Date May Not Occur.* Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

*-Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.* The distributions available to Holders of Allowed Claims and Allowed Interests under the Plan can be affected by a variety of contingencies, including whether or not the Debtors are consolidated and whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the impaired Classes entitled to vote to accept or reject the Plan or require any sort of revote by such impaired Classes.

If the conditions precedent to Confirmation are not met or waived, the Plan will not be confirmed; and if the conditions precedent to Consummation are not met or waived, the Effective Date will not take place. In the event that the Plan is not confirmed or is not consummated, the Debtors may seek Confirmation of a new plan. However, if the Debtors do not secure sufficient working capital to continue their operations or if the new plan is not confirmed, the Debtors may be forced to liquidate their assets. While the Liquidation Analysis indicates that some Holders of Claims in Classes [●] would receive a full or partial recovery, it also demonstrates that Holders of Claims in Classes [●] and Holders of Interests in Classes 7, 8, and 9 would receive no recovery in a hypothetical chapter 7 liquidation. For a more detailed description of the consequences of a liquidation scenario, see the Sections herein entitled "Best Interests Test" and "Findings of Liquidation Analysis," respectively.

**The Debtors cannot state with any degree of certainty what recovery will be available to Holders of Allowed Claims and Allowed Interests in voting Classes.**

No less than three unknown factors make certainty of creditor recoveries under the Plan impossible. First, the Debtors cannot know with any certainty, at this time, (a) how much money will remain after paying all Allowed Claims that are senior to the voting Classes or (b) the value of the Reorganized Debtors. Second, the Debtors cannot know with any certainty, at this time, the number or amount of Claims that ultimately will be Allowed. Third, the Debtors cannot know with any certainty, at this time, the number or size of Claims senior to the voting Classes or unclassified Claims that ultimately will be Allowed.

**The Debtors may not be able to achieve their projected financial results or meet post-reorganization debt obligations.**

The financial projections set forth on Exhibit B to this Disclosure Statement (the "Financial Projections") represent management's best estimate of the Debtors' future financial

performance based on currently known facts and assumptions about the Debtors' future operations, as well as the U.S. and world economy in general and the industry segments in which the Debtors operate in particular, and there is no guarantee that the Projections will be realized. The Debtors' actual financial results may differ significantly from the Projections. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due, may not be able to meet their operational needs, and the value of the New Equity may thereby be negatively affected. Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be able to obtain such working capital when it is required. Moreover, even if the Reorganized Debtors was able to obtain additional working capital, it may only be available on unreasonable or cost prohibitive terms. For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the Reorganized Debtors. If any such required capital is obtained in the form of equity, the Interests of the holders of the then-existing New Equity could be diluted.

**A liquid trading market for the New Equity is unlikely to develop.**

A liquid trading market for the New Equity is unlikely to develop. As of the Effective Date, the New Equity will not be listed for trading on any stock exchange or trading system. Consequently, the trading liquidity of the New Equity will be limited. The future liquidity of the trading market for the New Equity will depend upon, among other things, upon the number of holders of the New Equity, whether the stock is listed for trading on an exchange, and whether the New Equity is subject to the Shareholders Agreement.

**The Debtors' business, which depends on domestic drilling activity and spending by the oil and natural gas industry in the United States, may be adversely affected by industry conditions that are beyond the Debtors' control.**

The Debtors depend on their customers' willingness to make expenditures to explore for and develop and produce oil and natural gas in the United States. A customers' willingness to undertake these activities depends largely upon prevailing industry conditions that are influenced by numerous factors over which the Debtors' management has no control, such as: (a) the supply of and demand for oil and natural gas; (b) long lead times associated with acquiring equipment and shortages of qualified personnel; (c) the level of prices, and expectations about future prices, of oil and natural gas; (d) the cost of exploring for, developing, producing, and delivering oil and natural gas; (e) the expected rates of declining current production; (f) the discovery rates of new oil and natural gas reserves; (g) available pipeline, storage, and other transportation capacity; (h) weather conditions, including hurricanes and earthquakes, that can affect oil and natural gas operations over a wide area; (i) domestic and worldwide economic conditions; (j) political instability in oil and natural gas producing countries; (k) technical advances affecting energy consumption; (l) the price and availability of alternative fuels; (m) the ability of oil and natural gas producers to raise equity capital and debt financing; and (n) merger and divestiture activity among oil and natural gas producers.

K&E 15554052.32

**Estimated Valuation of the Reorganized Debtors, the New Equity, and the estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the potential market values (if any) of the New Equity.**

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Reorganized Debtors' securities, if any. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Reorganized Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Reorganized Debtors' ability to achieve the operating and financial results included in the Projections; (d) the Reorganized Debtors' ability to maintain adequate liquidity to fund operations; and (e) the assumption that capital and equity markets remain consistent with current conditions.

**Certain Holders of Claims and Holders of Interests will acquire the New Equity upon Consummation of the Plan.**

Upon Consummation of the Plan, certain Holders of Claims and Holders of Interests will receive distributions of outstanding shares of the New Equity, and certain Holders of Unsecured Funded Debt Claims will be in a position to exercise substantial influence over the outcome of actions requiring stockholder approval, including, among other things, election of directors. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Debtors and, consequently, affect the value of the New Equity.

**Certain tax implications of the Debtors' bankruptcy and reorganization may increase the tax liability of the Reorganized Debtors.**

Holders of Allowed Claims and Allowed Interests should carefully review the Section herein entitled, "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors.

**If the Debtors are unable to compete successfully, they could lose customers and their sales could decline.**

The oilfield service industry is competitive and fragmented and includes both numerous small companies capable of competing in the Debtors' markets on a local basis as well as several large companies that possess substantially greater financial and other resources than the Debtors, which local acumen or resources could allow them to compete more effectively. Barriers to entry in many of the Debtors' areas of operation are minimal and their competitors may offer products and services at a relatively low cost. The Debtors believe that the principal competitive factors in the market areas that they serve are quality of product and service, price, availability, and technical proficiency. The Debtors' operations may be adversely affected if their current competitors or new market entrants introduce new products or services with better features, performance, prices, or other characteristics, or that better address environmental concerns, than the Debtors' products and services. Competitive pressures, excess capacity in the Debtors' industry, or other factors also may result in significant price competition that could have a material adverse effect on their results of operations and financial condition. Finally, competition among oilfield service and equipment providers is also affected by each provider's reputation for safety and quality. If the Debtors' safety record or the quality of their service declines or it is unable to compete effectively, they may not be able to maintain their competitive position.

**The turmoil presently existing in the financial markets and general economic conditions could negatively affect the Debtors' financial performance.**

The current crisis in the global credit and financial markets, and the inability of corporate borrowers to access the debt markets, may materially and adversely affect the Debtors' ability to obtain sufficient financing to operate their business on a going forward basis. Further, the Debtors' business may be adversely affected by the major recession currently being experienced in the United States, since the Debtors are dependent on recurring and significant capital expenditures by their customers. The continuation or worsening of current economic conditions could cause customers to scale back such capital expenditures on new or existing wellsites, which could adversely affect the Debtors' revenues.

**The Debtors rely on a concentrated customer base.**

The Debtors derive a significant amount of their revenue from exploration and production companies and drilling contractors who are active in their markets. For the year ended December 31, 2008 and the six months ended June 30, 2009, the Debtors' top ten customers accounted for approximately 33.8% and 41.1%, respectively, of the Debtors' total revenue. The Debtors' inability to continue to perform services for a number of their large existing customers could have a material adverse effect on their business and operations. Moreover, if any of these customers fails to remain competitive in their respective markets or encounters financial or operational problems, the Debtors' revenue and profitability may decline.

**The Debtors' business is subject to seasonality.**

The Debtors' business experiences seasonal business swings, which correspond primarily to the Atlantic hurricane season and the winter effects in the northeastern and Rocky Mountain area of the midwestern United States. In addition to expected seasonal weather changes, unusually prolonged periods of cold, rain, blizzards, or other severe weather patterns, especially hurricanes, could delay or halt construction and wellsite activity. This seasonality requires that the Debtors manage their cash flows over the course of the year. If sales were to fall substantially below what the Debtors would normally expect during certain periods, the Debtors' annual financial results would be adversely affected and the Debtors' ability to service their debt may also be adversely affected.

**The Debtors operations are subject to hazards inherent in the oil and natural gas industry.**

Through their wellsite construction services, the Debtors operate cranes, forklifts, bulldozers, and other heavy equipment. In addition, in connection with providing rig logistics services, the Debtors transport land-based drilling rigs and related equipment through the use of their heavy hauler trucks and trailers, cranes, and other trucking and relocation assets. The operation of heavy equipment at the wellsite and the transportation of rigs and related assets may result in accidents, which can cause personal injury, loss of life, suspension of operations, damage to facilities, and damage to or destruction of property. These and other operational risks inherent in the industry could expose the Debtors to substantial liability for personal injury, wrongful death, property damage, loss of oil and natural gas production, pollution, and other environmental damages. The frequency and severity of such incidents will affect the Debtors' operating costs, insurability, and could affect their relationships with customers, where such customers may elect not to purchase the Debtors' services if they view the Debtors' safety record as unacceptable.

K&E 15554052.32

**The Debtors are subject to litigation which, if adversely determined, could result in substantial losses.**

As described in the Section herein entitled "Summary of Legal Proceedings," the Debtors are, from time to time, during the ordinary course of operating their business, subject to various litigation claims and legal disputes, including contract, lease, employment, and regulatory claims.

Certain litigation claims may not be covered entirely or at all by the Debtors' insurance policies or their insurance carriers may seek to deny coverage. In addition, litigation claims can be expensive to defend and may divert the Debtors' attention from the operations of their business. Further, litigation, even if without merit, can attract adverse media attention. As a result, litigation can have a material adverse effect on the Debtors' business and, because the Debtors cannot predict the outcome of any action, it is possible that adverse judgments or settlements could significantly reduce the Debtors' earnings or result in losses.

**A disruption in the Debtors' operations could materially affect their operating results.**

Many of the Debtors' facilities are located in areas that are vulnerable to natural disasters, such as hurricanes and earthquakes, as well as to terrorist attacks or other acts of violence or war. Hurricanes and the threat of hurricanes, especially during the second and third calendar quarters of the year, will often result in the shut-down of oil and natural gas operations in the Gulf of Mexico, coastal regions, and land operations within the hurricane path, which inflicts costs upon the Debtors in a number of ways. First, the Debtors may incur significant expenses when they transport their accommodation units and surface and other equipment away from and back to the affected wellsite. Second, during a shut-down period, the Debtors are unable to access wellsites and their services are suspended resulting in loss of revenue for this period of time. Third, if the Debtors are unsuccessful in transporting their accommodation units and surface equipment away from the storm threatened area, the units and equipment may suffer significant damage resulting in additional expenses incurred to repair or replace the damaged units or equipment. For example, a number of the Debtors' accommodation units and mats were damaged, displaced, or lost during Hurricane Katrina in 2005, and a period of approximately 60 days passed before the Debtors were able to purchase and deploy new accommodation units and mats in this area, resulting in lost revenue during such time.

Further, the Debtors' offshore workforce accommodation business operates in the Gulf of Mexico and, to a lesser extent, other international offshore regions where the Debtors are not insured against interruptions of their offshore operations or business activities. If the Debtors' operations in these areas are disrupted by severe weather conditions such as hurricanes, or otherwise, the Debtors will be unable to recoup the lost revenue resulting from these disruptions. If these operations are disrupted frequently and/or for a significant period of time, the Debtors could lose substantial revenue.

**The Debtors customers may not maintain insurance against damage to or the loss of the offshore products that they lease from the Debtors.**

In the Debtors' offshore workforce accommodation business, their customers are contractually obligated to maintain insurance against property damage to or loss of the Debtors' workforce accommodation units. However, if the Debtors' customers do not comply with their insurance obligations and the Debtors' products sustain damage or are lost, then the Debtors may be unable to recover the value of the damaged or lost products. For example, certain of the Debtors' offshore workforce accommodation units were damaged in the hurricanes that occurred in 2005, and some of the Debtors' customers failed to maintain requisite insurance against the damage to these units, resulting in products being lost or remaining unusable for a substantial period of time.

K&E 15554052.32

**The Debtors are subject to the credit risk of their customers.**

The Debtors provide credit to their customers in the normal course of business and generally do not require collateral in extending such credit. This exposure, coupled with material instances of default, could have an adverse effect on the Debtors' business, financial condition, results of operations, and cash flow. In addition, the Debtors may need to make credit decisions that could cause their business to decline or the collection of certain receivables could become impossible and it would need to write those off.

**Delays in obtaining permits by the Debtors or the Debtors' customers for their respective operations could impair the Debtors' business.**

The Debtors' business operations and that of their customers require permits from various governmental agencies, including the Bureau of Land Management of the United States Department of the Interior (the "BLM") and numerous state agencies. The ease of obtaining the necessary permits depends on the type of operation and the state in which the operation will take place. As with all governmental permit processes, permits may not be issued in a timely fashion, or at all, or in a form consistent with the Debtors' plan of operations. As a result, the Debtors' operations may be interrupted or suspended for long periods of time, which could cause the Debtors to lose revenue and have a material adverse effect on their results of operation.

**The contract period during which the Debtors provide services to their customers is relatively short, which exposes the Debtors to volatility in prices and equipment utilization levels. This volatility may have a material adverse effect on the Debtors' business.**

A significant portion of the Debtors' revenue is derived by charging their customers for the actual period of time during which the Debtors provide services to them. The period of time for which customers contract with the Debtors is usually relatively short, ranging from a few days to several months. The short term of these arrangements exposes the Debtors to the risks of a rapid reduction in market prices and equipment utilization and volatility in their revenue, which reductions and volatility may have a material adverse effect on their business. The Debtors do not maintain significant backlog and are generally dependent on replacement contracts to sustain and build revenue as jobs are completed.

**Increased prices for raw materials or finished goods used in the Debtors' products and/or interruptions in deliveries of raw materials or finished goods could adversely affect the Debtors' profitability, margins, and revenues.**

Raw materials essential to the Debtors' business are normally readily available, though market conditions can trigger constraints in the supply chain of certain raw materials such as sand, cement, and specialty metals, the price of which directly affects the Debtors' profitability. The commodities the Debtors use may undergo major price fluctuations and there is no certainty that the Debtors will be able to pass these costs through to their customers. The Debtors also may purchase raw materials and manufactured items from suppliers located in non-U.S. dollar-based economies. Therefore, the Debtors may also be affected by fluctuations in currency exchange rates. In certain instances, the Debtors depend upon single or limited source suppliers for the supply of raw materials. This dependency upon regular deliveries from particular suppliers means that interruptions or stoppages in such deliveries could adversely affect the Debtors' operations until arrangements with alternate suppliers could be made.

K&E 15554052.32

**Fuel prices or disruptions in fuel supplies could have a material adverse effect on the Debtors.**

Expenditures for fuel represent a major cost of operating the Debtors' business. The Debtors' operations depend on the availability of fuel supplies, and their financial results may be significantly affected by changes in the cost of fuel. Historically, the Debtors have been unable to pass along these increased costs to their customers in the form of higher prices and they may be unable to do so in the future. Fuel prices and supplies are influenced significantly by international political and economic circumstances, such as increasing demand by developing nations, conflicts or instability in the Middle East or other oil producing regions, and diplomatic tensions between the U.S. and oil producing nations, as well as Organization of Petroleum Exporting Countries ("OPEC") production curtailments, disruptions of oil imports, environmental concerns, weather, refinery outages or maintenance, and other unpredictable events.

**A decline in or substantial volatility of oil and natural gas prices could adversely affect the demand for the Debtors' services.**

The demand for the Debtors' services is primarily influenced by current and anticipated oil and natural gas prices and the related level of drilling activity and general production spending in the areas in which it has operations. Volatility or weakness in oil and natural gas prices (or the perception that oil and natural gas prices will decrease) affects the spending patterns of the Debtors' customers and may result in the drilling of fewer new wells. This, in turn, could result in lower demand for the Debtors' services. As a result, the Debtors may experience lower utilization of, and may be forced to lower rates for, their services and equipment.

Prices for oil and natural gas historically have been extremely volatile and are expected to continue to be volatile. Producers generally react to declining oil and natural gas prices by reducing expenditures. This has in the past had, and may in the future have, an adverse effect on the Debtors' business. The Debtors are unable to predict future oil and natural gas prices or the level of oil and natural gas industry activity, and a prolonged low level of activity in the oil and natural gas industry will adversely affect both the demand for the Debtors' products and services and their financial condition and results of operations.

**When land-based rig counts are low, the Debtors' rig relocation customers may not have a need for their services.**

Many of the major United States drilling services contractors have significant capabilities to move their own land-based drilling rigs and related oilfield equipment and to mobilize rigs. When regional rig counts are high, drilling contractors often exceed their own capabilities and contract for additional oilfield equipment hauling and onshore rig mobilization capacity. The Debtors' rig relocation business activity is correlated to the onshore rig count; however, the correlation varies over the rig count range. The Baker Hughes U.S. onshore rotary rig count for the week ended September 25, 2009 was 1,017, which was down 978 on a year-over-year basis. As rig count declines, some drilling contractors reach a point where all of their oilfield equipment hauling and rig mobilization needs can be met by their own fleets. If one or more of the Debtors' rig relocation customers decide not to outsource their rig and equipment hauling needs, the Debtors' revenue attributable to rig relocation may decline much faster than the corresponding rig count. This relationship between the Debtors' rig relocation business activity and the rig count in the areas where the Debtors have rig relocation operations can significantly increase the volatility of their earnings with respect to rig relocation.

K&E 15554052.32

**Increases in labor costs, potential labor disputes, and work stoppages at the Debtors' facilities or the facilities of their suppliers could materially adversely affect the Debtors' financial performance.**

The Debtors' financial performance is affected by the availability of qualified personnel and the cost of labor. The Debtors have approximately 1,700 employees and contract laborers. If the Debtors' workers were to engage in a strike, a work stoppage, or other slowdowns, the Debtors could experience disruptions of their operations. Such disruptions could result in a loss of business and an increase in operating expenses, which could reduce profit margins. In addition, the Debtors' labor force, which currently is non-unionized, may become subject to labor union organizing efforts, which could cause the Debtors to incur additional labor costs and increase the related risks currently faced. Strikes, work stoppages, or slowdowns experienced by these suppliers and customers could result in slowdowns or closures of facilities where components of the Debtors' products are manufactured or delivered. Any interruption in the production or delivery of these components could reduce sales, increase costs, and have a material adverse affect on the Debtors' business.

Further, many of the services that the Debtors provide and the products that they rent are complex, highly engineered, and often must perform or be performed in harsh conditions. The Debtors' success depends upon their ability to employ and retain technical personnel with the ability to design, utilize, and enhance these services and products. In addition, the Debtors' ability to expand their operations depends in part on their ability to increase their skilled labor force. A significant increase in the wages paid by competing employers could result in a reduction of the Debtors' skilled labor force, increases in the wage rates that they must pay, or both. If either of these events were to occur, the Debtors' cost structure could increase, their margins could decrease, and any growth potential could be impaired.

**An increase in the importation of liquefied natural gas ("LNG") as a substitute for oil and natural gas drilling activities may reduce the level of these drilling activities in North America, which may have a material adverse effect on the Debtors' business.**

The importation of LNG may become increasingly important as a supply source in order to meet future domestic natural gas demand. If the importation of LNG increases, replaces, or supplements oil and natural gas production as a source for natural gas, then the level of North American drilling activity related to oil and natural gas may decrease. The Debtors' services support drilling for oil and natural gas. Consequently, a substantial reduction in oil or natural gas production levels could have a material adverse effect on their business, even in an environment of stronger oil and natural gas prices.

**The Debtors are vulnerable to the potential difficulties associated with rapid growth and expansion.**

The Debtors have grown rapidly over the last several years through organic growth and acquisitions of other companies. From their inception through the Petition Date, the Debtors have acquired 37 businesses, 27 of which were acquired since January 1, 2006, alone. The Debtors believe that their future success depends on their ability to manage the rapid growth that it has experienced and the demands from increased responsibility on their management personnel. The following factors could present difficulties in that regard: (a) lack of sufficient executive-level personnel; (b) increased administrative burden; (c) increased organizational challenges common to large, expansive operations; and (d) long lead times associated with acquiring equipment. The Debtors' operating results could be adversely affected if they do not successfully manage these potential difficulties.

K&E 15554052.32

**Increasing trucking regulations may increase the Debtors' costs and negatively affect their results of operations.**

Through their rig relocation and heavy equipment hauling business, the Debtors operate trucks and loaders. As such, the Debtors operate as a motor carrier in providing certain of their services and therefore are subject to regulation by the United States Department of Transportation and by various state agencies. These regulatory authorities exercise broad powers governing activities such as the authorization to engage in motor carrier operations and regulatory safety. The trucking industry is subject to possible regulatory and legislative changes that may affect the economics of the industry by requiring changes in operating practices or by changing the demand for common or contract carrier services or the cost of providing truckload services. Some of these possible changes include increasingly stringent environmental regulations, changes in the hours of service regulations which govern the amount of time a driver may drive or work in any specific period, onboard black box recorder device requirements, or limits on vehicle weight and size.

Interstate motor carrier operations are subject to safety requirements prescribed by the United States Department of Transportation. To a large degree, intrastate motor carrier operations are subject to state safety regulations that mirror federal regulations. Matters such as the weight and dimensions of equipment are also subject to federal and state regulations.

From time to time, various legislative proposals are introduced, including proposals to increase federal, state, or local taxes, including taxes on motor fuels, which may increase the Debtors' costs or adversely affect the recruitment of drivers. The Debtors cannot predict whether, or in what form, any increase in any applicable taxes will be enacted.

**The Debtors have operations located on lands that are regulated by the BLM and these operations may be subject to long periods of interruption or suspension.**

The BLM enforces regulations that protect certain animals, such as deer, sage grouse, and raptors that inhabit lands in the northern United States, where the Debtors have operations. The Debtors provide services in these locations and their revenue attributable to these services accounted for 16% and 14.7% of their total revenue for the year ended December 31, 2008 and the six months ended June 30, 2009, respectively. The BLM may deny or delay the granting of permits to the Debtors or their customers necessary to conduct operations in these lands. The BLM may also restrict access to or seek the Debtors' relocation from these lands for a period of time. As a result of this enforcement, the Debtors' operations on these lands have been and may be interrupted or suspended for long periods of time. For example, each year from mid-November until mid-May, the period during which mule deer roam these lands, certain of the Debtors' operations cease and go on stand-by. In addition, during April and May of each year, sage grouse nesting occurs and, as a result, the Debtors are required to relocate their operations for a period of time. If these regulations become more stringent and, as a result, the Debtors' operations are interrupted or suspended for longer periods of time, the Debtors could lose substantial revenue.

**The Debtors are exposed to political, economic, and other risks that arise from operating a multinational business.**

The Debtors have operations in several international areas, including Mexico, Trinidad and Tobago, and Equatorial Guinea, and their business strategy contemplates expansion into international markets. The Debtors, therefore, are subject to the various risks inherent in conducting business operations in locations outside the United States, including, among other things, foreign currency risk and changes in local laws, policies, and tax regulations. The Debtors' operations in these areas increase their exposure to risks of war, terrorist attacks, local economic conditions, political disruptions, civil

disturbance, and governmental policies that may disrupt the Debtors' operations, restrict the movement of funds or limit repatriation of profits, and limit access to markets for periods of time.

U.S. laws and policies on foreign trade, taxation, and investment may also adversely affect the Debtors' international operations. In addition, if a dispute arises from the Debtors' international operations, courts outside the U.S. may have exclusive jurisdiction over the dispute, or the Debtors may not be able to subject persons outside the U.S. to the jurisdiction of U.S. courts.

Local laws and customs in many countries differ significantly from those in the United States. In many countries, particularly in those with developing economies, it is common to engage in business practices from which the Debtors are prohibited from engaging in by applicable U.S. regulations. For instance, the U.S. Foreign Corrupt Practices Act prohibits corporations, and others acting on their behalf, from engaging in certain activities to obtain or retain business or to influence a person working in an official capacity. The Debtors are responsible for any violations by their employees, contractors, and agents, whether based within or outside the United States, for violations thereof. Any such violation, even if prohibited by the Debtors' standing policies, could have a material adverse effect on their business. In addition, the Debtors' non-U.S. competitors that are not subject to the U.S. Foreign Corrupt Practices Act or similar laws may be able to secure business or other preferential treatment in such countries by means that such laws prohibit with respect to the Debtors.

**Governmental regulation and taxation policies could adversely affect the Debtors' business, financial condition, and results of operations.**

As discussed, the Debtors have operations both inside and outside of the United States. Consequently, the Debtors are subject to the jurisdiction of a significant number of taxing authorities. The income earned in these various jurisdictions is taxed on differing bases, including net income actually earned, net income deemed earned, and revenue-based tax withholding. The final determination of the Debtors' income tax liabilities involves the interpretation of local tax laws, tax treaties, and related authorities in each jurisdiction, as well as the significant use of estimates and assumptions regarding the scope of future operations and results achieved and the timing and nature of income earned and expenditures incurred. Changes in the operating environment, including changes in or interpretation of tax law and currency/repatriation controls, could affect the determination of the Debtors' income tax liabilities for a tax year.

**The Debtors are subject to federal, state, and local regulation regarding issues of health, safety, and protection of the environment. Under these regulations, the Debtors may become liable for penalties, damages, or costs of remediation. Any changes in laws and government regulations could increase their costs of doing business.**

The Debtors' operations are subject to federal, state, and local laws and regulations relating to protection of natural resources and the environment, health and safety, waste management, and transportation of waste and other materials. Liability under these laws and regulations could result in cancellation of land-based wellsite or offshore operations, fines and penalties, expenditures for remediation, and liability for property damages and personal injuries. Sanctions for noncompliance with applicable environmental laws and regulations also may include assessment of administrative, civil and criminal penalties, revocation of permits, and issuance of corrective action orders. As part of the Debtors' business, they handle, transport, and dispose of a variety of fluids and substances used or produced by the Debtors' customers in connection with their oil and gas exploration and production activities. The generation, handling, transportation, and disposal of these fluids, substances, and waste are regulated by a number of laws, including: the Resource Recovery and Conservation Act; the Comprehensive Environmental Response, Compensation, and Liability Act; the Clean Water Act; the Safe Drinking

Water Act; and analogous state laws. In addition, some of the Debtors' offshore workforce accommodation units must be certified by the U.S. Coast Guard before the Debtors can supply the units to their customers for use offshore. If the Debtors are unsuccessful or delayed in certifying certain of their accommodation units with the U.S. Coast Guard, the Debtors' business, operating results, and financial condition could be harmed.

Laws protecting the environment generally have become more stringent over time and are expected to continue to do so, which could lead to material increases in costs for future environmental compliance and remediation. The modification or interpretation of existing laws or regulations, or the adoption of new laws or regulations, could curtail exploratory or developmental drilling for oil and natural gas and could limit wellsite services opportunities. Some environmental laws and regulations may impose strict liability, which means that in some situations the Debtors could be exposed to liability as a result of conduct of, or conditions caused by, prior operators or other third parties, though the Debtors' conduct was lawful at the time it occurred. Clean-up costs and other damages arising as a result of environmental laws, and costs associated with changes in environmental laws and regulations could be substantial and could have a material adverse effect on the Debtors' financial condition. The Debtors maintain insurance against some risks associated with underground contamination that may occur as a result of wellsite service activities. However, this insurance is limited to activities at the wellsite, and this insurance may not continue to be available or may not be available at premium levels that justify its purchase. The occurrence of a significant event not fully insured or indemnified against could have a materially adverse effect on the Debtors' financial condition and operations.

**The Debtors may not have or may be unable to obtain sufficient insurance coverage to replace or cover the full value of losses the Debtors may suffer.**

The Debtors evaluate certain of their risks and insurance coverage annually. While the Debtors believe that they have obtained sufficient insurance coverage with respect to the occurrences of casualty damage to cover losses that could result from the acts or events described above for the next year, the Debtors may not be able to obtain sufficient or similar insurance for later periods and cannot predict whether they will encounter difficulty in collecting on any insurance claims it may submit, including claims for business interruption.

In addition, while the Debtors maintain insurance against many risks to the extent and in amounts that the Debtors believe are reasonable, these policies do not cover all risks and portions of the Debtors' business are difficult or impracticable to insure. Therefore, after carefully weighing the costs, risks, and benefits of retaining versus insuring various risks, as well as the availability of certain types of insurance coverage, the Debtors occasionally opt to retain certain risks not covered by their insurance policies. Retained risks are associated with deductible limits or self-insured retentions, partial self-insurance programs, and insurance policy coverage ceilings.

The Debtors carry certain insurance policies that, in the event of certain substantial losses, may not be sufficient to pay the full current market value or current replacement cost of damaged property. As a result, if a significant event were to occur that is not fully covered by the Debtors' insurance policies, the Debtors may lose all, or a portion of, the capital it has invested in a property, as well as the anticipated future revenue from such property, and the Debtors' business, financial condition, and results of operations could be adversely affected. There can be no assurance that the Debtors will not face uninsured losses pertaining to the risks they have retained.

**The Debtors' business will suffer if certain of their key officers or employees discontinue their employment.**

The success of the Debtors' business is materially dependent upon the skills, experience, and efforts of certain of their key officers and employees. The loss of key personnel could have a material adverse effect on the Debtors' business, operating results, or financial condition. The Debtors may not succeed in attracting and retaining the personnel they need to generate sales and to expand their operations successfully, and, in such event, the Debtors' business could be materially and adversely affected. The loss of the services of any key personnel, or the Debtors' inability to hire new personnel with the requisite skills, could impair the Debtors' ability to develop new products or enhance existing products, sell products to their customers, or manage their business effectively.

**The oilfield services industry has experienced a high rate of employee turnover. Any difficulty the Debtors experiences replacing or adding personnel could adversely affect their business.**

The Debtors may not be able to find enough skilled labor to meet their needs, which could limit growth. The oilfield service business has been cyclical in the past and is heavily influenced by oil and natural gas prices. In addition, the Debtors' services require skilled workers who can perform physically demanding work. As a result of industry volatility and the demanding nature of the work, workers may choose to pursue employment in fields that offer a more desirable work environment at wage rates that are competitive with those in the oilfield services industry. The Debtors' success is dependent upon their ability to continue to employ, train, and retain skilled personnel. The demand for skilled workers is high, and the supply is limited, particularly in the Rocky Mountain region, which is one of the Debtors' key regions. It is possible that the Debtors will have to raise wage rates to attract workers from other fields and to retain or expand their current work force. If the Debtors are not able to increase their service rates sufficiently to compensate for wage rate increases, their operating results may be adversely affected.

**The Debtors' historical financial information may not be comparable to the financial information of the Reorganized Debtors.**

As a result of the Consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

**The financial information is based on the Debtors' books and records and, unless otherwise stated, no audit was performed.**

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

**No legal or tax advice is provided by this Disclosure Statement.**

This Disclosure Statement is not legal advice to any Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or Interest should consult its own legal counsel and accountant with regard to any legal, tax, and other matters

concerning its Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation of the Plan.

**No admissions made.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims and Allowed Interests, or any other parties in interest.

**Failure to identify litigation claims or projected objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

**Information was provided by the Debtors and was relied upon by the Debtors' advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

**No representations outside this Disclosure Statement are authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to counsel to the Debtors, the Senior Administrative Agent, counsel to the Informal Funded Debt Committee, and the Office of the United States Trustee for the District of Delaware.

## Confirmation of the Plan

**The Confirmation Hearing**

The Bankruptcy Court has scheduled the Confirmation Hearing for [●] at [●] [_.m.], prevailing Eastern Time, before the Honorable [●], United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, [●] Floor, Courtroom # [●], Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or by any notice of adjournment of the Confirmation Hearing filed by the Debtors and posted on their website at http://chapter11.epiqsystems.com/stallion.

## Requirements For Confirmation of the Plan

Among the requirements for the Confirmation of the Plan are that the Plan (a) is accepted by all impaired Classes of Claims and Interests, or if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (b) is feasible, and (c) is in the "best interests" of Holders of Claims and Interests that are impaired under the Plan.

### *Requirements of Section 1129(a) of the Bankruptcy Code*

The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization:

- The plan complies with the applicable provisions of the Bankruptcy Code.

- The proponents of the plan comply with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

- The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policies.

- The proponent of the plan has disclosed the identity of any "insider" (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such insider.

- With respect to each holder within an impaired class of claims or interests —

  - each such holder (a) has accepted the plan, or (b) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or

  - if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class due to its election to retain a lien, each holder of a Claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the Estate's interest in the property that secures such claims.

- With respect to each class of claims or interests, such class (a) has accepted the plan, or (b) is not impaired under the plan (subject to the "cramdown" provisions discussed below).

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

  - with respect to a claim of a kind specified in sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim, unless otherwise agreed;

  - with respect to a class of claim of the kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive (a) if such class has accepted the plan, deferred cash payments of a value, on the effective date of the plan, equal to the allowed amount of such claim; or (b) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

  - with respect to a priority tax claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

- If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any "insider," as defined in section 101 of the Bankruptcy Code.

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

- All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

- The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(i)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

*Best Interests of Creditors*

Notwithstanding acceptance of a plan by each impaired class, to confirm a plan, the Bankruptcy Court must determine that it is in the best interests of each holder of a claim or interest in any such impaired class that has not voted to accept the plan. Accordingly, if an impaired class does not unanimously accept a plan, the "best interests" test requires that the Bankruptcy Court find that the plan provides to each member of such impaired class a recovery on account of the member's claim or Interest

that has a value, as of the effective date of the plan, at least equal to the value of the distribution that each such member would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code on such date. For additional information, as well as the Debtors' "best interests" analysis, please see the Section entitled "Liquidation Analysis."

*Acceptance*

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class.

Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

*Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtors, or any successor to the debtors (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the Financial Projections. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases, and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Code permits confirmation of a plan of reorganization notwithstanding rejection of the plan by an impaired class so long as (a) the plan of reorganization otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan of reorganization without taking into consideration the votes of any insiders in such class, and (c) the plan of reorganization is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted such plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

*"Fair and Equitable"*

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors, and Interest holders as follows:

*Secured Creditors*

A plan of reorganization is fair and equitable as to an impaired class of secured claims that rejects the plan if the plan provides: (a) that each of the holders of the secured claims included in the rejecting class (i) retains the liens securing its claim to the extent of the allowed amount of such claim, to the extent of the allowed amount of such claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (ii) receives on account of its secured claim deferred cash payments

58

having a present value, as of the effective date of the plan of reorganization, at least equal to the value of such Holder's interest in the Estate's interest in such property; (b) that each of the holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (c) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds in accordance with clause (a) or (b) of this paragraph.

*Unsecured Creditors*

A plan of reorganization is fair and equitable as to an impaired class of unsecured claims that rejects the plan if the plan provides that: (i) each Holder of a claim included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan of reorganization, equal to the amount of its allowed claim; or (ii) the holders of claims and Interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan of reorganization on account of such junior claims or interests.

*Holders of Interests*

A plan of reorganization is fair and equitable as to an impaired class of Interests that rejects the plan if the plan provides that: (a) each holder of an Interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan of reorganization, equal to the greatest of the allowed amount of (i) any fixed liquidation preference to which such holder is entitled, (ii) the fixed redemption price to which such Holder is entitled, or (iii) the value of the Interest; or (b) the Holder of any Interest that is junior to the Interests of the rejecting class will not receive or retain any property under the plan of reorganization on account of such junior interest.

The Plan is fair and equitable as to Holders of Claims in Classes 3 and 4 and Interests in Classes 8 and 9 because, pursuant to the Plan Support Agreement, the Debtors have sufficient support from such Holders so that such Classes vote to accept the Plan. The Plan is fair and equitable as to Holders of Claims in Classes 1, 2, 5, and 6 and Holders of Interests in Class 7 because the Plan provides that their Allowed Claims and Allowed Interests are Unimpaired. The Debtors believe the Plan is fair and equitable as to Holders of Claims in Class 10, who are conclusively deemed to have rejected the Plan, because there are no Claims or Interests junior to Class 10 Claims and, as such, the Plan does not provide any distribution to such Claims or Interests.

*"Unfair Discrimination"*

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally to other classes similarly situated and no such class receives more than it is legally entitled to receive for its claims or interests.

The Debtors do not believe that the Plan discriminates unfairly against any impaired Class of Claims or Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

*Valuation of the Debtors*

In conjunction with formulating the Plan, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Accordingly, such valuation is set forth in the Section herein entitled "Valuation Analysis."

# Effect of Confirmation of the Plan

## Preservation of Avoidance Actions

On and after the Effective Date, any and all Avoidance Actions shall be preserved and retained by the Reorganized Debtors, which shall have the exclusive right to enforce, settle, release, abandon, or prosecute any such Avoidance Actions. The Reorganized Debtors may offset any Claim supporting an Avoidance Action against any payment or distribution due to any Holder of a Claim or Interest under the Plan. In addition, if a distribution is made in error, the Reorganized Debtors can bring an action pursuant to section 502(d) of the Bankruptcy Code to recoup such distribution.

## Retention of Jurisdiction by the Bankruptcy Court

After the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan (except as otherwise set forth in any related agreements, documents, instruments, or contracts executed or entered into in connection with the Plan in which case the governing law of such agreement shall control). In particular, the Bankruptcy Court will keep exclusive jurisdiction to:

- Determine any disputes regarding any Claim against or Interest in the Debtors.

- Resolve any matters related to any executory contract or unexpired lease to which the Debtors are party.

- Ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

- Adjudicate, decide, or resolve any contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

- Adjudicate, decide, or resolve any and all matters related to any Causes of Action, including those based in whole or in part on events occurring before or after the Petition Date;

- Enter and implement such orders as may be necessary or appropriate to consummate the Plan and all documents created in connection with the Plan or this Disclosure Statement;

- Enter an order or final decree concluding or closing the Chapter 11 Cases; and

- Adjudicate any and all disputes arising from or relating to distributions under the Plan.

This list of matters over which the Bankruptcy Court will retain exclusive jurisdiction following the Confirmation and Consummation of the Plan is not exhaustive. For a full list of the matters over which the Bankruptcy Court retains jurisdiction through and after the Effective Date, please see Article XI of the Plan.

## Substantive Consolidation

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order substantively consolidating all of the Estates into a single consolidated Estate for all purposes associated with Confirmation and Consummation.

K&E 15554052.32

If substantive consolidation of all of the Estates is ordered, then on and after the Effective Date, all assets and liabilities of the Debtors shall be treated as though they were merged into the Estate of Stallion Oilfield Services Ltd. for all purposes associated with Confirmation and Consummation, and all guarantees by any Debtor Entity of the obligations of any other Debtor Entity shall be eliminated so that any Claim and any guarantee thereof by any other Debtor Entity, as well as any joint and several liability of any Debtor Entity with respect to any other Debtor Entity shall be treated as one collective obligation of the Debtors. Substantive consolidation shall not affect the legal and organizational structure of the Reorganized Debtors' Entities or their separate corporate existences or any prepetition or postpetition guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, any contract, instrument, or other agreement or document pursuant to the Plan (including the Amended and Restated Senior Secured Credit Agreement or New Financing), or, in connection with contracts or leases that were assumed or entered into during the Chapter 11 Cases. Any alleged defaults under any applicable agreement with the Debtors, the Reorganized Debtors, or their Affiliates arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

Notwithstanding the substantive consolidation provided for in the Plan, nothing shall affect the obligation of each and every Debtor Entity to pay Quarterly Fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 until such time as a particular case is closed, dismissed, or converted.

**Settlement, Release, Injunction, and Related Provisions**

*Discharge of Claims and Termination of Interests*

PURSUANT TO SECTION 1141(D) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR IN ANY CONTRACT, INSTRUMENT, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, THE DISTRIBUTIONS, RIGHTS, AND TREATMENT THAT ARE PROVIDED IN THE PLAN SHALL BE IN COMPLETE SATISFACTION, DISCHARGE, AND RELEASE, EFFECTIVE AS OF THE EFFECTIVE DATE, OF CLAIMS (INCLUDING ANY INTERCOMPANY CLAIMS RESOLVED OR COMPROMISED AFTER THE EFFECTIVE DATE BY THE REORGANIZED DEBTORS), INTERESTS, AND CAUSES OF ACTION OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS OR INTERESTS FROM AND AFTER THE PETITION DATE, WHETHER KNOWN OR UNKNOWN, AGAINST, LIABILITIES OF, LIENS ON, OBLIGATIONS OF, RIGHTS AGAINST, AND INTERESTS IN, THE DEBTORS OR ANY OF THEIR ASSETS OR PROPERTIES, REGARDLESS OF WHETHER ANY PROPERTY SHALL HAVE BEEN DISTRIBUTED OR RETAINED PURSUANT TO THE PLAN ON ACCOUNT OF SUCH CLAIMS AND INTERESTS, INCLUDING DEMANDS, LIABILITIES, AND CAUSES OF ACTION THAT AROSE BEFORE THE EFFECTIVE DATE, ANY LIABILITY (INCLUDING WITHDRAWAL LIABILITY) TO THE EXTENT SUCH CLAIMS OR INTERESTS RELATE TO SERVICES PERFORMED BY EMPLOYEES OF THE DEBTORS PRIOR TO THE EFFECTIVE DATE AND THAT ARISE FROM A TERMINATION OF EMPLOYMENT, ANY CONTINGENT OR NON-CONTINGENT LIABILITY ON ACCOUNT OF REPRESENTATIONS OR WARRANTIES ISSUED ON OR BEFORE THE EFFECTIVE DATE, AND ALL DEBTS OF THE KIND SPECIFIED IN SECTIONS 502(G), 502(H), OR 502(I) OF THE BANKRUPTCY CODE, IN EACH CASE WHETHER OR NOT: (1) A PROOF OF CLAIM OR INTEREST BASED UPON SUCH DEBT, RIGHT, OR INTEREST IS FILED OR DEEMED FILED PURSUANT TO SECTION 501 OF THE BANKRUPTCY CODE; (2) A CLAIM OR INTEREST BASED UPON SUCH DEBT, RIGHT, OR INTEREST IS ALLOWED PURSUANT TO SECTION 502 OF THE BANKRUPTCY CODE; OR (3) THE HOLDER OF SUCH A CLAIM OR

INTEREST HAS ACCEPTED THE PLAN. ANY DEFAULT BY THE DEBTORS OR AFFILIATES WITH RESPECT TO ANY CLAIM OR INTEREST THAT EXISTED IMMEDIATELY PRIOR TO OR ON ACCOUNT OF THE FILING OF THE CHAPTER 11 CASES SHALL BE DEEMED CURED ON THE EFFECTIVE DATE. THE CONFIRMATION ORDER SHALL BE A JUDICIAL DETERMINATION OF THE DISCHARGE OF ALL CLAIMS AND INTERESTS SUBJECT TO THE EFFECTIVE DATE OCCURRING.

### *Releases*

#### *Release of Liens*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, INCLUDING ARTICLE IV.I THEREOF, OR IN ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, ON THE EFFECTIVE DATE AND CONCURRENTLY WITH THE APPLICABLE DISTRIBUTIONS MADE PURSUANT TO THE PLAN AND, IN THE CASE OF A SECURED CLAIM, SATISFACTION IN FULL OF THE PORTION OF THE SECURED CLAIM THAT IS ALLOWED AS OF THE EFFECTIVE DATE, ALL MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS AGAINST ANY PROPERTY OF THE ESTATES SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL OF THE RIGHT, TITLE, AND INTEREST OF ANY HOLDER OF SUCH MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS SHALL REVERT TO THE REORGANIZED DEBTORS AND THEIR SUCCESSORS AND ASSIGNS.

#### *Releases by the Debtors*

PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THE ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN AND RELATED DISCLOSURE STATEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE OF THE PLAN, OTHER THAN CLAIMS OR LIABILITIES ARISING

**OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT OR GROSS NEGLIGENCE.**

*Releases by Holders of Claims and Interests*

**AS OF THE EFFECTIVE DATE, EACH HOLDER OF A CLAIM OR AN INTEREST SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED AND DISCHARGED THE DEBTORS, THE REORGANIZED DEBTORS, AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF A DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' RESTRUCTURING, THE CHAPTER 11 CASES, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE RELATED DISCLOSURE STATEMENT, THE RELATED PLAN SUPPLEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE OF THE PLAN, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, INCLUDING ANY OBLIGATIONS OF ANY PARTY UNDER THE AMENDED AND RESTATED SENIOR SECURED CREDIT AGREEMENT AND DOCUMENTS AND INSTRUMENTS RELATED THERETO.**

*Exculpation*

**EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR PLAN SUPPLEMENT, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY EXCULPATED CLAIM, OBLIGATION, CAUSE OF ACTION, OR LIABILITY FOR ANY EXCULPATED CLAIM, EXCEPT FOR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE DEBTORS AND THE REORGANIZED DEBTORS (AND EACH OF THEIR RESPECTIVE AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, ADVISORS, AND ATTORNEYS) HAVE PARTICIPATED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE**

BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF THE SECURITIES PURSUANT TO THE PLAN, AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

### *Injunction*

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN (INCLUDING ANY OBLIGATIONS UNDER THE AMENDED AND RESTATED SENIOR SECURED CREDIT AGREEMENT AND DOCUMENTS AND INSTRUMENTS RELATED THERETO), ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.C OR ARTICLE VIII.D OF THE PLAN, DISCHARGED PURSUANT TO ARTICLE VIII.A OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.E OF THE PLAN ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES:  (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING AN INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

### Important Securities Laws Disclosure

Under the Plan, shares of New Equity will be distributed to Holders of Claims in Class 4 and Holders of Interests in Classes 8 and 9.

New Stallion Holdings and the Reorganized Debtors will rely on section 1145 of the Bankruptcy Code to exempt from the registration requirements of the Securities Act the offer and distribution of the New Equity.  Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws when such

K&E 15554052.32

securities are to be exchanged for claims or principally in exchange for claims and partly for cash. In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (a) with a view to distributing those securities, and (b) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

To the extent that Entities who receive the New Equity are deemed to be "underwriters," resales by those Entities would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Those Entities would, however, be permitted to sell New Equity or other securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below.

**You should confer with your own legal advisors to help determine whether or not you are an "underwriter."**

Under certain circumstances, Holders of New Equity deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker," and that notice of the resale be filed with the SEC.

<u>**Nominee Voting Instructions**</u>

Only the Holders of Claims in Classes 3 and 4 and Holders of Interests in Classes 8 and 9 are entitled to vote to accept or reject the Plan, and such Holders may do so by completing the appropriate Ballots and returning them in the envelope provided. The failure of a Holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such Holder with respect to voting to accept or reject the Plan, and such abstentions will not be counted as votes to accept or reject the Plan. Voting instructions are attached to each Ballot.

With respect to certain Holders of the Class 4 Unsecured Funded Debt Claims (*i.e.*, Holders of Notes), a broker, dealer, commercial bank, trust company, or other agent or nominee of beneficial holders (each, a "<u>Nominee</u>") should deliver the Ballot and other documents relating to the Plan, including this

Disclosure Statement, to each beneficial owner of the eligible Unsecured Funded Debt Claims for which they serve as Nominee ("Beneficial Owner").

A Nominee has two options with respect to voting. Under the first option, the Nominee will forward the solicitation package, including the Ballot and related subscription forms, to each Beneficial Owner for voting and include a return envelope provided by and addressed to the Nominee so that the Beneficial Owner may return the completed Beneficial Owner Ballot to the nominee. Upon receipt of the Ballots, the Nominee will summarize the individual votes of its respective Beneficial Owners on the appropriate Master Ballot and then return the master ballot to the voting agent before the Voting Deadline.

Under the second option, if the Nominee elects to "pre-validate" Ballots:

- The Nominee shall forward the solicitation package or copies thereof (including (a) this Disclosure Statement (together with the Plan attached thereto as Exhibit A, and all other exhibits), (b) an individual Ballot that has been pre-validated, as indicated in the paragraph immediately below, and (c) a return envelope provided by and addressed to the Balloting Agent) to the Beneficial Owner within five business days of the receipt by such nominee of the solicitation package;

- To "pre-validate" a Ballot, the Nominee shall complete and execute the Ballot and indicate on the Ballot the name of the registered Holder, the amount of securities held by the Nominee for the Beneficial Owner, and the account number(s) for the account(s) in which such securities are held by the Nominee; and

- The Beneficial Owner shall return the pre-validated Ballot to the Balloting Agent by the Voting Deadline.

If a Master Ballot is received after the Voting Deadline, the votes and elections on such Master Ballot may be counted only in the sole and absolute discretion of the Debtors. The method of delivery of a Master Ballot to be sent to the Balloting Agent is at the election and risk of each Nominee. Except as otherwise provided in this Disclosure Statement, such delivery will be deemed made only when the executed Master Ballot is actually received by the Balloting Agent. Instead of effecting delivery by mail, it is recommended, though not required, that such entities use an overnight or hand delivery service. In all cases, sufficient time should be allowed to assure timely delivery. No Ballot should be sent to the Debtors, or the Debtors' financial or legal advisors, but only to the Balloting Agent as set forth under "How do I vote for or against the Plan?" in the Section herein entitled "Questions and Answers Regarding this Disclosure Statement and the Plan."

Nominees must provide appropriate information for each of the items on the Master Ballot, including identifying the votes to accept or reject the Plan.

By returning a Master Ballot, each Nominee will be certifying to the Debtors and the Bankruptcy Court, among other things, that:

- it has received a copy of this Disclosure Statement and other solicitation materials attached to this Disclosure Statement, and it has delivered the same to the Beneficial Owners;

- it has received a completed and signed Ballot from each Beneficial Owner whose vote is reflected on such Master Ballot;

- it is a bank, broker, or other nominee (or agent thereof) that holds the securities being voted on behalf of the Beneficial Owners identified on such Master Ballot;

- it has properly disclosed (a) the number of such Beneficial Owners, (b) the amount of securities held by each such Beneficial Owner, (c) each Beneficial Owner's respective vote, if any, concerning the Plan, and (d) the customer account, serial number, and/or other identification number for each such Beneficial Owner;

- each such Beneficial Owner has certified to the nominee that such Beneficial Owner has not submitted any other Ballots for such Claims held in other accounts or other names, or, if it has submitted another ballot held in other accounts or names, that the Beneficial Owner has certified to the Nominee that such Beneficial Owner has cast the same vote for such Claims, and the undersigned has identified such other accounts or owner and such other Ballots;

- it has been authorized by each such Beneficial Owner to vote on the Plan; and

- it will maintain the original Beneficial Owner Ballot returned by each Beneficial Owner (whether properly completed or defective) for one year after the Voting Deadline (or such other date as is set by subsequent Bankruptcy Court order) for disclosure to the Bankruptcy Court or the Debtors, if so ordered.

Except as otherwise provided herein, each Master Ballot must be returned in sufficient time to allow it to be RECEIVED by the Balloting Agent by no later than the Voting Deadline.

## Certain U.S. Federal Income Tax Consequences of the Plan

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, New Stallion Holdings, and certain U.S. Holders (as defined below) of Claims or Interests. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules, rulings, and pronouncements of the U.S. Internal Revenue Service (the "IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested and will not request a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given that the IRS would not assert, or that a Court would not sustain, a different position than any position discussed herein.

This discussion addresses only those U.S. Holders that hold Claims or Interests as capital assets within the meaning of Section 1221 of the Tax Code. In addition, this summary does not address non-U.S., state, local, estate, or gift tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as persons who are related to a Debtor within the meaning of the Tax Code, persons that that are not U.S. Holders, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, investors in pass-through entities, subchapter S corporations, persons who hold Claims or Interests, or who will hold the Amended Secured Debt (as defined below), New Equity, and/ or New Warrants, as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark to market method of

accounting, and U.S. Holders of Claims or Interests who are themselves in bankruptcy). Furthermore, this discussion assumes that U.S. Holders of Claims or Interests hold only Claims or Interests in a single Class. U.S. Holders of Claims or Interests in more than a single Class should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below.

For purposes of this discussion, the term "U.S. Holder" means a Holder of a Claim or Interest that is for U.S. federal income tax purposes (i) an individual citizen or resident of the United States, (ii) a corporation, or entity treated as a corporation, organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election to be treated as a U.S. person for U.S. federal income tax purposes or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

The U.S. federal income tax consequences to a partner in an entity or arrangement treated as a partnership for U.S. federal income tax purposes that holds a Claim or Interest generally will depend on the status of the partner and the activities of the partnership. Partners in a partnership holding a Claim or Interest should consult their own tax advisors.

This summary is not intended to constitute a complete analysis of all tax considerations relevant to a particular U.S. Holder of a Claim or Interest. Each U.S. Holder of a Claim or Interest should seek advice from its own independent tax advisors concerning the U.S. federal, state, local, foreign income, and other tax consequences of the Plan to it in light of its particular circumstances.

This discussion assumes that the various debt and other arrangements to which any Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM OR ALLOWED INTEREST. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.

**IRS CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**Certain U.S. Federal Income Tax Consequences to the Stallion Entities**

### Consequences to New Stallion Holdings

Pursuant to the Plan, on the Effective Date, Stallion Oilfield Services Ltd. will (i) contribute all of its assets (subject to certain liabilities of Stallion Oilfield Services Ltd.) to New Stallion Holdings in exchange for the secured debt under the Amended and Restated Senior Secured Credit Agreement ("Amended Secured Debt") and 100 percent of the New Equity and New Warrants, and (ii) distribute 98 percent of the New Equity to Holders of certain Claims, and likely all of the Amended Secured Debt to holders of certain other Claims, in satisfaction of such Claims. The remaining two percent of the New Equity and New Warrants will be retained, directly or indirectly, by the Holders of existing Interests. These transactions should be treated as if New Stallion Holdings acquired all of the assets of Stallion Oilfield Services Ltd. in a fully taxable exchange. As a result, (i) Stallion Oilfield Services Ltd. should recognize gain or loss with respect to the transferred assets, which gain or loss would be allocated to its partners in accordance with the terms of its partnership agreement, (ii) Stallion Oilfield Services Ltd. should take a fair market value basis in the two percent of New Equity that it retains, and (iii) New Stallion Holdings should have a basis for U.S. federal income tax purposes in the transferred assets equal to their fair market value. The basis of the transferred assets in the hands of New Stallion Holdings may be less than the basis of such assets in the hands of Stallion Oilfield Services Ltd.; therefore, New Stallion Holdings may have lower depreciation and amortization deductions with respect to the transferred assets available to offset future taxable income as a result of Consummation. In addition, as a newly formed corporation, New Stallion Holdings will not have any U.S. federal income tax history, and therefore will not have tax attributes, such as net operating loss, capital loss, or tax credit carryforwards. The assets of Stallion Oilfield Services Ltd. transferred (directly or indirectly) to New Stallion Holdings will include stock of several Debtors organized as corporations or treated as corporations for U.S. federal income tax purposes. Any such Debtor will retain its net operating loss, capital loss, tax credit carryforwards and similar tax attributes, if any. The availability after emergence of any net operating loss or similar tax attribute may be subject to limitation under applicable federal income tax rules.

### Consequences to Stallion Oilfield Services Ltd.

Pursuant to the Plan, Stallion Oilfield Services Ltd.'s aggregate outstanding indebtedness will be substantially reduced. In general, absent an exception, a debtor will recognize CODI upon discharge of its outstanding indebtedness for an amount less than its adjusted issue price. The amount of CODI, in general, is the excess of (i) the adjusted issue price of the indebtedness discharged, over (ii) the sum of (x) the issue price of any new indebtedness of the taxpayer (determined in the manner described below), (y) the amount of cash paid, and (z) the fair market value of any other consideration given in exchange for such indebtedness at the time of the exchange. Where the debtor is a partnership for U.S. federal income tax purposes, such as Stallion Oilfield Services Ltd., such CODI is allocated to its partners, and the partners (rather than the partnership) are subject to tax on such amount.

As a result of Consummation, and in particular the exchange of certain Claims for a portion of the Amended Secured Debt or New Equity, Stallion Oilfield Services Ltd. expects to realize substantial CODI. However, 100 percent of this CODI will be allocated to Stallion Oilfield Holdings, Ltd. and Stallion Interests, LLC pursuant to the partnership agreement of Stallion Oilfield Services Ltd. as in effect immediately prior to Consummation. Therefore, neither New Stallion Holdings nor any U.S. Holder of a Claim should recognize CODI as a result of the realization by Stallion Oilfield Services Ltd. of CODI.

### Consequences to Stallion Oilfield Holdings GP, LLC and Stallion Interests, LLC

The receipt of New Equity and New Warrants by Stallion Oilfield Holdings, Ltd. and Stallion Oilfield Holdings GP, LLC pursuant to the Plan should be treated as if Stallion Oilfield Holdings, Ltd. and Stallion Oilfield Holdings GP, LLC received such New Equity and New Warrants in liquidation of their Interests in Stallion Oilfield Services Ltd. (in the case of Stallion Oilfield Holdings GP, LLC, through its wholly-owned, disregarded subsidiary, Stallion Interests, LLC). As a result, neither Stallion Oilfield Holdings, Ltd. nor Stallion Oilfield Holdings GP, LLC should recognize any gain or loss, and each of Stallion Oilfield Holdings, Ltd. and Stallion Oilfield Holdings GP, LLC should take an aggregate adjusted tax basis in the New Equity and New Warrants equal to its adjusted tax basis in its interests in Stallion Oilfield Services Ltd. as of the Effective Date. However, the consequences of liquidating distributions from a partnership are complex and fact-specific. Each U.S. Holder who owns an interest in Stallion Oilfield Holdings, Ltd. or Stallion Oilfield Holdings GP, LLC should consult its own tax advisors regarding the consequences of the receipt by Stallion Oilfield Holdings, Ltd. and Stallion Oilfield Holdings GP, LLC of New Equity and New Warrants pursuant to the Plan.

Stallion Oilfield Holdings, Ltd. has elected to be taxed as a corporation for U.S. federal income tax purposes. Because Stallion Oilfield Services Ltd. is treated as a partnership for U.S. federal income tax purposes, Stallion Oilfield Holdings, Ltd. will be allocated its pro rata share (determined under the partnership agreement of Stallion Oilfield Services Ltd.) of the income, gain, loss, and deductions of Stallion Oilfield Services Ltd. through the Effective Date, including income (including CODI), gain, loss, and deductions of Stallion Oilfield Services, Ltd. that arise as a result of Consummation. As a result, Stallion Oilfield Holdings, Ltd. may have a corporate U.S. federal income tax liability with respect to its Interest in Stallion Oilfield Services Ltd. as a result of Consummation, but will not receive any distributions from any of the Debtors in order to satisfy that liability.

Stallion Oilfield Holdings GP, LLC is treated as a partnership for U.S. federal income tax purposes. Therefore, all items of income, gain, loss, or deduction of Stallion Oilfield Holdings GP, LLC are allocated to the members of Stallion Oilfield Holdings GP, LLC in accordance with the operating agreement of Stallion Oilfield Holdings GP, LLC, and the members of Stallion Oilfield Holdings GP, LLC, rather than Stallion Oilfield Holdings GP, LLC, will be responsible for the U.S. federal income tax consequences thereof.

Stallion Interests, LLC is treated for U.S. federal income tax purposes as an entity that is disregarded from its owner, Stallion Oilfield Holdings GP, LLC. Therefore, all items of income, gain, loss, or deduction of Stallion Interests, LLC are treated as if realized directly by Stallion Oilfield Holdings GP, LLC for U.S. federal income tax purposes.

### Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims and Interests

#### Consequences to U.S. Holders of Priority Non-Tax Claims and General Unsecured Claims

Pursuant to the Plan, each U.S. Holder of a Priority Non-Tax Claim or a General Unsecured Claim will receive payment in full in Cash on the Effective Date. A U.S. Holder that receives Cash in exchange for its Claim pursuant to the Plan generally will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of Cash received in exchange for its Claim and (ii) the U.S. Holder's adjusted tax basis in its Claim. Such gain or loss should be capital in nature (subject to the "accrued interest" and "market discount" rules described below) and should be long term capital gain or loss if the Claim was held for more than one year by the U.S. Holder.

70

*Consequences to U.S. Holders of Other Secured Claims*

Pursuant to the Plan, each Other Secured Claim will be Reinstated or otherwise rendered Unimpaired for the benefit of the Holders thereof. If an Other Secured Claim is Reinstated, then a U.S. Holder thereof should not recognize gain or loss except to the extent that collateral securing such Claim is changed, and the change in collateral constitutes a "significant modification" of the Other Secured Claim within the meaning of the Treasury Regulations promulgated under Section 1001 of the Tax Code.

*Consequences to U.S. Holders of Senior Secured Claims*

Pursuant to the Plan, each U.S. Holder of a Senior Secured Claim will receive, at the sole and absolute discretion of the Debtors, either: (i) its Pro Rata share of (a) Cash in the amount of the Senior Secured Paydown, and (b) [$220.9] million of Amended Secured Debt, or (ii) payment in full, in Cash; *provided* that the Debtors must elect the same option for all Holders of Senior Secured Claims.

If a U.S. Holder of a Senior Secured Claim receives Cash and Amended Secured Debt, such Holder should recognize gain or loss equal to the difference between (i) the sum of (x) the issue price of its pro rata share of the Amended Secured Debt (determined in the manner described below, and for this purpose as if it were newly issued on the Effective Date) and (y) the amount of Cash received and (ii) the U.S. Holder's tax basis in the Claim surrendered by the U.S. Holder. Such gain or loss should be capital in nature (subject to the "accrued interest" and "market discount" rules described below) and should be long term capital gain or loss if the Claim was held for more than one year by the U.S. Holder. A U.S. Holder's tax basis in the Amended Secured Debt received on the Effective Date should equal the issue price of the Amended Secured Debt (as described below). A U.S. Holder's holding period for the Amended Secured Debt received on the Effective Date should begin on the day following the Effective Date.

The determination of "issue price" for purposes of this analysis will depend, in part, on whether the debt instruments issued to a U.S. Holder, or the debt instruments surrendered by a U.S. Holder, under the Plan are traded on an "established securities market" at any time during the 60 day period ending 30 days after the Effective Date. In general, a debt instrument (or the property exchanged therefor) will be treated as traded on an established market if (i) it is listed on (a) a qualifying national securities exchange, (b) certain qualifying interdealer quotation systems, or (c) certain qualifying foreign securities exchanges; (ii) it appears on a system of general circulation that provides a reasonable basis to determine fair market value; or (iii) the price quotations are readily available from dealers, brokers, or traders. The issue price of a debt instrument that is traded on an established market (or, where the debt instrument is not so traded, that is issued for property so traded) would be the fair market value of such debt instrument (or, where the debt instrument is not so traded, such other property so traded) on the issue date as determined by such trading. The issue price of a debt instrument that is neither so traded nor issued for property so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable IRS federal rate).

If a U.S. Holder of a Senior Secured Claim receives only Cash in exchange for its Claim, the U.S. Holder will be subject to the treatment described above under the heading "Consequences to U.S. Holders of Priority Non-Tax Claims and General Unsecured Claims."

*Consequences to U.S. Holders of Unsecured Funded Debt Claims*

Pursuant to the Plan, each U.S. Holder of an Unsecured Funded Debt Claim will receive its Pro Rata share of 98 percent of the New Equity. The receipt of New Equity by a U.S. Holder of an Unsecured Funded Debt Claim should be treated as a fully taxable exchange in which the U.S. Holder generally

should recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the fair market value of the New Equity received in exchange for its Claim and (ii) the U.S. Holder's adjusted tax basis in its Claim. Such gain or loss should be capital in nature (subject to the "accrued interest" and "market discount" rules described below) and should be long term capital gain or loss if the Claim was held for more than one year by the U.S. Holder.

*Accrued Interest*

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but unpaid interest, such amount should be taxable to the U.S. Holder as interest income (to the extent not already taken into income by the Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by the U.S. Holder of a Claim will be attributable to accrued interest is unclear. The Plan generally provides that Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. Nevertheless, the Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. The applicability of these Treasury Regulations to a partial recovery in a bankruptcy is unclear. A U.S. Holder of a Claim with accrued and unpaid interest is urged to consult its own tax advisor as to the allocation of any recovery between principal and interest.

*Market Discount*

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a U.S. Holder of a Claim who exchanges the Claim for Cash, Amended Secured Debt or New Equity on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "accrued market discount" on the Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### Consequences to U.S. Holders of Interests in Stallion Oilfield Holdings GP, LLC

Pursuant to the Plan, each U.S. Holder of an Interest in Stallion Oilfield Holdings GP, LLC will receive its Pro Rata share of 0.0002 percent of the New Equity and the New Warrants. This is likely to be treated as if Stallion Oilfield Holdings GP, LLC distributed the New Equity and New Warrants previously received by it as described above under the heading "Consequences to Stallion Oilfield Holdings, Ltd., Stallion Oilfield Holdings GP, LLC, and Stallion Interests, LLC." The consequences of partnership distributions are complex and fact-specific. U.S. Holders of Interests in Stallion Oilfield Holdings GP,

LLC should consult their own tax advisors regarding the tax consequences to them of the receipt of New Equity and New Warrants.

In addition, because each of Stallion Oilfield Services Ltd. and Stallion Oilfield Holdings GP, LLC is treated as a partnership for U.S. federal income tax purposes, a U.S. Holder of an Interest in Stallion Oilfield Holdings GP, LLC will be allocated its pro rata share (determined under the operating agreement of Stallion Oilfield Holdings GP, LLC) of the income, gain, loss, and deductions of Stallion Oilfield Holdings GP, LLC through the Effective Date, including its indirect share of income (including CODI), gain, loss, and deductions of Stallion Oilfield Services Ltd. that arise as a result of Consummation. As a result, a U.S. Holder of an Interest in Stallion Oilfield Holdings GP, LLC may have a U.S. federal income tax liability with respect to its Interest in Stallion Oilfield Holdings GP, LLC as a result of Consummation, but will not receive any distributions of Cash from any of the Debtors in order to satisfy that liability.

The determination of all of the consequences of Consummation to a U.S. Holder of an Interest in Stallion Oilfield Holdings GP, LLC is complex and depends on a number of factors outside the Debtors' control. U.S. Holders of Interests in Stallion Oilfield Holdings GP, LLC should consult their own tax advisors regarding the consequences to them of the transactions contemplated by the Plan.

### Consequences to U.S. Holders of Interests in Stallion Oilfield Holdings, Ltd.

Holders of Interests in Stallion Oilfield Holdings, Ltd. will not receive any distribution pursuant to the Plan, but rather will continue to own all of the equity in Reorganized Stallion Oilfield Holdings, Ltd. Therefore, U.S. Holders of Interests in Stallion Oilfield Holdings, Ltd. generally should not suffer any U.S. federal income tax consequences as a result of Consummation.

### Dividends on New Equity

For U.S. federal income tax purposes, the gross amount of any distribution (other than certain distributions, if any, of shares distributed to all shareholders of New Stallion Holdings) made to a U.S. Holder with respect to New Equity will constitute dividends to the extent of New Stallion Holdings' current and accumulated earnings and profits (as determined under U.S. federal income tax principles). Non-corporate U.S. Holders generally will be taxed on such distributions at the lower rates applicable to long-term capital gains (*i.e.*, gains from the sale of capital assets held for more than one year) with respect to taxable years beginning on or before December 31, 2010. If distributions with respect to New Equity exceed New Stallion Holdings' current and accumulated earnings and profits as determined under U.S. federal income tax principles, the excess would be treated first as a tax-free return of capital to the extent of the U.S. Holder's adjusted tax basis in the New Equity. Any amount in excess of the amounts treated as (i) a dividend and (ii) a return of capital would be treated as capital gain.

### Limitation on Use of Capital Losses

A U.S. Holder of Claims or Interests who recognizes capital losses as a result of the distributions under the Plan will be subject to limitations on the use of its capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (i) $3,000 ($1,500 for married individuals filing separate returns) or (ii) the excess of such Holder's capital losses over its capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to offset capital gains and a portion of its ordinary income for an unlimited number of years following the capital loss year. For a corporate U.S. Holder, capital losses may only be used to offset capital gains. A corporate U.S. Holder may carry over

unused capital losses for the five years following the capital loss year, and may carry back unused capital losses to the three years preceding the capital loss year.

### *Consequences to U.S. Holders of Section 510(b) Claims*

Pursuant to the Plan, each Section 510(b) Claim will be cancelled without any distribution. A U.S. Holder may be entitled in the year of cancellation (or in an earlier year) to a bad debt deduction in some amount under section 166(a) of the Tax Code to the extent of such U.S. Holder's tax basis in the Section 510(b) Claim. The rules governing the timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. U.S. Holders of Section 510(b) Claims therefore are urged to consult their own tax advisors with respect to their ability to take such a deduction.

### *Information Reporting and Back-up Withholding*

Payments with respect to Allowed Claims and Allowed Interests under the Plan and dividend payments by New Stallion Holdings or gains on a future disposition of New Equity may be subject to applicable information reporting and backup withholding (at the applicable rate). Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's federal income tax liability, and a U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

**The U.S. federal income tax consequences of the Plan are complex. The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular U.S. Holder in light of such U.S. Holder's circumstances and income tax situation. All Holders of Claims or Interests should consult with their tax advisors as to the particular tax consequences to them of the transactions contemplated by the Plan, including the applicability and effect of any state, local, or foreign tax laws and of any change in applicable tax laws.**

### <u>Recommendation of the Debtors</u>

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' stakeholder than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Allowed Interests than proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote to accept or reject the Plan support Confirmation of the Plan and vote to accept the Plan.

Dated:  October 19, 2009

Respectfully submitted,

STALLION OILFIELD SERVICES LTD.
(for itself and on behalf of each of its affiliated debtors)

By: _____
Name: John R. Castellano
Title: Chief Restructuring Officer

Prepared by:

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
(212) 446-4800 (telephone)

- and -

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware
(302) 651-7700 (telephone)

ATTORNEYS FOR THE DEBTORS

<u>**EXHIBIT A**</u>

**PLAN OF REORGANIZATION**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STALLION OILFIELD SERVICES LTD., *et al.*,[1] | ) | Case No. 09-_____(___) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

---

## JOINT PLAN OF REORGANIZATION OF STALLION OILFIELD SERVICES LTD., *ET AL.*, PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701

Attorneys for the Debtors

Dated:  October 19, 2009

---

[1]    Stallion in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, include:  Stallion Oilfield Services Ltd. (2101); Central Industries, Inc. (3594); Salty's Disposal Wells, LP (0682); Salty's Manufacturing, Ltd. (0679); Stallion Acquisition, LLC (2495); Stallion Heavy Haulers, LP (3203); Stallion Interests, LLC (4416); Stallion Offshore Quarters, Inc. (7410); Stallion Oilfield Construction, LLC (1600); Stallion Oilfield Finance Corp. (7114); Stallion Oilfield Holdings GP, LLC (7889); Stallion Oilfield Holdings, Ltd. (7890); Stallion Oilfield Services, Inc. (8455); Stallion Production Services, LP (2038); Stallion Production, LLC (2040); Stallion Rockies Ltd. (9473); Stallion Solids Control, Inc. (4425); and Stallion Stables, LLC (7522).  The location of Stallion Oilfield Services Ltd.'s corporate headquarters and the service address for the Debtors is:  950 Corbindale Road, Suite 300, Houston, Texas 77024.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
    GOVERNING LAW ............................................................................................................................. 1
    A.    Defined Terms. ................................................................................................................... 1
    B.    Rules of Interpretation. .................................................................................................... 10
    C.    Computation of Time. ...................................................................................................... 10
    D.    Governing Law. ................................................................................................................ 10
    E.    Reference to Monetary Figures. ...................................................................................... 11

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ........................................ 11
    A.    Administrative Claims. .................................................................................................... 11
    B.    Priority Tax Claims. ......................................................................................................... 12

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..................... 12
    A.    Classification of Claims and Interests. ........................................................................... 12
    B.    Treatment of Claims and Interests. ................................................................................. 13
    C.    Special Provision Governing Unimpaired Claims. ......................................................... 16
    D.    Acceptance or Rejection of the Plan. .............................................................................. 16
    E.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ................. 17
    F.    Controversy Concerning Impairment. ............................................................................. 17
    G.    Subordinated Claims ........................................................................................................ 17

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................................ 17
    A.    Substantive Consolidation. .............................................................................................. 17
    B.    General Settlement of Claims and Interests. ................................................................... 17
    C.    Restructuring Transactions. ............................................................................................. 18
    D.    New Stallion Holdings. .................................................................................................... 18
    E.    Existing Letters of Credit. ............................................................................................... 18
    F.    Sources of Consideration for Plan Distributions. ........................................................... 18
    G.    Corporate Existence. ........................................................................................................ 20
    H.    Vesting of Assets in the Reorganized Debtors. ............................................................... 20
    I.    Cancellation of Securities and Agreements. ................................................................... 20
    J.    Surrender of Existing Securities. ..................................................................................... 21
    K.    Corporate Action. ............................................................................................................. 21
    L.    New Organizational Documents. ..................................................................................... 21
    M.    Directors and Officers of the Reorganized Debtors and New Stallion Holdings. ........... 22
    N.    Effectuating Documents; Further Transactions. ............................................................. 22
    O.    Section 1146 Exemption. ................................................................................................. 22
    P.    Director and Officer Liability Insurance. ........................................................................ 22
    Q.    Management Equity Incentive Program. .......................................................................... 22
    R.    Employee and Retiree Benefits. ...................................................................................... 23
    S.    Preservation of Causes of Action. ................................................................................... 23

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............... 24
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ................... 24
    B.    Indemnification Obligations. ........................................................................................... 24
    C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases. .................... 24
    D.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed. ................. 25
    E.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. .......... 25
    F.    Insurance Policies. ........................................................................................................... 25
    G.    Modifications, Amendments, Supplements, Restatements, or Other Agreements. ........ 25
    H.    Reservation of Rights. ..................................................................................................... 26
    I.    Nonoccurrence of Effective Date. ................................................................................... 26
    J.    Contracts and Leases Entered Into After the Petition Date. ........................................... 26

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .................................................................26
    A.     Timing and Calculation of Amounts to Be Distributed. ..................................26
    B.     Disbursing Agent. ..................................................................................................26
    C.     Rights and Powers of Disbursing Agent. ..........................................................27
    D.     Delivery of Distributions and Undeliverable or Unclaimed Distributions. .....27
    E.     Manner of Payment. ...............................................................................................28
    F.     Section 1145 Exemption. .......................................................................................28
    G.     Compliance with Tax Requirements. ...................................................................28
    H.     Allocations. ............................................................................................................28
    I.     No Postpetition Interest on Claims. .....................................................................28
    J.     Setoffs and Recoupment. .......................................................................................29
    K.     Claims Paid or Payable by Third Parties. ............................................................29

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
           DISPUTED CLAIMS ..............................................................................................29
    A.     Allowance of Claims. .............................................................................................29
    B.     Claims Administration Responsibilities. ..............................................................29
    C.     Estimation of Claims and Interests. ......................................................................30
    D.     Adjustment to Claims or Interests Without Objection. ........................................30
    E.     Time to File Objections to Claims. .......................................................................30
    F.     Disallowance of Claims or Interests. ....................................................................30
    G.     Amendments to Claims or Interests. .....................................................................31
    H.     No Distributions Pending Allowance. ...................................................................31
    I.     Distributions After Allowance. .............................................................................31

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...........31
    A.     Discharge of Claims and Termination of Interests. .............................................31
    **B.**     **Release of Liens.** ....................................................................................................31
    **C.**     **Releases by the Debtors.** .......................................................................................32
    **D.**     **Releases by Holders of Claims and Interests.** ....................................................32
    **E.**     **Exculpation.** ...........................................................................................................32
    **F.**     **Injunction.** .............................................................................................................33
    G.     Protections Against Discriminatory Treatment. ...................................................33
    **H.**     **Setoffs.** ...................................................................................................................33
    **I.**     **Recoupment.** .........................................................................................................34
    J.     Subordination Rights. .............................................................................................34
    K.     Document Retention. ..............................................................................................34
    L.     Reimbursement or Contribution. ...........................................................................34

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF
           THE PLAN ..............................................................................................................34
    A.     Conditions Precedent to Confirmation. ................................................................34
    B.     Conditions Precedent to the Effective Date. ........................................................35
    C.     Waiver of Conditions. ............................................................................................36
    D.     Effect of Failure of Conditions. ...........................................................................36

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....................36
    A.     Modification and Amendments. .............................................................................36
    B.     Effect of Confirmation on Modifications. ............................................................36
    C.     Revocation or Withdrawal of Plan. .......................................................................36

ARTICLE XI. RETENTION OF JURISDICTION ........................................................................................37

ARTICLE XII. MISCELLANEOUS PROVISIONS .....................................................................................38
    A.     Immediate Binding Effect. .....................................................................................38
    B.     Additional Documents. ..........................................................................................38

| C. | Payment of Statutory Fees. | 39 |
| D. | Payment of Fees and Expenses of Professionals in Connection with the Unsecured Funded Debt. | 39 |
| E. | Statutory Committee and Cessation of Fee and Expense Payment. | 39 |
| F. | Reservation of Rights. | 39 |
| G. | Successors and Assigns. | 39 |
| H. | Notices. | 39 |
| I. | Term of Injunctions or Stays. | 40 |
| J. | Entire Agreement. | 41 |
| K. | Exhibits. | 41 |
| L. | Nonseverability of Plan Provisions. | 41 |
| M. | Votes Solicited in Good Faith. | 41 |
| N. | Closing of Chapter 11 Cases. | 41 |
| O. | Waiver or Estoppel. | 41 |
| P. | Conflicts. | 42 |

K&E 15594211.23

# INTRODUCTION

Stallion Oilfield Services Ltd., together with its affiliates Central Industries, Inc., Salty's Disposal Wells, LP, Salty's Manufacturing, Ltd., Stallion Acquisition, LLC, Stallion Heavy Haulers, LP, Stallion Interests, LLC, Stallion Offshore Quarters, Inc., Stallion Oilfield Construction, LLC, Stallion Oilfield Finance Corp., Stallion Oilfield Holdings GP, LLC, Stallion Oilfield Holdings, Ltd., Stallion Oilfield Services, Inc., Stallion Production Services, LP, Stallion Production, LLC, Stallion Rockies Ltd., Stallion Solids Control, Inc., and Stallion Stables, LLC, as debtors and debtors in possession (each, a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>") propose this joint plan of reorganization (the "<u>Plan</u>") for the resolution of the outstanding claims against and interests in the Debtors pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, accomplishments during the Chapter 11 Cases, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE PLAN PROVIDES FOR SUBSTANTIVE CONSOLIDATION OF THE ESTATES FOR ALL PURPOSES ASSOCIATED WITH CONFIRMATION AND CONSUMMATION.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

*A.      Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*Administrative Claim*" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses awarded or Allowed pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date; (c) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of the Judicial Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

2.      "*Administrative Claim Bar Date*" deadline for filing requests for payment of Administrative Claims, which shall be 45 days after the Effective Date.

3.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code; *provided*, *however*, that the Stallion Shareholders shall not be considered Affiliates.

4.      "*Allowed*" means with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest that is evidenced by a Proof of Claim or Proof of Interest, as applicable, by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Proof of Interest, as applicable, under the Bankruptcy Code or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Proof of Interest, as applicable, has been timely Filed; or (c) a Claim or Interest that is Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or

1

assumed in connection herewith. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law. Any Claim or Interest that has been or is hereafter identified in the Schedules as disputed, contingent, or unliquidated, and for which no Proof of Claim or Proof of Interest has been timely Filed, is not considered Allowed and shall be expunged without further action by the Reorganized Debtors and without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

5. "*Amended and Restated Senior Secured Credit Agreement*" means that certain first-priority senior secured term and revolving loan and all other documents entered into in connection therewith or contemplated thereby, substantially on the terms and conditions contained in the Plan Supplement, which shall be consistent with the terms of the Plan Support Agreement.

6. "*Banks*" means, in connection with the Officer Loans, Whitney National Bank and Bank of Houston, as lenders, and their successors, assigns, and transferees.

7. "*Balloting Agent*" means Epiq Financial Balloting Group, LLC, located at 757 Third Avenue, New York, New York 10017, (866) 734-9393.

8. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Chapter 11 Cases.

9. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

10. "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim and Proofs of Interests must be Filed with respect to such Claims, as ordered by the Bankruptcy Court.

11. "*Bridge Agent*" means Wilmington Trust FSB, and/or its successors, as administrative agent under the Bridge Loan Agreement.

12. "*Bridge Lenders*" means certain financial institutions and lender parties to the Bridge Loan Agreement.

13. "*Bridge Loan Claims*" means Claims arising under the Bridge Loan Agreement.

14. "*Bridge Loan Agreement*" means that certain credit agreement, dated as of August 1, 2007, by and among Stallion Oilfield Services Ltd., as borrower, and certain of its affiliates, as guarantors, Wilmington Trust FSB, as administrative agent, the certain lenders thereunder, and any schedules, amendments, guarantees, security documents, and other documents in connection therewith.

15. "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

16. "*Cash*" means cash and cash equivalents.

17. "*Causes of Action*" means any: (a) Claims, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises; (b) all rights of setoff, counterclaim, or recoupment and Claims on contracts or for breaches of duties imposed by law; (c) rights to object to Claims or Interests; (d) Claims pursuant to sections 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code; and (e) Claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, whether arising before, on, or after

the Petition Date including through the Effective Date, in contract, in tort, in law, or in equity, or pursuant to any other theory of law.

18.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

19.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

20.     "*Claim*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor.

21.     "*Claims Agent*" means Epiq Bankruptcy Solutions, LLC, located at 757 Third Avenue, New York, New York 10017, (866) 734-9393, retained as the Debtors' claims agent.

22.     "*Claims Register*" means the official register of Claims maintained by the Claims Agent.

23.     "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

24.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

25.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A hereof having been (a) satisfied or (b) waived pursuant to Article IX.C hereof.

26.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

27.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

28.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

29.     "*Consummation*" means the occurrence of the Effective Date.

30.     "*Cure Claim*" means a Claim based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

31.     "*Disbursing Agent*" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, to make or facilitate distributions pursuant to the Plan.

32.     "*Disclosure Statement*" means the *Disclosure Statement Relating to the Joint Plan of Reorganization of Stallion Oilfield Services Ltd., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, dated October 19, 2009, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

33.     "*Disputed*" means any Claim or Interest that is not yet Allowed.

34.     "*Distribution Record Date*" means other than with respect to any publicly held securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be five Business Days after the Confirmation Date.

K&E 15594211.23

35. "*Effective Date*" means the date selected by the Debtors that is a Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been met or waived pursuant to Article IX.B and Article IX.C hereof and (b) no stay of the Confirmation Order is in effect. Unless otherwise specifically provided herein, anything required to be done by the Debtors or the Reorganized Debtors, as applicable, on the Effective Date may be done on the Effective Date or as soon as reasonably practicable thereafter.

36. "*Entity*" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

37. "*Equity Security*" means any equity security as defined in section 101(16) of the Bankruptcy Code in a Debtor.

38. "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

39. "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*

40. "*Exculpated Claim*" means any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' out-of-court restructuring efforts, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement or the Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases or proceedings pursuant to the pursuit of Confirmation, the pursuit of Consummation, and the administration and implementation of the Plan, including the issuance of New Equity or the distribution of property under the Plan or any other agreement.

41. "*Exculpated Party*" means each of: (a) the Debtors, the Reorganized Debtors, and their Affiliates; (b) the Senior Secured Agent and the Holders of Senior Secured Claims, in each case, in their capacity as such; (c) the Informal Funded Debt Committee, the Holders of Notes Claims, and the Notes Indenture Trustee, in each case, in their capacity as such; (d) Stallion Shareholders, in their capacity as such; and (e) with respect to each of the foregoing Entities in clauses (a) through (d), such Entities' current or former subsidiaries, affiliates, managed accounts or funds, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, in each case in their capacity as such.

42. "*Existing Letters of Credit*" means all outstanding and undrawn letters of credit under the Senior Secured Credit Agreement.

43. "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

44. "*Federal Judgment Rate*" means the federal judgment rate of [●]%, which was in effect as of the Petition Date.

45. "*File*" or "*Filed*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

46. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, re-argument, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing has been timely filed, or as to which any appeal that has been taken, any petition for certiorari, or motion for a new trial, re-argument, or rehearing that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

47. "*First Forgiveness Period*" means the period beginning on the Effective Date and lasting 18 months.

K&E 15594211.23

48.     "*Forgiveness Periods*" means the First Forgiveness Period together with all Successive Forgiveness Periods.

49.     "*General Administrative Claim*" means any Administrative Claim, including Cure Claims, other than a Professional Fee Claim.

50.     "*General Unsecured Claim*" means any Unsecured Claim that is not an Unsecured Funded Debt Claim, an Intercompany Claim, or a Section 510(b) Claim.

51.     "*Governmental Unit*" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

52.     "*Holdback Amount*" means the aggregate holdback of those Professional fees billed to the Debtors during the Chapter 11 Cases that are held back pursuant to the Professional Fee Order or any other order of the Bankruptcy Court, which amount is to be deposited in the Holdback Escrow Account as of the Effective Date. The Holdback Amount shall not be considered property of the Debtors or the Reorganized Debtors. When all Professional Fee Claims have been paid, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors.

53.     "*Holdback Escrow Account*" means the escrow account established by the Reorganized Debtors into which Cash equal to the Holdback Amount shall be deposited on the Effective Date for the payment of Allowed Professional Fee Claims to the extent not previously paid or disallowed.

54.     "*Holder*" means an Entity holding a Claim or an Interest.

55.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

56.     "*Indemnification Obligation*" means a Debtor's obligation under an Executory Contract or otherwise to indemnify directors, officers, or employees of the Debtors with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by the Debtors' respective articles of incorporation, certificates of formation, by-laws, similar corporate documents, and applicable law, as in effect on the Effective Date.

57.     "*Informal Funded Debt Committee*" means the informal committee of the Unsecured Funded Debt Lenders, which as of the Petition Date consisted of 8 members, that represents the requisite amount of Unsecured Funded Debt Lenders needed to confirm a plan of reorganization pursuant to Section 1126(c) of the Bankruptcy Code represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP.

58.     "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor or any Claim held by an Affiliate against a Debtor.

59.     "*Intercompany Interest*" means any Interest in a Debtor held by another Debtor or any Interest in a Debtor held by an Affiliate of a Debtor.

60.     "*Interests*" means any: (a) Equity Security, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors together with any warrants, options, or contractual rights to purchase or acquire such Equity Securities at any time and all rights arising with respect thereto; and (b) partnership, limited liability company, or similar interest in a Debtor.

61.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

62.     "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

K&E 15594211.23

63.     "*Management Equity Incentive Plan*" means that certain post-Effective Date management equity incentive plan, the form of which shall be included in the Plan Supplement, and shall be implemented by the New Board of New Stallion Holdings, and shall consist of restricted stock units, stock options, and/or stock appreciation rights in an amount of 10% of the New Equity, a minimum of 4% of which shall be allocated to management by the New Board of New Stallion Holdings within 30 days of the Effective Date.

64.     "*New Boards*" means, with respect the Reorganized Debtors that are corporations or manager-managed limited liability companies, the initial boards of directors of such Reorganized Debtors.

65.     "*New Equity*" means a certain number of common shares in the capital of New Stallion Holdings authorized pursuant to the Plan, of which up to [●] shares shall be initially issued and outstanding pursuant to the Plan as of the Effective Date.

66.     "*New Financing*" means any financing that may be obtained by the Reorganized Debtors on the Effective Date, which such financing shall be used to, among other things, satisfy the Senior Secured Claims (or such Allowed amount thereof) in full in cash on the Effective Date.

67.     "*New Organizational Documents*" means such certificates or articles of incorporation, by-laws, or such other applicable formation documents of each of the Reorganized Debtors and New Stallion Holdings, which form will be included in the Plan Supplement.

68.     "*New Stallion Holdings*" means a newly formed corporation or a Reorganized Debtor used to implement the Restructuring Transactions.

69.     "*New Stallion Total Enterprise Value*" means the value of the Reorganized Debtors in the amount of between approximately $533 million and $619 million.

70.     "*New Warrants*" means warrants to purchase up to 1% of New Equity in New Stallion Holdings, subject to dilution by the Management Equity Incentive Plan, exercisable upon the New Stallion Total Enterprise Value reaching $750 million, as more fully set forth in the Plan Supplement.

71.     "*New Warrants Agreement*" means that certain warrant agreement, dated as of the Effective Date, governing the New Warrants to be issued by New Stallion Holdings, substantially in the form to be included in the Plan Supplement.

72.     "*Notes*" means the $300 million in 9.75% unsecured senior notes due February 1, 2015, issued by Stallion Oilfield Services Ltd. and Stallion Oilfield Finance Corp. pursuant to the Notes Indenture, of which $265 million remains outstanding.

73.     "*Notes Claims*" means Claims arising under the Notes Indenture.

74.     "*Notes Indenture*" means that certain indenture, dated as of January 24, 2007, by and among Stallion Oilfield Services Ltd. and Stallion Oilfield Finance Corp., as issuers, certain of their affiliates, as guarantors, and The Bank of New York Trust Company, N.A., as indenture trustee.

75.     "*Notes Indenture Trustee*" means The Bank of New York Trust Company, N.A., and/or its successors, as indenture trustee under the Notes Indenture.

76.     "*Other Secured Claim*" means any Secured Claim that is not a Senior Secured Claim, including Claims arising under the Swap Agreements.

77.     "*Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Stallion Oilfield Holdings, Ltd., dated December 5, 2006, by and among Stallion Oilfield Holdings GP, LLC, as General Partner, and certain non-Debtor affiliates, as Limited Partners.

6

78.     "*Petition Date*" means October 19, 2009, the date on which the Debtors commenced the Chapter 11 Cases.

79.     "*Plan*" means this *Joint Plan of Reorganization of the Stallion Oilfield Services Ltd., et al. Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement, which is incorporated herein by reference.

80.     "*Plan Equity Value*" means the New Stallion Total Enterprise Value less the aggregate principal amount of the Amended and Restated Senior Secured Credit Agreement or New Financing, as applicable.

81.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be Filed by the Debtors no later than 10 days prior to the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, comprised of, among other documents, the following:  (a) New Organizational Documents; (b) Rejected Executory Contract and Unexpired Lease List; (c) a list of retained Causes of Action; (d) Restructuring Transaction Memorandum; (e) Management Equity Incentive Plan and employment agreements with certain management employees; (f) Shareholders Agreement (if any); (g) New Warrants Agreement; and (h) Amended and Restated Senior Secured Credit Agreement or New Financing, as applicable.  Any reference to the Plan Supplement in this Plan shall include each of the documents identified above as (a) through (h).  The Debtors shall have the right to amend the documents contained in the Plan Supplement through and including the Effective Date in accordance with Article IX.

82.     "*Postpetition Period*" means the period of time following the Petition Date through the Confirmation Date.

83.     "*Priority Non-Tax Claims*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

84.     "*Priority Tax Claim*" means any Claim of the kind specified in section 507(a)(8) of the Bankruptcy Code.

85.     "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

86.     "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

87.     "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through the Confirmation Date.

88.     "*Professional Fee Order*" means that certain order of the Bankruptcy Court entered on [●], 2009, establishing procedures for interim compensation and reimbursement of expenses of Professionals [Docket No. [●]].

89.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

90.     "*Proof of Interest*" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases

91.     "*Reinstated*" means:  (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest so as to leave such Claim or Interest Unimpaired; or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to

K&E 15594211.23

demand or receive accelerated payment of such Claim or Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the Holder of such Claim or Interest (other than a Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder.

92.    "*Rejected Executory Contract and Unexpired Lease List*" means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors, as applicable, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Reorganized Debtors pursuant to the provisions of Article V hereof.

93.    "*Released Party*" means each of: (a) the Senior Secured Agent and each Holder of a Senior Secured Claim, in each case, in its capacity as such; (b) the Bridge Agent and each Holder of a Bridge Loan Claim, in each case, in its capacity as such; (c) the Indenture Notes Trustee and each Holder of a Notes Claim, in each case, in its capacity as such (d) the Stallion Shareholders, in their capacity as such; and (e) with respect to each of the foregoing entities in clauses (a) through (d), such person's current and former affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such; and (f) the Debtors' and the Reorganized Debtors' current and former officer, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such.

94.    "*Reorganized Debtors*" means the Debtors, in each case, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including New Stallion Holdings.

95.    "*Reorganized Stallion Oilfield Holdings, Ltd.*" means Stallion Oilfield Holdings, Ltd., or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

96.    "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors or the Reorganized Debtors determine to be necessary or appropriate to effect a restructuring of a Debtor's business or a restructuring of the overall corporate structure of the Reorganized Debtors, including those described in the Restructuring Transactions Memorandum.

97.    "*Restructuring Transactions Memorandum*" means the memorandum describing the Restructuring Transactions, including those inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors or the Reorganized Debtors may determine to be necessary or appropriate to implement the Restructuring Transactions and to effect a restructuring of a Debtor's business or a restructuring of the overall corporate structure of the Reorganized Debtors, which will be included in the Plan Supplement.

98.    "*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts or Unexpired Leases, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules, as they may be amended, modified, or supplemented from time to time.

99.    "*Section 510(b) Claim*" means any Claim against the Debtors arising from rescission of a purchase or sale of a Security of any of the Debtors or an affiliate of any of the Debtors, for damages arising from the

purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

100.    "*Secured*" means when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed as such pursuant to the Plan.

101.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder.

102.    "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

103.    "*Senior Secured Agent*" means UBS AG, Stamford Branch, and/or its successors and assigns, as administrative agent under the Senior Secured Credit Agreement.

104.    "*Senior Secured Claims*" means Claims arising under the Senior Secured Credit Agreement and any other Claims, other than Claims arising pursuant to the Swap Agreements, that, pursuant to the terms of the Senior Secured Credit Agreement, rank *pari passu* with and are secured equally and ratably with such Claims.

105.    "*Senior Secured Credit Agreement*" means that certain third amended and restated credit agreement, dated as of June 12, 2007, by and among Stallion Oilfield Services Ltd., as borrower, and certain of its affiliates, as guarantors, UBS AG Stamford Branch, as administrative agent, and certain financial institutions and lender parties thereto, and any schedules, amendments, guarantees, security documents, and other documents in connection therewith.

106.    "*Senior Secured Paydown*" means a payment in Cash in an amount equal to $25,000,000 in the aggregate (as further described in and pursuant to the terms of the Plan Support Agreement).

107.    "*Shareholders Agreement*" means that certain agreement, if any, by and among New Stallion Holdings and certain holders of the New Equity, to be entered into on the Effective Date, substantially in the form to be included in the Plan Supplement.

108.    "*Stallion Officers*" shall mean:   Craig M. Johnson, as Chief Executive Officer; David S. Schorlemer, as Chief Financial Officer; and Hill M. Dishman, as Chief Operating Officer.

109.    "*Stallion Officer Loans*" shall means those certain promissory notes by and among the Stallion Officers and the Banks, as amended, restated, amended and restated, supplemented, modified, renewed, extended, or otherwise.

110.    "*Stallion Shareholders*" means Holders of Interests (other than Intercompany Interests) in Stallion Oilfield Holdings GP, LLC and Stallion Oilfield Holdings, Ltd.

111.    "*Successive Forgiveness Period*" means each 12-month period beginning upon the termination of the First Forgiveness Period.

112.    "*Swap Agreements*" means those certain hedging agreements between Stallion Oilfield Services Ltd. and Credit Suisse International related to the Senior Secured Claims and the Bridge Loan Claims, as evidenced by that certain Master Agreement, dated December 4, 2008.

113.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

K&E 15594211.23

114.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

115.    "*Unsecured Claim*" means any Claim that is neither Secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, including any Claim arising from the rejection of an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code.

116.    "*Unsecured Funded Debt Claim*" means, collectively, the Bridge Loan Claims and the Notes Claims.

117.    "*Unsecured Funded Debt Lenders*" means the Holders of the Notes and the Bridge Lenders.

**B.    *Rules of Interpretation.***

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references Herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (14) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

**C.    *Computation of Time.***

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

**D.    *Governing Law.***

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan,

K&E 15594211.23

any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in Delaware shall be governed by the laws of the state of incorporation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

1.      General Administrative Claims.

Except as specified in this Article II hereof, unless otherwise agreed to by the Holder of a General Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed General Administrative Claim will receive, in full satisfaction of its General Administrative Claim, Cash equal to the amount of such Allowed General Administrative Claim either:  (a) on the Effective Date; (b) if the General Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which an order allowing such General Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (c) if the Allowed General Administrative Claims are based on liabilities incurred by the Debtors in the ordinary course of their business during the Postpetition Period, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed General Administrative Claims, without any further action by the Holders of such Allowed General Administrative Claims.

2.      Professional Compensation.

(a)      Final Fee Applications.

All final requests for payment of Professional Fee Claims, including the Holdback Amount and Professional Fee Claims incurred during the period from Petition Date through the Confirmation Date, must be filed with the Bankruptcy Court and served on the Reorganized Debtors no later than 45 days after the Confirmation Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, the allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

(b)      Payment of Interim Amounts.

Subject to the Holdback Amount, on the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay all amounts owing to Professionals for all outstanding amounts payable relating to prior periods through the Confirmation Date.  To receive payment, on or before Effective Date, each Professional shall submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order.

K&E 15594211.23

(c)        Post-Confirmation Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Reorganized Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

B.       *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.       *Classification of Claims and Interests.*

Claims and Interests, except for Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

     1.     <u>Substantive Consolidation of the Debtor Estates</u>.

Pursuant to Article IV.A hereof, the Plan provides for the consensual substantive consolidation of the Estates into a single Estate for all purposes associated with Confirmation and Consummation. As a result of the substantive consolidation of the Estates, each Class of Claims and Interests will be treated as against a single consolidated Estate without regard to the separate identification of the Debtors.

     2.     <u>Class Identification</u>.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Senior Secured Claims | Impaired | Entitled to Vote |
| Class 4 | Unsecured Funded Debt Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 6 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

12

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 7 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 8 | Interests in Stallion Oilfield Holdings GP, LLC | Impaired | Entitled to Vote |
| Class 9 | Interests in Stallion Oilfield Holdings, Ltd. | Impaired | Entitled to Vote |
| Class 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

1.      <u>Class 1 - Priority Non-Tax Claims</u>.

(a)      *Classification*:  Class 1 consists of all Priority Non-Tax Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Claim in Class 1 agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class 1, each such Holder shall be paid in full in Cash.

(c)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.      <u>Class 2 - Other Secured Claims</u>.

(a)      *Classification*:  Class 2 consists of all Other Secured Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Claim in Class 2 agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class 2, each such Claim shall be Reinstated or otherwise rendered Unimpaired for the benefit of the Holders thereof.

(c)      *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.      <u>Class 3 - Senior Secured Claims</u>.

(a)      *Classification*:  Class 3 consists of all Senior Secured Claims.

(b)      *Allowance:*  The Senior Secured Claims are Allowed in an aggregate amount equal to $245.9 million.[2]

(c)      *Treatment*:  On the Effective Date, except to the extent that a Holder of an Allowed Claim in Class 3 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed

---

[2]      Subject to adjustment for paydown using asset sale proceeds and accrued and unpaid interest and fees.

Claim in Class 3, each such Holder shall receive, at the sole and absolute discretion of the Debtors, either:

(i)     its Pro Rata share of the (A) Senior Secured Paydown and (B) $220.9 million[3] in first priority senior secured debt pursuant to the Amended and Restated Senior Secured Credit Agreement; or

(ii)    in the event that the Reorganized Debtors enter into New Financing, payment in full, in Cash;

*provided*, *however*, that the Debtors must elect the same option for all Holders of Senior Secured Claims.

(d)     *Voting:*  Class 3 is Impaired under the Plan.  Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan; *provided, however,* that if the Debtors elect to satisfy Senior Secured Claims pursuant to (c)(ii) above, then each Holder will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, will not be entitled to vote to accept or reject the Plan (and, to the extent such Holders already have submitted a Ballot, such Ballot shall not be counted).

4.     Class 4 - Unsecured Funded Debt Claims.

(a)     *Classification:*  Class 4 consists of all Unsecured Funded Debt Claims.

(b)     *Allowance:*  The Bridge Loan Claims shall be Allowed in an aggregate amount equal to $259.3 million.  The Notes Claims shall be Allowed in an aggregate amount equal to $283.9 million.

(c)     *Treatment:*  On the Effective Date, except to the extent that a Holder of an Allowed Claim in Class 4 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class 4, each such Holder shall receive its Pro Rata share of 98% of the New Equity issued on the Effective Date (subject to dilution by amounts reserved pursuant to the Management Equity Incentive Plan and the New Warrants) based on such Holder's amount of Allowed Claim in Class 4.

(d)     *Voting:*  Class 4 is Impaired under the Plan.  Holders of Allowed Claims in Class 4 are entitled to vote to accept or reject the Plan.

5.     Class 5 - General Unsecured Claims.

(a)     *Classification:*  Class 5 consists of all General Unsecured Claims.

(b)     *Treatment:*  On the Effective Date, except to the extent that a Holder of an Allowed Claim in Class 5 agrees to less favorable treatment of its Allowed Claim or has been paid prior to the Effective Date, each such Allowed Claim shall be Unimpaired.  Each Holder of an Allowed Claim in Class 5 that is not due and payable on or before the Effective

---

[3]     Number equals total Allowed Senior Secured Claims less Senior Secured Paydown.  Debt consideration subject to adjustment for paydown using asset sale proceeds and accrued and unpaid interest and fees at such time.  Amount includes Existing Letters of Credit, which shall be Reinstated pursuant to Article IV.E hereof.

K&E 15594211.23

Date will receive payment in full in Cash of the unpaid portion of such Allowed Claim (including, to the extent required under applicable non-bankruptcy law, interest accrued on account of such Allowed Claim following the Petition Date through the date that such Allowed Claim is paid at the Federal Judgment Rate) in the ordinary course of business or will be otherwise rendered Unimpaired. The Debtors reserve their rights, however, to dispute the validity of any Claim in Class 5, whether or not objected to prior to the Effective Date.

(c) *Voting:* Class 5 is Unimpaired under the Plan. Holders of Claims in Class 5 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

6. <u>Class 6 - Intercompany Claims</u>.

(a) *Classification:* Class 6 consists of all Intercompany Claims.

(b) *Treatment*: Intercompany Claims may be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, be cancelled, and no distribution shall be made on account of such Claims.

(c) *Voting*: Class 6 is Unimpaired under the Plan. Holders of Claims in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

7. <u>Class 7 - Intercompany Interests</u>.

(a) *Classification:* Class 7 consists of all Intercompany Interests.

(b) *Treatment*: Intercompany Interests may be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, be cancelled, and no distribution shall be made on account of such Interests.

(c) *Voting:* Class 7 is Unimpaired under the Plan. Holders of Interests in Class 7 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

8. <u>Class 8 - Interests in Stallion Oilfield Holdings GP, LLC</u>.

(a) *Classification:* Class 8 consists of all Interests in Stallion Oilfield Holdings GP, LLC

(b) *Treatment:* On the Effective Date, except to the extent that a Holder of an Allowed Interest in Class 8 agrees to a less favorable treatment of its Allowed Interest, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Interest in Class 8, each such Holder shall receive its Pro Rata share of 0.0002% of (i) the New Equity issued on the Effective Date (subject to dilution by amounts reserved pursuant to the Management Equity Incentive Plan and the New Warrants) and (ii) the New Warrants.

(c) *Voting:* Class 8 is Impaired under the Plan. Holders of Allowed Interests in Class 8 are entitled to vote to accept or reject the Plan.

15

9. <u>Class 9 - Interests in Stallion Oilfield Holdings, Ltd</u>.

    (a)     *Classification:* Class 9 consists of all Interests in Stallion Oilfield Holdings, Ltd.

    (b)     *Treatment:* On the Effective Date, except to the extent that a Holder of an Allowed Interest in Class 9 agrees to a less favorable treatment of its Allowed Interest, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Interest in Class 9, each such Holder's Interest shall be Reinstated in Reorganized Stallion Oilfield Holdings, Ltd. and Reorganized Stallion Oilfield Holdings, Ltd. shall receive 1.9998% of (i) the New Equity issued on the Effective Date (subject to dilution by amounts reserved pursuant to the Management Equity Incentive Plan and the New Warrants) and (ii) the New Warrants.

    (c)     *Voting:* Class 9 is Impaired under the Plan. Holders of Allowed Interests in Class 9 are entitled to vote to accept or reject the Plan.

10.     <u>Class 10 - Section 510(b) Claims</u>.

    (a)     *Classification:* Class 10 consists of all Section 510(b) Claims.

    (b)     *Treatment*: On the Effective Date, all Claims in Class 10 shall be cancelled without any distribution.

    (c)     *Voting:* Class 10 is Impaired under the Plan. Holders of Claims in Class 10 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims.*

    Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.     *Acceptance or Rejection of the Plan.*

1.     <u>Voting Classes</u>.

    Classes 3, 4, 8, and 9 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

2.     <u>Presumed Acceptance of the Plan</u>.

    Classes 1, 2, 5, 6, and 7 are Unimpaired under the Plan. The Holders of Claims and Interests in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

3.     <u>Presumed Rejection of Plan</u>.

    Class 10 is Impaired and shall receive no distribution under the Plan. The Holders of Claims in Class 10 are deemed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

K&E 15594211.23

*E.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by either Class 3 or Class 4.   The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims.

*F.      Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

*G.      Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.   Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

*A.      Substantive Consolidation.*

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order substantively consolidating all of the Estates into a single consolidated Estate for all purposes associated with Confirmation and Consummation.

If substantive consolidation of all of the Estates is ordered, then on and after the Effective Date, all assets and liabilities of the Debtors shall be treated as though they were merged into the Estate of Stallion Oilfield Services Ltd. for all purposes associated with Confirmation and Consummation, and all guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor shall be treated as one collective obligation of the Debtors.   Substantive consolidation shall not affect the legal and organizational structure of the Reorganized Debtors' Entities or their separate corporate existences or any prepetition or postpetition guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, any contract, instrument, or other agreement or document pursuant to the Plan (including the Amended and Restated Senior Secured Credit Agreement or New Financing), or, in connection with contracts or leases that were assumed or entered into during the Chapter 11 Cases.   Any alleged defaults under any applicable agreement with the Debtors, the Reorganized Debtors, or their Affiliates arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

Notwithstanding the substantive consolidation provided for herein, nothing shall affect the obligation of each and every Debtor to pay Quarterly Fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 until such time as a particular case is closed, dismissed, or converted.

*B.      General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved

17

pursuant to the Plan. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

C.    *Restructuring Transactions.*

On the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into the Restructuring Transactions, including those described in the Restructuring Transactions Memorandum, and shall take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Reorganized Debtors, as and to the extent provided therein. The Restructuring Transactions may include one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions as may be determined by the Debtors or the Reorganized Debtors, as applicable, to be necessary or appropriate. The actions to effect the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.

D.    *New Stallion Holdings.*

On the Effective Date, the New Board of New Stallion Holdings shall be established and New Stallion Holdings shall adopt its New Organizational Documents and the Management Equity Incentive Plan. New Stallion Holdings shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary or desirable to consummate the Plan.

E.    *Existing Letters of Credit.*

On the Effective Date, subject to (F) below, all Existing Letters of Credit shall be Reinstated and continue to remain outstanding.

F.    *Sources of Consideration for Plan Distributions.*

The Reorganized Debtors shall fund distributions under the Plan with Cash on hand, including Cash from operations.

1.    New Financing.

On the Effective Date, the Reorganized Debtors may obtain New Financing so long as (a) all or a portion of the New Financing is used to indefeasibly pay in full in Cash all of the Senior Secured Claims, (b) all commitments to lend or otherwise provide financial accommodations under the Senior Secured Credit Agreement are terminated, (c) any amounts drawn under Existing Letters of Credit have been reimbursed in Cash in full, and (d) any Existing Letters of Credit have been cash collateralized, replaced, or backstopped in a manner reasonably acceptable to the Senior Secured Agent. Confirmation shall be deemed approval of New Financing (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith) and authorization for the Reorganized Debtors to enter into and execute New Financing documents, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary to consummate such New Financing.

2.      Amended and Restated Senior Secured Credit Agreement and Senior Secured Paydown.

On the Effective Date, the Reorganized Debtors may distribute the Senior Secured Paydown in accordance herewith and enter into the Amended and Restated Senior Secured Credit Agreement. Confirmation shall be deemed approval of the Senior Secured Paydown and the Amended and Restated Senior Secured Credit Agreement (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith) and authorization for the Reorganized Debtors to distribute the Senior Secured Paydown to Holders of Claims and Interests entitled to such distributions hereunder and to enter into and execute the Amended and Restated Senior Secured Credit Agreement documents, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary to consummate such Amended and Restated Senior Secured Credit Agreement.

3.      Intercompany Account Settlement.

The Debtors and the Reorganized Debtors, as applicable, will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

4.      Issuance of New Equity.

The issuance of the New Equity, including options, or other equity awards, if any, reserved for the Management Equity Incentive Plan, by New Stallion Holdings is authorized without the need for any further corporate action or without any further action by the Holders of Claims or Interests. New Stallion Holdings shall be authorized to issue up to [●] shares of New Equity pursuant to its New Organizational Documents. On the Effective Date, an initial number of shares of New Equity shall be issued and distributed as follows: (a) [●] shares of New Equity will be issued to the Holders of Claims in Class 4; (b) [●] shares of New Equity will be issued to the Holders of Interests in Class 8; and (c) [●] shares of New Equity will be issued to Reorganized Stallion Oilfield Holdings, Ltd. In addition, within 30 days of the Effective Date, at least [●] shares of New Equity shall be issued to management of New Stallion Holdings.

All of the shares of New Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. For purposes of distribution, the New Equity shall be deemed to have the value assigned to it based upon, among other things, the New Stallion Total Enterprise Value, regardless of the date of distribution.

The Holders of New Equity may be parties to the Shareholders Agreement, which shall be in form and substance reasonably acceptable to the Informal Funded Debt Committee and Holders of Interests in Classes 8 and 9; *provided, however*, that so long as the Informal Funded Debt Committee and such Holders, working in good faith, agree upon certain reasonable provisions requested by such Holders which are not considered material economic terms by the Informal Funded Debt Committee, such Shareholders Agreement shall be deemed to be in form and substance reasonably acceptable to a majority of Holders of Interests in Class 8 and Class 9.

5.      Issuance of New Warrants.

On the Effective Date, New Stallion Holdings shall issue the New Warrants to the Holders of Interests in Class 8 and to Reorganized Stallion Oilfield Holdings, Ltd., pursuant to the terms of the New Warrant Agreement. All of the New Warrants issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the

instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

G.    *Corporate Existence.*

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

H.    *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the Amended and Restated Senior Secured Credit Agreement or New Financing).  On and after the Effective Date, except as otherwise provided in the Plan, each the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

I.    *Cancellation of Securities and Agreements.*

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Senior Secured Credit Agreement, the Bridge Loan Agreement, the Notes Indenture, and any other Certificate, Equity Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such Certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors and their affiliates, and the Reorganized Debtors shall not have any continuing obligations thereunder, and (2) the obligations of the Debtors and their affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, by-laws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; *provided*, *however*, that notwithstanding Confirmation or Consummation, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan; *provided further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors; *provided further*, *however*, that the foregoing shall not affect the cancellation of shares issued pursuant to the Restructuring Transactions nor any other shares held by one Debtor in the capital of another Debtor; *provided further*, *however*, that to the extent provided in the Amended and Restated Senior Secured Credit Agreement, the guarantees of and Liens securing obligations under the Senior Secured Credit Agreement shall not be cancelled and shall guarantee or secure obligations under the Amended and Restated Senior Secured Credit Agreement and only such obligations.

K&E 15594211.23

*J.*     *Surrender of Existing Securities.*

As soon as reasonably practicable on or after the Effective Date, each Holder of Notes Claims shall surrender its note(s) to the Notes Indenture Trustee, or in the event such note(s) are held in the name of, or by a nominee of, The Depository Trust Company, the Reorganized Debtors shall seek the cooperation of The Depository Trust Company to provide appropriate instructions to the Notes Indenture Trustee.  No distributions under the Plan shall be made for or on behalf of such Holder unless and until such note is received by the Notes Indenture Trustee or appropriate instructions from The Depository Trust Company shall be received by the Notes Indenture Trustee or the loss, theft, or destruction of such note is established to the reasonable satisfaction of the Notes Indenture Trustee, which satisfaction may require such Holder to submit:  (1) a lost instrument affidavit; and (2) an indemnity bond holding the Debtors, the Reorganized Debtors, and the Notes Indenture Trustee harmless in respect of such note and distributions made thereof.  Upon compliance with this Section by a Holder of any Notes, such Holder shall, for all purposes under the Plan, be deemed to have surrendered such Notes.  Any Holder that fails to surrender such Notes or satisfactorily explain its non-availability to the Notes Indenture Trustee within one year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Reorganized Debtors (or their property), or the Notes Indenture Trustee in respect of such Claim and shall not participate in any distribution under the Plan.  All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Reorganized Debtors by the Notes Indenture Trustee, and any such security shall be cancelled.

*K.*     *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including:  (1) adoption or assumption, as applicable, of the agreements with existing management; (2) selection of the directors and officers for the Reorganized Debtors and New Stallion Holdings; (3) the distribution of the New Equity; (4) implementation of the Restructuring Transactions as set forth in the Restructuring Transactions Memorandum; (5) adoption of the Management Equity Incentive Plan; (6) distribution of the Senior Secured Paydown and execution and entry into the Amended and Restated Senior Secured Credit Agreement, or entry into New Financing, as applicable; and (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors, the Reorganized Debtors, or New Stallion Holdings in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors or officers of the Debtors, the Reorganized Debtors, or New Stallion Holdings.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors, or New Stallion Holdings, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors and New Stallion Holdings, including the Amended and Restated Senior Secured Credit Agreement or New Financing, as applicable, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.  The issuance of the New Equity shall be exempt from the requirements of section 16(b) of the Securities Exchange Act of 1934 (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

*L.*     *New Organizational Documents.*

On or immediately prior to the Effective Date, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective state, province, or country of incorporation and its respective New Organizational Documents.

K&E 15594211.23

*M.*      *Directors and Officers of the Reorganized Debtors and New Stallion Holdings.*

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and the initial boards of directors, including the New Boards, and the officers of each of the Reorganized Debtors shall be appointed in accordance with the respective New Organizational Documents. The New Board of New Stallion Holdings shall be composed of five members, which shall consist of the Chief Executive Officer of New Stallion Holdings and four directors, including a non-executive Chairman, to be chosen by the Informal Funded Debt Committee. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial board of directors or be an officer of each of the Reorganized Debtors and New Stallion Holdings. To the extent any such director or officer of the Reorganized Debtors or New Stallion Holdings is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors or New Stallion Holdings.

*N.*      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors and New Stallion Holdings, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors and New Stallion Holdings, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

*O.*      *Section 1146 Exemption.*

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

*P.*      *Director and Officer Liability Insurance.*

On or before the Effective Date, the Reorganized Debtors will obtain sufficient liability insurance policy coverage for a period of six years after the Effective Date for the Debtors' current and former directors and officers serving from and after the Petition Date.

*Q.*      *Management Equity Incentive Program.*

On the Effective Date, 10% of the New Equity, on a fully-diluted basis, shall be reserved for issuance as grants of stock, restricted stock, options, or stock appreciation rights or similar equity awards in connection with the Management Equity Incentive Program.

A minimum of 4% of the fully-diluted New Equity will be issued to management of New Stallion Holdings within 30 days of the Effective Date, and such New Equity shall vest 50% on the date that is one year after the Effective Date, 25% on the date that is two years after the Effective Date, and 25% on the date that is three years after the Effective Date.

All New Equity reserved pursuant to the Management Equity Incentive Plan and not issued may be granted to managers of New Stallion Holdings within five years of the Effective Date at the discretion of the New Board. In the event that a liquidity event occurs before the fifth anniversary of the Effective Date, all New Equity reserved

pursuant to the Management Equity Incentive Plan may be, in the discretion of the New Board, granted (in the form of stock) to and vested with managers participating in the Management Equity Incentive Plan.

Reorganized Stallion Holdings shall guarantee the obligations of the Stallion Officers under the Stallion Officer Loans and shall have the right to purchase the Stallion Officer Loans from the Banks. Reorganized Stallion Holdings shall make payments to the Stallion Officers equal to their required interest payments plus a gross up for taxes due on account of such payment. For each scheduled amortization payment, Reorganized Stallion Holdings will loan, as requested, to each Stallion Officer an amount equal to the required amortization payment, with interest on such loan equal to the applicable federal rate (AFR) on the Effective Date. The Stallion Officers will seek a 5-year extension of the existing Officer Loans with a 10-year amortization payment schedule for the outstanding amounts. At the end of the First Forgiveness Period, as well as each Successive Forgiveness Period, if the Stallion Officer remains employed in good standing with Reorganized Stallion Holdings or the Stallion Officer was terminated without cause during such period, 50% of any principal payments made on such Stallion Officer's behalf by Reorganized Stallion Holdings during the applicable Forgiveness Period will be forgiven. Reorganized Stallion Holdings will not provide a gross up payment with regard to any taxable income incurred as a result of such forgiveness. Each Stallion Officer shall use a minimum of 50% of, and may use up to 100% of, the after tax proceeds of any annual cash incentive bonuses such Stallion Officer receives to reduce the bank loan balance.

R.    *Employee and Retiree Benefits.*

All employment, retirement, indemnification, and other agreements or arrangements in place as of the Effective Date with the Debtors' officers, directors, or employees, who will continue in such capacities or similar capacities after the Effective Date, or retirement income plans and welfare benefit plans for such persons, or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees identified as key leaders, top level managers, or sales leaders, or indemnification arrangements with directors of non-Debtor subsidiaries, shall remain in place after the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans; *provided*, *however*, that the foregoing shall not apply to any equity-based compensation or incentive-based plan, agreement, or arrangement existing as of the Petition Date. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

S.    *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a  Debtor may hold against

any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.      Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases, not previously assumed or rejected pursuant to an order of the Bankruptcy Court, will be deemed assumed, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (1) previously were assumed or rejected by the Debtors; (2) are identified on the Rejected Executory Contract and Unexpired Lease List; (3) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and the rejection of the Executory Contracts or Unexpired Leases listed on the Rejected Executory Contract and Unexpired Lease List pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the schedules of Executory Contracts and Unexpired Leases identified in this Article V and in the Plan Supplement at any time through and including 30 days after the Effective Date.

*B.      Indemnification Obligations.*

Each Indemnification Obligation of directors, officers, and employees of the Debtors who served in such capacity on or after the Petition Date shall be assumed by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such Indemnification Obligation is executory, unless such Indemnification Obligation previously was rejected by the Debtors pursuant to a Final Order or is the subject of a motion to reject pending on the Effective Date. Notwithstanding the foregoing, an Indemnification Obligation in favor of any Entity who as of the Petition Date no longer was a director, officer, or employee of a Debtor shall terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise, as of the Effective Date; *provided*, however, that the Reorganized Debtors reserves the right to honor or reaffirm Indemnification Obligations other than those rejected or terminated by a prior or subsequent Final Order of the Bankruptcy Court, whether or not executory, in which case such honoring or reaffirmation shall be in complete satisfaction, discharge, and release of any Claim on account of such Indemnification Obligation. Each Indemnification Obligation that is assumed, deemed assumed, honored, or reaffirmed shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

*C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the

effective date of such rejection, or (3) the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.5 hereof.

D.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least 10 days prior to the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served, and actually received by the Debtors at least three days prior to the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

F.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

G.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any

other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**H.**     *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

**I.**     *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**J.**     *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**A.**     *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interests shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interest in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**B.**     *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so

otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.    *Rights and Powers of Disbursing Agent.*

    1.    <u>Powers of the Disbursing Agent</u>.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

    2.    <u>Expenses Incurred On or After the Effective Date</u>.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

    1.    <u>Delivery of Distributions in General</u>.

Except as otherwise provided herein, the Reorganized Debtors shall make distributions to Holders of Allowed Claims and Allowed Interests on the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided, however*, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further, however*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

    2.    <u>Minimum Distributions</u>.

No fractional shares of New Equity shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest would otherwise result in the issuance of a number of shares of New Equity that is not a whole number, the actual distribution of shares of New Equity shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of New Equity to be distributed to holders of Allowed Claims and Allowed Interests shall be adjusted as necessary to account for the foregoing rounding.

    3.    <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

*E.      Manner of Payment.*

1.      All distributions of the New Equity to the Holders of Claims and Interests under the Plan shall be made by the Disbursing Agent on behalf of New Stallion Holdings.

2.      All distributions of the Senior Secured Paydown or New Financing proceeds, as applicable, to the Holders of Claims under the Plan shall be made by the Disbursing Agent on behalf of the Reorganized Debtors.

3.      All distributions of Cash under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor.

4.      At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

*F.      Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Equity, as contemplated by Article III.B hereof to Classes 4 and 8 and to Reorganized Stallion Oilfield Holdings, Ltd., shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  In addition, under section 1145 of the Bankruptcy Code, such New Equity will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the Shareholders Agreement and the Reorganized Debtors' New Organizational Documents.

*G.      Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

*H.      Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

*I.      No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or the interim or final cash collateral order (it being understood and agreed that the Senior Secured Claims will continue to accrue and be paid postpetition interest on the terms set forth in the interim or final cash collateral order), or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.

*J.*       *Setoffs and Recoupment.*

The Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the Holder of such Claim.

*K.*       *Claims Paid or Payable by Third Parties.*

1.       Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.       Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.       Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

*A.*       *Allowance of Claims.*

After the Effective Date, each the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.

*B.*       *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the

Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.      *Estimation of Claims and Interests*.

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      *Adjustment to Claims or Interests Without Objection.*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the later of (1) the date that is one year after the Effective Date and (2) such date as may be fixed by the Bankruptcy Court, after notice and a hearing, whether fixed before or after the date that is one year after the Effective Date.

F.      *Disallowance of Claims or Interests.*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. All Claims Filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Entities elect to honor such employee benefit, without any further notice to or action, order, or approval of the Bankruptcy Court.

**EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

K&E 15594211.23

*G.*     *Amendments to Claims or Interests.*

On or after the Effective Date, a Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim or Interest Filed shall be deemed disallowed in full and expunged without any further action.

*H.*     *No Distributions Pending Allowance.*

If an objection to a Claim or Interest or portion thereof is filed as set forth in Article VII.B hereof, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portion thereof unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

*I.*     *Distributions After Allowance.*

To the extent that a Disputed Claim or Disputed Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

*A.*     *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

*B.*     **Release of Liens.**

**Except as otherwise provided in the Plan, including in Article IV.I hereof, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of**

31

trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

**C.**     *Releases by the Debtors.*

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and related Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.

**D.**     *Releases by Holders of Claims and Interests.*

As of the Effective Date, each Holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of a debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the related Disclosure Statement, the related Plan Supplement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including any obligations of any party under the Amended and Restated Senior Secured Credit Agreement and documents and instruments related thereto.

**E.**     *Exculpation.*

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim, obligation, cause of action, or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors and the Reorganized Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Securities pursuant to the Plan, and, therefore, are not, and on account of

such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**F.      Injunction.**

Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan (including any obligations under the Amended and Restated Senior Secured Credit Agreement and documents and instruments related thereto), all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.C or Article VIII.D hereof, discharged pursuant to Article VIII.A hereof, or are subject to exculpation pursuant to Article VIII.E hereof are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

**G.      Protections Against Discriminatory Treatment.**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**H.      Setoffs.**

Except as otherwise expressly provided for in the Plan, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may setoff against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor or the Reorganized Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.  In no event shall any Holder of Claims be entitled to setoff any Claim against any Claim, right, or Cause of Action of a Debtor or a Reorganized Debtor, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

I.      *Recoupment.*

**In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.**

J.      *Subordination Rights.*

Any distributions under the Plan to Holders shall be received and retained free from any obligations to hold or transfer the same to any other Holder, and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights.  Any such subordination rights shall be waived and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to Property distributed under the Plan, in each case other than as provided in the Plan.

K.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their current document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

L.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to Confirmation.*

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.   the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtors and reasonably acceptable to the Senior Secured Agent and counsel to the Informal Funded Debt Committee;

2.   the Confirmation Order shall:

<ol type="a" start="1">
<li>(a) authorize the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;</li>

<li>(b) decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;</li>

<li>(c) authorize the Reorganized Debtors to (a) issue the New Equity pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements and (b) enter into any agreements contained in the Plan Supplement;</li>

<li>(d) decree that the Confirmation order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;</li>

<li>(e) authorize the implementation of the Plan in accordance with its terms; and</li>

<li>(f) provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax (including, any mortgages or security interest filing to be recorded or filed in connection with New Financing or the Amended and Restated Senior Secured Credit Agreement, as applicable); and</li>
</ol>

3. the Plan must be in form and substance acceptable to the Debtors and reasonably acceptable to the Senior Secured Agent and counsel to the Informal Funded Debt Committee.

**B.    *Conditions Precedent to the Effective Date.***

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1. the Confirmation Order shall (a) have been entered in a form and substance satisfactory to the Debtors and reasonably acceptable to the Senior Secured Agent and counsel to the Informal Funded Debt Committee, and (b) have become a Final Order;

2. the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in form and substance acceptable to the Debtors and reasonably acceptable to the Senior Secured Agent and counsel to the Informal Funded Debt Committee;

3. counsel to the Informal Funded Debt Committee shall have reasonably determined that there are no General Unsecured Claims, not previously disclosed to it, the existence of which could have a material adverse effect on the Debtors;

4. all actions, documents, Certificates, and agreements necessary to implement the Plan, including documents contained in the Plan Supplement, shall have been effected or executed and delivered, as the case may be, to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws; *provided*, *however*, that each document, instrument, and agreement must be acceptable to the Debtors and reasonably acceptable to the Senior Secured Agent and counsel to the Informal Funded Debt Committee;

5. all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan shall have been received;

6. the initial boards of directors of the Reorganized Debtors shall have been appointed; and

7. the effectiveness of New Financing or the Amended and Restated Senior Secured Credit Agreement, as applicable, in each case in form and substance acceptable to the Debtors, the Senior Secured Agent, and counsel to the Informal Funded Debt Committee.

C. *Waiver of Conditions.*

The conditions to Confirmation and Consummation set forth in this Article IX may be waived only by consent of the Debtors, the Senior Secured Agent, and counsel for the Informal Funded Debt Committee, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

D. *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

# ARTICLE X.
# MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A. *Modification and Amendments.*

Except as otherwise specifically provided in the Plan, the Debtors, with the reasonable consent of the Senior Secured Agent and counsel for the Informal Funded Debt Committee, reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, with the reasonable consent of the Senior Secured Agent and counsel for the Informal Funded Debt Committee, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.

B. *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C. *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

36

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.　　　　allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.　　　　decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.　　　　resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.　　　　ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.　　　　adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.　　　　adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.　　　　enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.　　　　enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.　　　　resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.　　　　issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.　　　　resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

37

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K.1 hereof;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and released granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

22.     enforce all orders previously entered by the Bankruptcy Court; and

23.     hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A.     Immediate Binding Effect.*

Subject to Article IX.B hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

*B.     Additional Documents.*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and

38

deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.     *Payment of Fees and Expenses of Professionals in Connection with the Unsecured Funded Debt.*

On the Effective Date or as soon as reasonably practicable thereafter, the Disbursing Agent shall pay in full in Cash all reasonable and documented fees and expenses of the Senior Secured Agent (including with respect to the preparation and negotiation of that certain third amendment to the Senior Secured Credit Agreement), the Bridge Agent, the Notes Indenture Trustee, and counsel to the Informal Funded Debt Committee, as well as reasonable and documented fees and expenses of advisors retained by each of the foregoing; *provided* that reasonably detailed fee invoices provided to the Entity shall be required as a condition of payment hereunder.

E.     *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Senior Secured Agent, the Bridge Agent, the Notes Indenture Trustee, or the Informal Funded Debt Committee, and any other statutory committees after the Effective Date.

F.     *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

G.     *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

H.     *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> 1.      <u>if to the Debtors, to:</u>
>
>    950 Corbindale
>    Suite 300
>    Houston, Texas 77024
>    Facsimile: (713)-528-1276

Attention:   Douglas Stewart, Esq.
E-mail address:   dstewart@sofs.cc

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Facsimile:  (212) 446-4900
Attention: Jonathan S. Henes, Esq. and Benjamin P.D. Schrag, Esq.
E-mail addresses:  jonathan.henes@kirkland.com and benjamin.schrag@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention: Chad J. Husnick, Esq. and Jeffrey D. Pawlitz, Esq.
Email addresses:  chad.husnick@kirkland.com and jeffrey.pawlitz@kirkland.com

2.        if to the Senior Secured Agent, to:

UBS Investment Bank
677 Washington Boulevard
6th Floor
Stamford, Connecticut 06901
Attention:  Thomas Donnelly, Esq.
Email address:  Thomas.Donnelly@ubs.com

with copies (which shall not constitute notice) to:

Latham & Watkins LLP
233 South Wacker Drive
Suite 5800
Chicago, Illinois 60606
Attention:  David S. Heller, Esq.
E-mail address:  david.heller@lw.com

3.        if to the Informal Funded Debt Committee, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attention:  Andrew Rosenberg, Esq. and Elizabeth McColm, Esq.
E-mail addresses:  arosenberg@paulweiss.com and emccolm@paulweiss.com

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

I.        *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the

40

Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## J.     Entire Agreement.

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## K.     Exhibits.

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://chapter11.epiqsystems.com/stallion or the Bankruptcy Court's website at www.deb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

## L.     Nonseverability of Plan Provisions.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

## M.     Votes Solicited in Good Faith.

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

## N.     Closing of Chapter 11 Cases.

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

## O.     Waiver or Estoppel.

**Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their**

**counsel, the Senior Secured Agent, the Bridge Agent, the Notes Indenture Trustee, or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

P.    *Conflicts.*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

K&E 15594211.23

Wilmington, Delaware
Dated: October 19, 2009

STALLION OILFIELD SERVICES LTD., on behalf of itself and
the other Debtors

By: _____

Name:    John R. Castellano

Title:    Chief Restructuring Officer

COUNSEL:

_____
Daniel J. DeFranceschi (Bar No. 2732)
Lee E. Kaufman (Bar No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701

- and -

Jonathan S. Henes, Esq. (*pro hac vice* pending)
Chad J. Husnick, Esq. (*pro hac vice* pending)
Benjamin P.D. Schrag, Esq. (*pro hac vice* pending)
Jeffrey D. Pawlitz, Esq. (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-49000

Attorneys for the Debtors

**EXHIBIT B**

**LIQUIDATION ANALYSIS**

## Stallion Oilfield Services - Summary Low

| | Notes | Stallion Oilfield Services Ltd. ("SOS") | Central Industries, Inc. ("CII") | Salty's Disposal Wells, LP ("SDW") | Salty's Manufacturing, Ltd. ("SMFG") | Stallion Acquisition, LLC ("SACQ") | Stallion Heavy Haulers, LP ("SHH") | Stallion Interests, LLC ("SI") | Stallion Offshore Quarters, Inc. ("SOQ") | Stallion Oilfield Construction, LLC ("SOC") | Stallion Oilfield Finance Corp. ("SOFS") | Stallion Oilfield Holdings GP, LLC ("SOSGP") | Stallion Oilfield Holdings, Ltd. ("SOSLTD") | Stallion Oilfield Services, Inc. ("SOSINC") | Stallion Production Services, LP ("SPS") | Stallion Production, LLC ("SPSLLC") | Stallion Rockies Ltd. ("SR") | Stallion Solids Control, Inc. ("SSC") | Stallion Stables, LLC ("STBLS") | Stallion Consolidated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **Hypothetical Liquidation Values** | | | | | | | | | | | | | | | | | | |
| (*$ in 000's*) | | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low |

### Table I: Assets Available for Distribution

| | Notes | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Assets and Net Proceeds Available for Distribution | a | $ 76,959 | $ - | $ 6,893 | $ 1,507 | $ 1 | $ 8,302 | $ - | $ 19,522 | $ 50,507 | $ - | $ - | $ - | $ 1 | $ 19,905 | $ - | $ 16,182 | $ 8,675 | $ 4,108 | $ 212,562 |
| % of Net Book Assets | | 9.0% | 0.0% | 5.6% | 5.5% | 100.0% | 20.9% | 0.0% | 36.1% | 43.6% | 0.0% | 0.0% | 0.0% | 100.0% | 21.3% | 98.0% | 11.4% | 34.8% | 21.3% | 26.1% |

### Table II: Estimated Chapter 7 Expenses

| | Notes | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Operational Winddown Costs | | $ 26,977 | $ - | $ 3,139 | $ 52 | $ - | $ 2,834 | $ - | $ 1,686 | $ 5,434 | $ - | $ - | $ - | $ - | $ 4,692 | $ - | $ 2,048 | $ 1,596 | $ - | $ 48,459 |
| Chapter 7 Trustee, Professional Fees & Costs | b & c | 5,379 | - | 487 | 105 | 0 | 579 | - | 1,366 | 3,535 | - | - | - | 0 | 1,397 | 0 | 1,135 | 610 | 283 | 14,877 |
| Total Chapter 7 Administrative Claims | | 32,356 | - | 3,626 | 157 | 0 | 3,413 | - | 3,052 | 8,970 | - | - | - | 0 | 6,089 | 0 | 3,183 | 2,207 | 283 | 63,336 |
| **Net Proceeds after Chapter 7 Administrative Claims** | | **$ 44,603** | **$ -** | **$ 3,267** | **$ 1,350** | **$ 1** | **$ 4,889** | **$ -** | **$ 16,470** | **$ 41,538** | **$ -** | **$ -** | **$ -** | **$ 1** | **$ 13,815** | **$ 0** | **$ 12,999** | **$ 6,468** | **$ 3,825** | **$ 149,226** |

### Table III: Estimated Creditor Recoveries

| | | **Hypothetical Creditor Recovery Values** | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low | Low |
| Administrative Claims - Recovery | | $ 2,209 | $ - | $ 104 | $ 492 | $ 0 | $ 123 | $ - | $ 247 | $ 820 | $ - | $ - | $ - | $ 0 | $ 348 | $ 0 | $ 428 | $ 161 | $ 66 | $ 5,000 |
| Administrative Claims | | 2,209 | - | 104 | 492 | 0 | 123 | - | 247 | 820 | - | - | - | 0 | 348 | 0 | 428 | 161 | 66 | 5,000 |
| % Recovery | | 100% | | 100% | 100% | 100% | 100% | | 100% | 100% | | | | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Priority Tax Claims - Recovery | | 1,729 | - | 261 | 82 | - | 342 | - | 55 | 399 | - | - | - | - | 804 | - | 206 | 454 | - | 4,332 |
| Priority Tax Claims | | 1,729 | - | 261 | 82 | - | 342 | - | 55 | 399 | - | - | - | - | 804 | - | 206 | 454 | - | 4,332 |
| % Recovery | | 100% | | 100% | 100% | | 100% | | 100% | 100% | | | | | 100% | | 100% | 100% | | 100% |
| *Classified Claims* | | | | | | | | | | | | | | | | | | | | |
| Class 1: Priority Non-Tax Claims - Recovery | | 2,692 | - | 175 | 270 | - | 1,046 | - | 470 | 1,468 | - | - | - | - | 1,485 | - | 1,694 | 774 | | 10,075 |
| Class 1: Priority Non-Tax Claims | | 2,692 | - | 175 | 270 | - | 1,046 | - | 470 | 1,468 | - | - | - | - | 1,485 | - | 1,694 | 774 | | 10,075 |
| % Recovery | | 100% | | 100% | 100% | | 100% | | 100% | 100% | | | | | 100% | | 100% | 100% | | 100% |
| Class 2: Other Secured Claims - Recovery | | - | - | - | - | - | - | - | - | 187 | - | - | - | - | - | - | - | - | | 187 |
| Class 2: Other Secured Claims | | - | - | - | - | - | - | - | - | 187 | - | - | - | - | - | - | - | - | | 187 |
| % Recovery | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 100% | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 100% |
| Class 3: Senior Secured Claims - Recovery | | 37,972 | - | 2,727 | 505 | 1 | 3,378 | - | 15,699 | 38,663 | - | - | - | 1 | 11,178 | 0 | 10,671 | 5,078 | 3,759 | 129,632 |
| Class 3: Senior Secured Claims | | 254,340 | 254,340 | 254,340 | 254,340 | 254,340 | 254,340 | 254,340 | 254,340 | 254,340 | 7,802 | 7,802 | 254,340 | 7,802 | 254,340 | 254,340 | 254,340 | 254,340 | 254,340 | 254,340 |
| % Recovery | | 15% | 0% | 1% | 0% | n/a | 1% | 0% | 6% | 15% | 0% | 0% | 0% | 0% | 4% | 0% | 4% | 2% | 1% | 51% |
| Class 4: Unsecured Funded Debt Claims - Recovery | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 4: Unsecured Funded Debt Claims | | 539,770 | 539,760 | 541,315 | 539,754 | 539,754 | 539,844 | 257,458 | 539,754 | 540,023 | 282,307 | - | 257,458 | - | 539,769 | 539,754 | 540,245 | 539,824 | - | 542,281 |
| % Recovery | | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | n/a | 0% | n/a | 0% | 0% | 0% | 0% | n/a | 0% |
| Class 5: General Unsecured Claims - Recovery | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 5: General Unsecured Claims | | 24,941 | 3,011 | 1,415 | 178 | - | 1,250 | - | 3,455 | 3,753 | - | - | - | - | 1,568 | - | 5,480 | 1,797 | 739 | 47,587 |
| % Recovery | | 0% | 0% | 0% | 0% | n/a | 0% | n/a | 0% | 0% | n/a | n/a | n/a | n/a | 0% | n/a | 0% | 0% | 0% | 0% |
| Class 6: InterCompany - Recovery | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 6: InterCompany | | 8,253 | - | 157,764 | 79,503 | - | 82,387 | - | 6 | 109,713 | - | - | - | - | 159,980 | 0 | 53,451 | 15,160 | 18,948 | - |
| % Recovery | | 0% | n/a | 0% | 0% | n/a | 0% | n/a | 0% | 0% | n/a | n/a | n/a | n/a | 0% | 0% | 0% | 0% | 0% | n/a |
| Class 7: Intercompany Interest - Recovery | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 7: Intercompany Interest | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| % Recovery | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Class 8: Interests in Stallion Oilfield Holdings Ltd. - Recovery | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 8: Interests in Stallion Oilfield Holdings Ltd. | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| % Recovery | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Class 9: Section 510(b) Claims - Recovery | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 9: Section 510(b) Claims | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| % Recovery | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| **Total Consolidated Claims - Recovery** | | **$ 44,603** | **$ -** | **$ 3,267** | **$ 1,350** | **$ 1** | **$ 4,889** | **$ -** | **$ 16,470** | **$ 41,538** | **$ -** | **$ -** | **$ -** | **$ 1** | **$ 13,815** | **$ 0** | **$ 12,999** | **$ 6,468** | **$ 3,825** | **$ 149,226** |
| **Total Consolidated Claims** | | **$ 833,935** | **$ 797,111** | **$ 955,373** | **$ 874,619** | **$ 794,094** | **$ 879,332** | **$ 511,797** | **$ 798,327** | **$ 910,704** | **$ 290,109** | **$ 7,802** | **$ 511,797** | **$ 7,802** | **$ 958,294** | **$ 794,094** | **$ 855,843** | **$ 812,511** | **$ 274,092** | **$ 863,801** |
| *% Recovery* | | 5.3% | 0.0% | 0.3% | 0.2% | 0.0% | 0.6% | 0.0% | 2.1% | 4.6% | 0.0% | 0.0% | 0.0% | 0.0% | 1.4% | 0.0% | 1.5% | 0.8% | 1.4% | 17.3% |

*Notes:*

a  Balances are as of August 31, 2009 (unaudited)

b  Chapter 7 Trustee Fees assumes 3% on gross proceeds available for distribution.

c  Chapter 7 Professional Fees assumes 15-month wind down period to assist in winding down the estate and completing any necessary accounting work.

## Stallion Oilfield Services - Summary High

| | Notes | Stallion Oilfield Services Ltd. ("SOS") | Central Industries, Inc. ("CII") | Salty's Disposal Wells, LP ("SDW") | Salty's Manufacturing, Ltd. ("SMFG") | Stallion Acquisition, LLC ("SACQ") | Stallion Heavy Haulers, LP ("SHH") | Stallion Interests, LLC ("SI") | Stallion Offshore Quarters, Inc. ("SOQ") | Stallion Oilfield Construction, LLC ("SOC") | Stallion Oilfield Finance Corp. ("SOFS") | Stallion Oilfield Holdings GP, LLC ("SOSGP") | Stallion Oilfield Holdings, Ltd. ("SOSLTD") | Stallion Oilfield Services, Inc. ("SOSINC") | Stallion Production Services, LP ("SPS") | Stallion Production, LLC ("SPSLLC") | Stallion Rockies Ltd. ("SR") | Stallion Solids Control, Inc. ("SSC") | Stallion Stables, LLC ("STBLS") | Stallion Consolidated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | High | High | High | High | High | High | High | High | High | High | High | High | High | High | High | High | High | High | High |

### Table I: Assets Available for Distribution

| | | | | | | | | | | Hypothetical Liquidation Values | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ($ in 000's) | Notes | High | High | High | High | High | High | High | High | High | High | High | High | High | High | High | High | High | High | High |
| Total Assets and Net Proceeds Available for Distribution | a | $ 83,868 $ | - | $ 10,014 $ | 2,161 $ | 1 | $ 12,332 $ | - | $ 23,082 $ | 58,971 $ | - $ | - $ | - $ | 1 | $ 28,941 $ | 0 $ | 35,447 $ | 10,679 $ | 6,572 | $ 272,071 |
| % of Net Book Assets | | 9.8% | 0.0% | 8.1% | 7.9% | 100.0% | 31.0% | 0.0% | 42.7% | 51.0% | 0.0% | 0.0% | 0.0% | 100.0% | 31.0% | 98.0% | 25.1% | 42.9% | 34.1% | 33.4% |

### Table II: Estimated Chapter 7 Expenses

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Operational Winddown Costs | | $ 26,977 $ | - | $ 2,139 $ | 52 $ | - | $ 2,834 $ | - | $ 1,686 $ | 5,434 $ | - $ | - $ | - $ | - $ | 4,692 $ | - $ | 2,048 $ | 1,596 $ | - | $ 47,459 |
| Chapter 7 Trustee, Professional Fees & Costs | b & c | 5,026 | - | 600 | 125 | 0 | 740 | - | 1,382 | 3,539 | - | - | - | 0 | 1,738 | 0 | 2,123 | 640 | 397 | 16,312 |
| Total Chapter 7 Administrative Claims | | 32,003 | - | 2,739 | 177 | 0 | 3,574 | - | 3,069 | 8,974 | - | - | - | 0 | 6,430 | 0 | 4,171 | 2,237 | 397 | 63,771 |
| Net Proceeds after Chapter 7 Administrative Claims | | $ 51,865 $ | - | $ 7,275 $ | 1,984 $ | 1 | $ 8,758 $ | - | $ 20,014 $ | 49,998 $ | - $ | - $ | - $ | 1 | $ 22,511 $ | 0 $ | 31,276 $ | 8,442 $ | 6,175 | $ 208,300 |

### Table III: Estimated Creditor Recoveries

| | | | | | | | | | | | Hypothetical Creditor Recovery Values | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | High | High | High | High | High | High | High | High | High | High | High | High | High | High | High | High | High | High | High |
| Administrative Claims - Recovery | | $ 1,756 $ | - | $ 39 $ | 478 $ | 0 $ | - | $ 42 $ | - | $ 113 $ | 483 $ | - $ | - $ | - $ | 0 $ | 159 $ | 0 $ | 155 $ | 98 $ | 21 | $ 3,342 |
| Administrative Claims | | 1,756 | - | 39 | 478 | 0 | 42 | - | 113 | 483 | - | - | - | 0 | 159 | 0 | 155 | 98 | 21 | 3,342 |
| % Recovery | | 100% | | 100% | 100% | 100% | 100% | | 100% | 100% | | | | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Priority Tax Claims - Recovery | | 1,441 | - | 217 | 69 | - | 285 | - | 45 | 333 | - | - | - | - | 670 | - | 172 | 378 | - | 3,610 |
| Priority Tax Claims | | 1,441 | - | 217 | 69 | - | 285 | - | 45 | 333 | - | - | - | - | 670 | - | 172 | 378 | - | 3,610 |
| % Recovery | | 100% | | 100% | 100% | | 100% | | 100% | 100% | | | | | 100% | | 100% | 100% | | 100% |
| **Classified Claims** | | | | | | | | | | | | | | | | | | | | |
| Class 1: Priority Non-Tax Claims - Recovery | | 2,244 | - | 146 | 225 | - | 872 | - | 392 | 1,224 | - | - | - | - | 1,237 | - | 1,411 | 645 | - | 8,396 |
| Class 1: Priority Non-Tax Claims | | 2,244 | - | 146 | 225 | - | 872 | - | 392 | 1,224 | - | - | - | - | 1,237 | - | 1,411 | 645 | - | 8,396 |
| % Recovery | | 100% | | 100% | 100% | | 100% | | 100% | 100% | | | | | 100% | | 100% | 100% | | 100% |
| Class 2: Other Secured Claims - Recovery | | - | - | - | - | - | - | - | - | 187 | - | - | - | - | - | - | - | - | - | 187 |
| Class 2: Other Secured Claims | | - | - | - | - | - | - | - | - | 187 | - | - | - | - | - | - | - | - | - | 187 |
| % Recovery | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 100% | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 100% |
| Class 3: Senior Secured Claims - Recovery | | 46,425 | - | 6,873 | 1,212 | 1 | 7,560 | - | 19,463 | 47,772 | - | - | - | 1 | 20,445 | 0 | 29,538 | 7,320 | 6,155 | 192,765 |
| Class 3: Senior Secured Claims | | 253,177 | 253,177 | 253,177 | 253,177 | 253,177 | 253,177 | 253,177 | 253,177 | 253,177 | 6,640 | 6,640 | 253,177 | 6,640 | 253,177 | 253,177 | 253,177 | 253,177 | 253,177 | 253,177 |
| % Recovery | | 18% | 0% | 3% | 0% | n/a | 3% | 0% | 8% | 19% | 0% | 0% | 0% | 0% | 8% | 0% | 12% | 3% | 2% | 76% |
| Class 4: Unsecured Funded Debt Claims - Recovery | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 4: Unsecured Funded Debt Claims | | 539,770 | 539,760 | 541,315 | 539,754 | 539,754 | 539,844 | 257,458 | 539,754 | 540,023 | 282,307 | - | 257,458 | - | 539,769 | 539,754 | 540,245 | 539,824 | - | 542,281 |
| % Recovery | | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | n/a | 0% | n/a | 0% | 0% | 0% | 0% | n/a | 0% |
| Class 5: General Unsecured Claims - Recovery | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 5: General Unsecured Claims | | 22,689 | 2,688 | 1,407 | 178 | - | 1,246 | - | 3,426 | 3,687 | - | - | - | - | 1,553 | - | 5,285 | 1,792 | 739 | 44,689 |
| % Recovery | | 0% | 0% | 0% | 0% | n/a | 0% | n/a | 0% | 0% | n/a | n/a | n/a | n/a | 0% | n/a | 0% | 0% | 0% | 0% |
| Class 6: InterCompany - Recovery | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 6: InterCompany | | 8,253 | - | 157,764 | 79,503 | - | 82,387 | - | 6 | 109,713 | - | - | - | - | 159,980 | 0 | 53,451 | 15,160 | 18,948 | - |
| % Recovery | | 0% | n/a | 0% | 0% | n/a | 0% | n/a | 0% | 0% | n/a | n/a | n/a | n/a | 0% | 0% | 0% | 0% | 0% | n/a |
| Class 7: Intercompany Interest - Recovery | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 7: Intercompany Interest | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| % Recovery | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Class 8: Interests in Stallion Oilfield Holdings Ltd. - Recovery | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 8: Interests in Stallion Oilfield Holdings Ltd. | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| % Recovery | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Class 9: Section 510(b) Claims - Recovery | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 9: Section 510(b) Claims | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| % Recovery | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| **Total Consolidated Claims - Recovery** | | $ 51,865 $ | - | $ 7,275 $ | 1,984 $ | 1 $ | - | $ 8,758 $ | - | $ 20,014 $ | 49,998 $ | - $ | - $ | - $ | 1 | $ 22,511 $ | 0 $ | 31,276 $ | 8,442 $ | 6,175 | $ 208,300 |
| **Total Consolidated Claims** | | $ 829,331 $ | 795,626 $ | 954,065 $ | 873,384 $ | 792,932 $ | 877,853 $ | 510,635 $ | 796,914 $ | 908,826 $ | 288,947 $ | 6,640 $ | 510,635 $ | 6,640 | 956,546 $ | 792,932 $ | 853,896 $ | 811,076 $ | 272,885 $ | 855,682 |
| **% Recovery** | | 6.3% | 0.0% | 0.8% | 0.2% | 0.0% | 1.0% | 0.0% | 2.5% | 5.5% | 0.0% | 0.0% | 0.0% | 0.0% | 2.4% | 0.0% | 3.7% | 1.0% | 2.3% | 24.3% |

*Notes:*

a  Balances are as of August 31, 2009 (unaudited)

b  Chapter 7 Trustee Fees assume 3% on gross proceeds available for distribution.

c  Chapter 7 Professional Fees assumes 15-month wind down period to assist in winding down the estate and completing any necessary accounting work.

## EXHIBIT C

## REORGANIZED DEBTORS' FINANCIAL PROJECTIONS

# DEBTORS' INCOME STATEMENT

*US$ Thousands*

*Unaudited - Not in Accordance with GAAP*

| | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 |
|---|---|---|---|---|---|---|
| **INCOME STATEMENT** | | | | | | |
| SERVICE REVENUE | 349,282 | 382,476 | 460,869 | 507,118 | 502,022 | 462,124 |
| COST OF SERVICES | 252,184 | 258,997 | 300,780 | 324,435 | 318,257 | 290,423 |
| Gross Profit | 97,098 | 123,478 | 160,089 | 182,683 | 183,765 | 171,701 |
| Gross Margin % | 27.8% | 32.3% | 34.7% | 36.0% | 36.6% | 37.2% |
| OPERATING EXPENSES | | | | | | |
| Selling, general and administrative expenses | 36,941 | 42,374 | 44,156 | 45,202 | 45,089 | 44,297 |
| Depreciation and amortization | 65,062 | 46,716 | 40,943 | 37,756 | 38,088 | 39,091 |
| (Gain) / Loss on disposal of property, plant and equipment | 2,448 | - | - | - | - | - |
| Loss on impairment of goodwill / other assets | 244,723 | - | 1,500 | 1,750 | 1,875 | 1,938 |
| TOTAL OPERATING EXPENSES | 349,174 | 89,090 | 86,599 | 84,708 | 85,051 | 85,326 |
| **(LOSS) INCOME FROM OPERATIONS** | **(252,076)** | **34,388** | **73,490** | **97,975** | **98,714** | **86,375** |
| Operating Margin % | -72.2% | 9.0% | 15.9% | 19.3% | 19.7% | 18.7% |
| OTHER INCOME (EXPENSE) | | | | | | |
| Interest Expense | (58,968) | (21,962) | (18,679) | (18,706) | (19,321) | (19,759) |
| Gain on retirement of debt | 534,015 | - | - | - | - | - |
| Restructuring Professional Fees | (25,663) | - | - | - | - | - |
| Corporate Overhead Allocation | 282 | 0 | (0) | 0 | - | (0) |
| TOTAL OTHER EXPENSES | 449,666 | (21,962) | (18,679) | (18,706) | (19,321) | (19,759) |
| (LOSS) INCOME BEFORE INCOME TAXES | 197,590 | 12,426 | 54,811 | 79,269 | 79,393 | 66,616 |
| (BENEFIT) PROVISION FOR INCOME TAXES | (27,262) | 6,128 | 23,351 | 33,312 | 33,359 | 28,133 |
| **NET (LOSS) INCOME** | **224,852** | **6,298** | **31,460** | **45,957** | **46,033** | **38,483** |
| **EBITDA (excl. Restructuring Prof. Fees)** | **60,157** | **81,104** | **115,933** | **137,480** | **138,676** | **127,404** |
| Monitoring Fees | 1,215 | - | - | - | - | - |
| **ADJUSTED EBITDA (excl. Restructuring Prof. Fees)** | **61,372** | **81,104** | **115,933** | **137,480** | **138,676** | **127,404** |
| EBITDA Margin | 17.6% | 21.2% | 25.2% | 27.1% | 27.6% | 27.6% |
| Capital Spend | 17,401 | 15,000 | 20,000 | 25,000 | 20,000 | 15,000 |

# DEBTORS' BALANCE SHEET

***Financial Statements - CONSOLIDATED***

*US$ Thousands*

*Unaudited - Not in Accordance with GAAP*

| | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 |
|---|---|---|---|---|---|---|
| **BALANCE SHEET** | | | | | | |
| **ASSETS** | | | | | | |
| **CURRENT ASSETS** | | | | | | |
| Cash and cash equivalents | 31,689 | 55,653 | 99,111 | 152,707 | 221,584 | 286,361 |
| Accounts receivable, net | 80,296 | 92,415 | 105,473 | 112,744 | 104,310 | 99,936 |
| Cost and estimated earnings in excess of billings on uncompleted work | 1,701 | 1,701 | 1,701 | 1,701 | 1,701 | 1,701 |
| Inventory | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 |
| Prepaid Expenses | 10,922 | 11,492 | 12,838 | 13,633 | 13,545 | 12,860 |
| Deferred tax assets | 7,066 | 7,066 | 7,066 | 7,066 | 7,066 | 7,066 |
| **TOTAL CURRENT ASSETS** | **133,547** | **170,200** | **228,063** | **289,724** | **350,079** | **409,798** |
| PROPERTY, PLANT AND EQUIPMENT, net | 372,088 | 343,060 | 324,393 | 312,262 | 294,704 | 271,142 |
| GOODWILL | 137,942 | 137,942 | 137,942 | 137,942 | 137,942 | 137,942 |
| LOANS TO OFFICERS FOR AMORTIZATION | - | 2,000 | 2,500 | 2,750 | 2,875 | 2,774 |
| INTANGIBLE / DEFERRED TAXES AND OTHER ASSETS, net | 10,249 | 4,474 | 1,683 | 1,058 | 529 | - |
| **TOTAL ASSETS** | **653,827** | **657,676** | **694,581** | **743,737** | **786,130** | **821,656** |
| **LIABILITIES AND PARTNERS' CAPITAL** | | | | | | |
| **CURRENT LIABILITIES** | | | | | | |
| Accounts payable - trade | 18,108 | 20,147 | 22,420 | 23,661 | 21,629 | 20,484 |
| Distribution Payable | - | - | - | - | - | - |
| Accrued expenses | 25,258 | 29,420 | 33,544 | 36,105 | 33,462 | 30,608 |
| Derivative financial instruments | - | - | - | - | - | - |
| Current portion of long-term debt and notes payable | 964 | 750 | 750 | 750 | 750 | 750 |
| Current portion of obligations under capital leases | - | - | - | - | - | - |
| **TOTAL CURRENT LIABILITIES** | **44,330** | **50,317** | **56,714** | **60,516** | **55,841** | **51,842** |
| Intercompany - Liabilities Subject to Compromise | - | - | - | - | - | - |
| Third Party - Liabilities Subject to Compromise | - | - | - | - | - | - |
| **LIABILITIES SUBJECT TO COMPROMISE** | **-** | **-** | **-** | **-** | **-** | **-** |
| LONG-TERM DEBT AND NOTES PAYABLE, net of current portion | 214,209 | 205,959 | 205,209 | 204,459 | 203,709 | 202,959 |
| OBLIGATIONS UNDER CAPITAL LEASES, net of current portion | - | - | - | - | - | - |
| ASSET RETIREMENT OBLIGATIONS | 931 | 1,003 | 1,080 | 1,163 | 1,253 | 1,350 |
| DEFERRED RENT | 1,627 | 1,369 | 1,090 | 1,155 | 2,849 | 4,544 |
| DERIVATIVE FINANCIAL INSTRUMENTS | - | - | - | - | - | - |
| DEFERRED TAX LIABILITIES | - | - | - | - | - | - |
| **TOTAL LIABILITIES** | **261,097** | **258,648** | **264,093** | **267,292** | **263,652** | **260,695** |
| COMMITMENTS AND CONTINGENCIES | - | - | - | - | - | - |
| PARTNERS' CAPITAL | 392,730 | 399,028 | 430,488 | 476,445 | 522,478 | 560,961 |
| **TOTAL LIABILITIES AND PARTNERS' CAPITAL** | **653,827** | **657,676** | **694,581** | **743,737** | **786,130** | **821,656** |

# DEBTORS' STATEMENT OF CASH FLOW

*Financial Statements - CONSOLIDATED*

US$ Thousands

*Unaudited - Not in Accordance with GAAP*

| | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 |
|---|---|---|---|---|---|---|
| **STATEMENT OF CASH FLOWS** | | | | | | |
| CASH FLOW FROM OPERATING ACTIVITIES | | | | | | |
| Net (loss) income | 224,852 | 6,298 | 31,460 | 45,957 | 46,033 | 38,483 |
| Adjustments to reconcile net (loss) income to net cash | | | | | | |
| provided by (used in) operating activities: | | | | | | |
| Depreciation and amortization | 65,062 | 46,716 | 40,943 | 37,756 | 38,088 | 39,091 |
| Amortization of debt issuance costs | 13,450 | 3,088 | 515 | - | - | - |
| Amortization of discount | 3,583 | - | - | - | - | - |
| Accretion of asset retirement obligations expense | 67 | 71 | 77 | 83 | 90 | 97 |
| Interest income on notes receivable - officers | - | - | - | - | - | - |
| Loss on impairment of goodwill / other assets | 244,723 | - | 1,500 | 1,750 | 1,875 | 1,938 |
| Loss on disposal of property, plant and equipment | 2,448 | - | - | - | - | - |
| Officer Loan Amortization | | (2,000) | (2,000) | (2,000) | (2,000) | (1,836) |
| Gain on retirement of debt | (515,000) | - | - | - | - | - |
| Deferred tax expense (benefit) | (26,687) | - | - | - | - | - |
| Bad debt expense | (70) | - | - | - | - | - |
| Other | 2,936 | - | - | - | - | - |
| | 15,364 | 54,173 | 72,495 | 83,545 | 84,086 | 77,773 |
| Changes in assets and liabilities, net of acquired | | | | | | |
| assets and liabilities: | | | | | | |
| Decrease (increase) in accounts receivable | 56,341 | (12,119) | (13,058) | (7,272) | 8,434 | 4,373 |
| Decrease (increase) in Cost and estimated earnings in excess of billings on uncompleted work | 974 | - | - | - | - | - |
| Decrease (increase) in inventory | 1,753 | - | - | - | - | - |
| Decrease (increase) in prepaid expenses and other assets | (7,324) | (827) | (1,626) | (730) | 1,782 | 2,380 |
| Increase (decrease) in accounts payable | (34,080) | 2,039 | 2,273 | 1,241 | (2,032) | (1,145) |
| Increase (decrease) in accrued expenses | (19,948) | 4,163 | 4,124 | 2,561 | (2,643) | (2,854) |
| **NET CASH PROVIDED BY OPERATING ACTIVITIES** | **13,081** | **47,428** | **64,208** | **79,345** | **89,627** | **80,527** |
| CASH FLOW FROM INVESTING ACTIVITIES | | | | | | |
| Cash paid for acquisitions, net of cash received | (388) | - | - | - | - | - |
| Cash paid for acquisition costs | 2 | - | - | - | - | - |
| Cash paid for property, plant and equipment | (17,400) | (15,000) | (20,000) | (25,000) | (20,000) | (15,000) |
| Proceeds received for disposal of property, plant and equipment | 1,894 | - | - | - | - | - |
| (Increase) decrease of notes receivable - officers | - | - | - | - | - | - |
| **NET CASH USED IN INVESTING ACTIVITIES** | **(15,892)** | **(15,000)** | **(20,000)** | **(25,000)** | **(20,000)** | **(15,000)** |
| CASH FLOW FROM FINANCING ACTIVITIES | | | | | | |
| Partners' capital contribution, net | - | - | - | - | - | - |
| Distribution to partners | - | - | - | - | - | - |
| Payments of long-term debt | - | (7,500) | - | - | - | - |
| Payments of long-term debt | (26,705) | (964) | (750) | (750) | (750) | (750) |
| Proceeds from line of credit, net | - | - | - | - | - | - |
| Payments for debt issuance costs | - | - | - | - | - | - |
| Payments for debt discount | - | - | - | - | - | - |
| Payments of obligations under capital leases | (96) | - | - | - | - | - |
| **NET CASH PROVIDED BY FINANCING ACTIVITIES** | **(26,801)** | **(8,464)** | **(750)** | **(750)** | **(750)** | **(750)** |
| **NET INCREASE IN CASH AND CASH EQUIVALENTS** | **(29,613)** | **23,964** | **43,458** | **53,595** | **68,877** | **64,777** |
| **CASH AND CASH EQUIVALENTS, beginning of year** | **61,302** | **31,689** | **55,653** | **99,111** | **152,707** | **221,584** |
| **CASH AND CASH EQUIVALENTS, end of year** | **31,689** | **55,653** | **99,111** | **152,707** | **221,584** | **286,361** |

# DEBTORS' PRO FORMA BALANCE SHEET ADJUSTMENTS

## *Financial Statements - Consolidated*

*US$ Thousands*

*Unaudited - Not in Accordance with GAAP*

| BALANCE SHEET | Projected 12/31/09E (Unaudited) | Fresh Start & Recap Adj. (Unaudited) | Pro Forma 12/31/09E (Unaudited) |
|---|---|---|---|
| **ASSETS** | | | |
| **CURRENT ASSETS** | | | |
| Cash and cash equivalents | 80,133 | (48,444) | 31,689 |
| Accounts receivable, net | 80,296 | - | 80,296 |
| Cost and estimated earnings in excess of billings on uncompleted work | 1,701 | - | 1,701 |
| Inventory | 1,873 | - | 1,873 |
| Prepaid Expenses | 10,922 | - | 10,922 |
| Deferred tax assets | 7,066 | - | 7,066 |
| **TOTAL CURRENT ASSETS** | **181,991** | **(48,444)** | **133,547** |
| PROPERTY, PLANT AND EQUIPMENT, net | 372,088 | - | 372,088 |
| GOODWILL | 35,721 | 102,221 | 137,942 |
| LOANS TO OFFICERS FOR AMORTIZATION | - | - | - |
| INTANGIBLE / DEFERRED TAXES AND OTHER ASSETS, net | 6,647 | 3,602 | 10,249 |
| **TOTAL ASSETS** | **596,447** | **57,380** | **653,827** |
| **LIABILITIES AND PARTNERS' CAPITAL** | | | |
| **CURRENT LIABILITIES** | | | |
| Accounts payable - trade | 18,108 | - | 18,108 |
| Distribution Payable | - | - | - |
| Accrued expenses | 25,258 | - | 25,258 |
| Derivative financial instruments | 3,444 | (3,444) | - |
| Current portion of long-term debt and notes payable | 240,173 | (239,209) | 964 |
| Current portion of obligations under capital leases | - | - | - |
| **TOTAL CURRENT LIABILITIES** | **286,982** | **(242,653)** | **44,330** |
| Intercompany - Liabilities Subject to Compromise | - | - | - |
| Third Party - Liabilities Subject to Compromise | 547,197 | (547,197) | - |
| **LIABILITIES SUBJECT TO COMPROMISE** | **547,197** | **(547,197)** | **-** |
| LONG-TERM DEBT AND NOTES PAYABLE, net of current portion | - | 214,209 | 214,209 |
| OBLIGATIONS UNDER CAPITAL LEASES, net of current portion | - | - | - |
| ASSET RETIREMENT OBLIGATIONS | 931 | - | 931 |
| DEFERRED RENT | 1,627 | - | 1,627 |
| DERIVATIVE FINANCIAL INSTRUMENTS | - | - | - |
| DEFERRED TAX LIABILITIES | - | - | - |
| **TOTAL LIABILITIES** | **836,737** | **(575,641)** | **261,097** |
| COMMITMENTS AND CONTINGENCIES | - | - | - |
| PARTNERS' CAPITAL | (240,290) | 633,020 | 392,730 |
| **TOTAL LIABILITIES AND PARTNERS' CAPITAL** | **596,447** | **57,380** | **653,827** |